1  MICHAEL BLUMENTHAL (PHV)
   mike@mmblumenthal.com
2  MILTON M. BLUMENTHAL & ASSOC.
   Attorneys at Law
3  105 West Madison St., Suite 1004
   Chicago, IL 60602
4  Telephone:    (312) 372-3566
   Facsimile:    (312) 372-3573
5
   JOHN C. KIRKE, #175055
6  jkirke@donahue.com
   JASON M. FLOM, #287904
7  jflom@donahue.com
   DONAHUE FITZGERALD LLP
8  Attorneys at Law
   1999 Harrison Street, 25th Floor
9  Oakland, California 94612-3520
   Telephone:    (510) 451-3300
10 Facsimile:    (510) 451-1527

11 Attorneys for Plaintiff
   UNITED TACTICAL SYSTEMS, LLC,
12
                    UNITED STATES DISTRICT COURT
13
                  NORTHERN DISTRICT OF CALIFORNIA
14

15
   UNITED TACTICAL SYSTEMS, LLC, a        CASE NO. 3:14-CV-04050-MEJ
16 Delaware company,
                                          **PLAINTIFF'S REPLY IN SUPPORT OF**
17              Plaintiff,                **PLAINTIFF'S MOTION FOR ORDER TO**
                                          **SHOW CAUSE REGARDING**
18       v.                               **PRELIMINARY INJUNCTION**

19 REAL ACTION PAINTBALL, INC., a         Date:      November 13, 2014
   California corporation, and K.T. TRAN, Time:      10:00 am
20 individually                           Ctrm:      B - 15th Floor
                                          Judge:     Hon. Maria-Elena James
21              Defendants.

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 3

ARGUMENT ...................................................................................................................... 9

I.     THE RULES OF EVIDENCE ARE RELAXED AND DISCOVERY IS OFTEN LIMITED IN THE PRELIMINARY INJUNCTION CONTEXT ........... 9

II.    UTS APPROPRIATELY PRESENTED EVIDENCE BY ITS REQUEST FOR JUDICIAL NOTICE ...................................................................... 10

III.   DEFENDANTS FAIL TO REFUTE UTS' SHOWING OF A LIKELIHOOD OF SUCCESS ON THE MERITS ................................................ 11

     A.    Defendants Have Failed To Refute UTS's Evidence Showing Not Only A Likelihood Of Success On Its Trademark Infringement Claim, But That Defendants Willfully Infringed ........................................ 11

     B.    Defendants Defenses Are "Without Merit." ................................................ 12

          1.    Defendants' Used The PEPPERBALL Mark To Describe The Nature Of Their Products, Not Merely To Refer To The Corporate Name Of A Competitor ................................................. 12

          2.    Defendants' Argument That PEPPERBALL Was Not Used On Defendants' Projectiles Is Irrelevant ...................................... 12

          3.    PEPPERBALL Is Not A Generic Trademark .............................. 13

          4.    The Nominative Fair Use Doctrine Is Inapplicable ..................... 14

     C.    Defendants Cannot Deny Their Use Of A Counterfeit Mark In Connection With The Offering For Sale And Distribution Of Their Products ................................................................................................ 15

     D.    Defendant Cannot Disprove The Evidence That Supports Each Element Of UTS's Deceptive Comparative Advertising Claim ............... 16

     E.    Defendants Fail To Rebut UTS's Showing Of A Likelihood Of Success On Its False Advertising Claim And Unfair Competition Claims ................................................................................................... 17

     F.    Defendants Fail To Rebut UTS's Showing Of A Likelihood Of Success On Its Trade Dress Claim ........................................................... 18

     G.    Defendants Ignore UTS's Evidence Of The Fame Of The PEPPERBALL Mark In Its Response To The Trademark Dilution Claim ..................................................................................................... 20

     H.    UTS Presented Evidence Of Confidentiality And Ownership Of Its Trade Secrets ........................................................................................ 21

IV.   DEFENDANTS FAIL TO REBUT UTS'S EVIDENCE OF IRREPARABLE HARM ............................................................................ 22

V.    DEFENDANTS DO NOT REFUTE THAT THE BALANCING OF THE EQUITIES WEIGHS IN UTS'S FAVOR ..................................................... 23

**TABLE OF CONTENTS**
(continued)

Page

VI.     INFRINGEMENT OF IP RIGHTS AND THE INDISCRIMINATE SALE OF POTENTIALLY LETHAL PRODUCTS ARE NEVER IN THE PUBLIC INTEREST ................................................................ 24

VII.    THE REQUESTED INJUNCTION IS NOT OVERBROAD ............................ 25

VIII.   NO MORE THAN A $10,000 BOND IS WARRANTED ................................. 27

CONCLUSION ................................................................................................................ 29

# TABLE OF AUTHORITIES

**Page**

CASES

*American LegalNet, Inc. v. Davis*,
673 F.Supp.2d 1063 (C.D. Cal. 2009) ................................................................ 10

*Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*,
457 F.3d 1062 (9th Cir. 2006) ............................................................................ 17

*Brocade Communications Systems, Inc. v. A10 Networks, Inc.*,
873 F.Supp.2d 1192 (N.D. Cal. 2012) ................................................................ 21

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
174 F.3d 1036 (9th Cir. 1999) ............................................................................ 12

*Cairns v. Franklin Mint Co.*,
*24 F. Supp. 2d 1013 (C.D. Cal. 1998)* .............................................................. 17

*Central Valley General Hosp. v. Smith*,
75 Cal. Rptr. 3d 771 (2008) ................................................................................ 21

*Century 21 Real Estate Corp. v. Sandlin*,
846 F.2d 1175 (9th Cir. 1988) ............................................................................ 25

*Cleary v. News Corp.*,
30 F.3d 1255 (9th Cir. 1994) ........................................................................ 17, 18

*Creative Computing v. Getloaded.com LLC*,
386 F. 3d 930 (9th Cir. 2004) ............................................................................ 25

*Dimension Data N. Am. v. NetStar–1, Inc.*,
226 F.R.D. 528 (E.D.N.C.2005) ........................................................................ 10

*Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*,
158 F.3d 1002 (9th Cir. 1998) ............................................................................ 19

*Dwyer Instruments, Inc. v. Sensocon, Inc.*,
873 F.Supp.2d 1015 (N.D. Ind. 2012) ................................................................ 12

*Flynt Distributing Co., Inc. v. Harvey*,
734 F.2d 1389 (9th Cir. 1984) .............................................................................. 9

*Fuddruckers, Inc. v. Doc's BR Others, Inc.*,
826 F.2d 837 (9th Cir. 1987) ........................................................................ 17, 18

*Kendall-Jackson Winery v. E. & J. Gallo Winery*,
150 F.3d 1042 (9th Cir. 1998) ............................................................................ 18

-iii-

## TABLE OF AUTHORITIES
### (continued)

Page

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
    408 F.3d 596 (9th Cir. 2005) ............................................................................. 13

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ............................................................................. 10

*Mallard Creek Industries, Inc. v. Morgan*,
    56 Cal.App.4th 426, 65 Cal.Rptr.2d 461 (1997) .......................................... 17, 18

*Medtronic, Inc. v. Benda*,
    689 F.2d 645 ....................................................................................................... 27

*New Kids on the Block v. News Am. Publ'g, Inc.*,
    971 F.2d 302 (9th Cir. 1992) ............................................................................. 14

*Nordstrom, Inc. v. NoMoreRack Retail Grp., Inc.*,
    Case No. C12-1853-RSM (W.D. Wash. March 25, 2013) ...................................... 9

*Novelty, Inc. v. Mountain View Marketing Inc.*,
    No. 1:07-CV-1229, 2010 WL 1490416 (S.D. Ind. Apr. 12, 2010) ..................... 4, 9

*PepsiCo, Inc. v. California Security Cans*,
    238 F.Supp.2d 1172 (C.D. Cal. 2002) ................................................................ 16

*Philip Morris USA Inc. v. Liu*,
    489 F. Supp. 2d 1119 (C.D. Cal. 2007) ......................................................... 17, 18

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*,
    793 F.2d 1132 (9th Cir. 1986) ........................................................................... 26

*Rosen Entm't Sys., LP v. Icon Enters, Inc.*,
    359 F.Supp.2d 902 (C.D. Cal. 2005) .................................................................... 9

*Rosenbloom v. Pyott*,
    765 F.3d 1137 (9th Cir. 2014) ........................................................................... 11

*Roulo v. Russ Berrie & Co., Inc.*,
    886 F. 2d 931 (7th Cir. 1989) ........................................................................... 20

*Scandia Down Corp. v. Euroquilt, Inc.*,
    772 F.2d 1423 (7th Cir. 1985) ........................................................................... 25

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) ........................................................................... 17

# TABLE OF AUTHORITIES
### (continued)

Page

*State of Idaho Potato Comm'n v. G&T Terminal Packaging, Inc.*,
    425 F.3d 708 (9th Cir. 2005).................................................................. 15

*SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*,
    846 F.Supp.2d 1063 (2012)............................................................ 11, 13

*Taylor v. Charter Medical Corp.*,
    162 F.3d 827 (5th Cir. 1998)................................................................. 10

*Ticketmaster L.L.C. v. RMG Technologies*,
    507 F.Supp.2d 1096 (C.D. Cal. 2007) ..................................................... 9

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
    610 F.3d 1171 (2010)................................................................... 14, 15

*TrafficSchool.com v. Edriver Inc.*,
    653 F.3d 820 (9th Cir. 2011)................................................................. 28

*U.S. v. 10,510 Packaged Computer Towers, More or Less*,
    152 F.Supp.2d 1189 (N.D. Cal. 2001) .................................................. 16

*Wyatt v. Terhune*,
    315 F.3d 1108 (9th Cir. 2003)............................................................... 10

STATUTES

15 U.S.C. § 1116(d)(1)(A) .................................................................... 16

15 U.S.C. § 1116(d)(1)(B) .................................................................... 15

15 U.S.C. § 1125(a)(1)(A) .............................................................. 15, 16

15 U.S.C. § 1127 .......................................................................... 15, 20

2 J. McCarthy, Trademarks and Unfair Competition § 30:6........................ 26

Cal Civ. Code § 3426.4 ....................................................................... 28

Fed. R. Civ. P. 65(d) ...................................................................... 25, 27

Fed. R. Civ. P. 65(d)(2)(C) ................................................................. 27

Fed. R. Evid. 201(b)(2) ....................................................................... 10

Fed. R. Evid. 803(1)-(3)....................................................................... 11

**INTRODUCTION**

Plaintiff United Tactical Systems, LLC ("UTS") seeks a preliminary injunction similar to that already issued against Defendants Real Action Paintball, Inc. ("RAP") and K.T. Tran ("Tran") (collectively, "Defendants") enjoining Defendants from violating the rights of UTS's predecessor-in-interest Advanced Tactical Ordinance Systems, LLC ("ATO"), rights now owned by UTS. Although the injunction issued by the Indiana Court was recently vacated on jurisdictional grounds, the need to maintain the status quo that has existed in the irritant powder filled projectile market from the late 1990's through August 2012 remains unchanged. The need for a preliminary injunction ordering Defendants to adhere to the law is further demonstrated by Defendants' willful ignorance of the temporary restraining order as supported by the Indiana Court's explicit rejection of Defendants' selling of the Sun/APON projectiles after placing words or Defendants' logo on the shells of the quarantined projectiles. The Indiana Court made clear that it did not impose sanctions because it lacked "sufficient proof" that the projectiles Defendants modified were the quarantined projectiles or because it was of the mistaken impression that "PAVA" and/or "Less Lethal" somehow identified the Defendants as the source of the projectiles. Defendants prevented ATO from acquiring any such evidence by violating the TRO/PI's provisions allowing ATO to inspect and inventory the quarantined projectiles.

Defendants' Opposition merely repeats the same meritless arguments that the Indiana Court rejected, but adds a specious claim that UTS's motion relies on a flawed declaration and unauthenticated exhibits.[1] The Gibson declaration was not flawed, but even assuming *arguendo* it was, the supposed defect has been cured by the submission of another declaration by Gibson.

Further, as was the case in Indiana, Defendants constantly complain about the need for more discovery before any preliminary injunctive relief is granted. However, despite having had two years to conduct discovery, the Defendants have failed to uncover any evidence to support any of their claims or defenses – including their central assertion that APON manufactured

---

[1] Defendants never get more specific than to state "[t]he vast majority of UTS's other exhibits are also not authenticated." (Doc. 45, at 2.) Plaintiff authenticated every exhibit and provided more detail than the Defendants, who simply assert that an exhibit is accurate copy of a document. In any event, Defendants do not include any Objections to Evidence with their Opposition.

projectiles for PepperBall Technologies, Inc.[2] Further, Defendants not only continue to fail to inform this Court of exactly what discovery they need, but they fail to produce documents that are within their exclusive possession that are necessary to support their claimed harm.

The case law demonstrates that the rules of evidence are relaxed in the preliminary injunction context. In any event, UTS properly presented evidence through a Request for Judicial Notice and the Gibson and Piell Declarations. Precedent exists for the taking of judicial notice of another Court's findings of fact. Moreover, no dispute exists as to the evidentiary filings before the Indiana Court, which allows this Court to evaluate that evidence and give it the weight this Court deems appropriate. As for the Gibson declaration and the Defendants' claimed fatal flaw that it was executed before the sale of ATO's assets, the month "August" was typed in to the declaration as the declaration was expected to be filed in the month of August and Gibson only filled the actual date which was the 4th day of October. Out of an abundance of caution, Gibson has submitted a second declaration clarifying this and confirming his previous testimony, that the sale closed on August 8. (*See* Tab 106 ¶ 3.)

The Opposition fails to refute UTS's showing of a likelihood of success on the merits. Defendants incorrectly claim that PEPPERBALL is a generic trademark, ignoring the presumption of validity of a federal registration and presenting no evidence of genericide. The Opposition points to the use of the Pepperball Technologies, Inc. corporate name in an attempt to distinguish UTS's evidence of infringement under the *Sleekcraft* factors. This is a distinction without a difference, as Defendants used the PEPPERBALL trademark to create confusion as to the source of its products. Defendants do not refute UTS's evidence of trademark infringement. Defendants' nominative fair use argument fails, for each of the following independent reasons: (i) use of the PEPPERBALL mark is not necessary to identify Defendants' products, (ii) Defendants' took more of the PEPPERBALL mark than was necessary; and (iii) Defendants' used the PEPPERBALL mark in a manner likely to suggest sponsorship or endorsement of its

---

[2] Defendants sought to block the dismissal of APON in October 2012 because they claimed to need discovery from APON. (*See* Tab 107, at 2-3.) Despite recognizing the need for discovery, in the two years since, Defendants never sent APON a subpoena or sent APON a subpoena without disclosing this fact to Plaintiff and did not like the response. The latter is a very real possibility because Plaintiff did not learn about at least one subpoena sent in the Indiana case until Defendants submitted their bill of costs.

-2-

1  product by ATO/UTS. Defendants' arguments against trademark counterfeiting ignores that they

2  used an exact replica of the PEPPERBALL mark and color scheme in connection with the

3  offering for sale of goods.

4      Defendants do not disprove the extensive evidence presented by UTS of Defendants' false

5  advertising in their misrepresentation of the nature of their projectiles under both federal and state

6  law. The Opposition's attempts to claim that UTS's trade dress is functional fails, as Defendants

7  do not show that (i) UTS's color scheme yields a utilitarian advantage; (ii) alternate designs are

8  unavailable; (iii) UTS's advertising touts the utilitarian advantages of the design; and (iv) that

9  UTS's design results from a comparatively simple or inexpensive method of manufacture.

10  Defendants' abandonment arguments fail because they cannot show nonuse for three years or an

11  intent to abandon.

12      Defendants' used the PEPPERBALL mark in their announcements and emails and also in

13  metatags and hidden text on their website. Defendants simply ignore UTS's evidence of the fame

14  of the PEPPERBALL mark when dealing with the trademark dilution claim. Defendants likewise

15  ignore UTS's evidence of the confidentiality of its trade secrets and of their misappropriation.

16      The Opposition does not explain why UTS does not suffer irreparable harm from all these

17  wrongs, which strike at the heart of UTS' products and reputation. The Opposition also does not

18  demonstrate why the public is not harmed by Defendants' misleading assertions as to the source

19  or sponsorship of their products, particularly given the inconsistent performance and quality

20  issues of Defendants' projectiles

21      The requested injunction is narrowly tailored to protect UTS's rights and simply requires

22  Defendants to maintain the status quo and do what the law already requires. Given Defendants'

23  illegal conduct, already recognized by the Indiana Court, no more than a $10,000 bond is

24  warranted.

25  **<u>STATEMENT OF FACTS</u>**

26      UTS owns the Incontestable PEPPERBALL Trademark and is the Sole Manufacturer of

27  Authentic PepperBall[®] Projectiles. (*See* Tabs 3 & 106.) ATO owned and sold to UTS all of the

28  tangible and intangible property that PepperBall Technologies, Inc. ("PTI") had transferred to it

-3-

(*See id.* ¶¶ 3 & 9; Tab 108.) This transfer occurred by written assignment, UTS has recorded this assignment with the USPTO. (*See* Tab 109.)[3] The Simpson loan documents demonstrate that, when ATO purchased the Simpson loans, it gained the right to sell and/or assign the intellectual property at issue to itself. (*See* Tab 7 ¶¶ 2, 6(a) & 6(d).) Additionally, all of the secured creditors who were entitled to notice received notice, and no secured creditor has complained that they did not receive notice.[4] (*See* Tab 106, at 9.) Even if such a creditor had appeared, this would not result in a cancellation or voiding of the sale by which ATO/UTS acquired the intellectual property at issue, only that the secured creditor's lien would remain attached to the property. Nevertheless, Defendants re-assert in this Court an argument that has zero merit.[5] Additionally, UTS cited the self-serving Declaration of former co-Defendant Sun (Tab 97) not for the legal beliefs of a non-lawyer set out in paragraph 13 but for the admission that Sun believed there were no restrictions on his use of PTI/ATO/UTS's trade secrets. (*See* Doc. 27, at 27 (citing Tab 97 ¶¶ 24, 26 & 29).)[6] Finally, Defendants attempt to attack ATO's ownership of PTI's assets by vaguely claiming (without evidentiary support) that ATO acquired PTI's assets by shady means and for nefarious purposes. Contrary to Defendants' wild accusations, Gibson testified that he was contacted by Simpson (PTI's largest secured creditor) through Conrad Sun as PTI could not find investors or other buyers. (*See* Tab 6, at 60:4-61:9.) Accordingly, there is no "uncertainty surrounding ATO's acquisition of PTI's property."

---

[3] A quick search of the USPTO's online database reveals the inaccuracy of Defendants' counsel's claim that "it is impossible to know what 'property' ATO owned at that time, or indeed whether it owned any property at all." (*See* Tabs 108 & 109; Defs.' Response, at 12.)

[4] Although Defendants argue that the secured creditors were not notified, despite having had over two years to gather such evidence, they fail to identify a single creditor with liens against the property at issue who would be entitled to notice who did not receive notice.

[5] Defendants' entire "null and void" argument is based on a non-lawyer Defendants' "understanding" as to what the law provides. (*See* Tab 97 ¶ 13.) Although Sun never discloses where he got his "understanding" of California law from, it was likely from his attorney at the time (Paul Overhauser) who abandoned the theory when pressed. This is not the first time Defendants' counsel has sought to mislead a Court via an ambiguous declaration. *See Novelty, Inc. v. Mountain View Marketing Inc.*, No. 1:07-CV-1229, 2010 WL 1490416, at *2 (S.D. Ind. Apr. 12, 2010).

[6] Despite being a defendant in the Indiana action and a secured creditor, Sun never sought to vacate the sale or rescind the agreement between ATO and any of the secured creditors who received compensation from ATO in exchange for assigning their secured debt to ATO. This failure to act, and Sun's replacing Paul Overhauser as his counsel a week later, speaks volumes as to what Sun thought of the legal arguments Overhauser sought to advance via the Sun Declaration.

-4-

On August 8, 2014, UTS purchased the PepperBall® trademark and all tangible and intangible assets of ATO. (*See* Tab 2 ¶ 4 & Tab 106 ¶ 3.) ATO's claims against Defendants for their trademark infringement and other acts of unfair competition were included in the sale. (*See* Tab 106 ¶18 & Tab 109.)

In the two month period before the sale to ATO, ATO's owners ensured a seamless transition from PTI to ATO, which included retaining most employees, trainers, and suppliers. (*See* Tab 8, at 77:20-78:9.) Since the foreclosure ATO operated PTI under the same "PepperBall" trade name and provided the same quality service and product as PTI had provided. (*See* Tab 106 ¶ 19.) At no time has ATO or UTS concealed from the government or anyone else that there was a change in management. (*See* Tabs 106 ¶ 19; 110 ¶ 9; 111 ¶ 9.) Immediately following the acquisition of the PepperBall® assets by ATO and then UTS, the process of changing the registration with the government was implemented. (*See* Tabs 110 ¶ 10 & 111 ¶ 9.)

With respect to the Defendants' infringement, Plaintiff seeks to ban Defendants from selling all completely spherical irritant powder filled projectiles that are either: (1) all-red or half-red/half-black; or (2) manufactured using Plaintiff's technology or based on Plaintiff's shell or powder formula, recipe, or manufacturing equipment primarily for two reasons. First, Defendants have claimed *all* of their irritant powder filled projectiles are made on the machinery and/or by the manufacturer of projectiles for PepperBall Technologies, Inc. – which as already noted is demonstrably false. (*See* Tabs 26-28, 36, 106 ¶ 20, 110 ¶ 7 & 111 ¶ 7.) Second, when the Indiana Court amended the TRO *sua sponte* based on the misrepresentations advanced by the Defendants, the Court made clear that projectiles obtained from Conrad Sun were not to be sold. Defendants nevertheless decided to take those quarantined projectiles, add text describing the active ingredient and class of product but not identifying the source, and resumed selling the projectiles in direct violation of the Court's order. (*Compare* Tabs 47, at 2 & Tab 48, at 3-4 with Tab 67 & Tab 106 ¶ 20.) Given Defendants' past conduct and professed inability to understand Court orders, an injunction totally banning their sale of irritant powder filled projectiles would be appropriate. Here, UTS seeks much less. Defendants' refusal to refrain from selling infringing projectiles or projectiles specially manufactured to appear identical to UTS' projectiles or which

-5-

1  utilize stolen trade secrets is the choice they made. (*See* Doc. 27, at 35 ¶ (a).)

2       Finally, the Opposition contains numerous additional, easily verifiable, indisputable

3  factual misrepresentations that cast doubt on the veracity of Defendants and their counsel. First,

4  in an effort to claim a need to have the ability to use the PEPPERBALL mark, Defendants claim,

5  "Like most businesses, Real Action provides its customers with compatibility and comparative

6  information about its products, including projectiles." (Doc. 45, at 3 & Doc. 45-1 ¶ 7.) However,

7  a review of Defendants' website from before the preliminary injunction shows Defendant did not

8  provide compatibility information and did not use the term "PepperBall" to describe the

9  compatibility of its projectiles or launchers. (*See* Tabs 61, 111-113, 139.) Second, Defendants

10  falsely claim the need to use UTS's mark as they supposedly continue to sell genuine PepperBall®

11  products. (*See* Doc. 45, at 4 & Doc. 45-1 ¶ 9.) Defendants' own exhibits demonstrate that

12  Defendants no longer sell the HotShot® device, that the live refill cartridge has been discontinued

13  as well, and Defendants are eliminating their refill inventory. (*See* Defs.' Ex. 20-2 [Doc. 45-21]

14  (no mention of HotShot® device, only the refill cartridge); *see also* Tabs 114-115.) Further, not

15  only did Defendants' website *never* include "PepperBall" in the text of the HotShot® product

16  page, but Defendants blurred the PepperBall® logo that was on the device and used the HotShot®

17  mark without indicating it was a trademark or the mark's owner. (*See* Tabs 69-70, 114 & 116-

18  117.[7])

19       Third, Defendants continue to repeat their unsupported claim that "[n]on-party PTI

20  obtained its projectiles from two suppliers – Perfect Circle, Inc. of Lake Forest, Illinois ("PC")

21  and APON, which is in Mexico." (Defs.' Opp. [Doc. 45], at 4.) The only competent evidence

22  regarding this issue was introduced by ATO and that evidence was that APON merely assembled

23  projectiles – by hand – using parts provided to it by PTI. (*See* Tabs 106 ¶ 14; 12 at 82:7-21; 18 at

24  113:12-17.) Fourth, contrary to Defendants' claim, Defendants never used UTS's mark to sell

---

26  [7] Defendants proffer two reasons for why "PepperBall" is not visible on the picture of the HotShot® device
27  on Defendants' website. Plaintiff's offer the photo which was edited by the Defendants which shows that
the PepperBall logo was blurred by the Defendants. (*See* Tab 118.) A comparison of the two shows that
the texture of the handle is visible in both photos, but "PepperBall" is blurred in the photo on Defendants'
28  website. Additionally, Defendants cropped the top of the photo to conceal that "HotShot" was trademarked
by PTI.

SWAT projectiles. (*Compare* Defs.' Opp., at 4 & Doc. 45-1 ¶ 10 with Tabs 61, 112-113 & 120.) Fifth, Defendants blatantly misrepresent that "Real Action Paintball has never used the term PEPPERBALL to sell projectiles that were not originally purchased from PTI SWAT, and has not used the term PEPPERBALL to sell any projectiles in 2012 or later." (*See* Doc. 45, at 4-5 & Doc. 45-1 ¶ 10) UTS has provided numerous examples of Defendants using the term PEPPERBALL – with and without being followed by "Technologies, Inc" – and the Defendants have even attached one of these same exhibits to their opposition. (*See* Tabs 10, 26-28, 36 & Defs.' Ex. 19.) Sixth, Defendants' claim is demonstrably false that "[s]ince 2011, the only trademarks Real Action [Paintball] has used for its projectiles are LESS LETHAL LIVE AGENT ROUNDS and MAX PAYLOAD LIVE AGENT LESS LETHAL, which are sold in containers also bearing the mark RAP4." (*Compare* Doc. 45, at 5 & Doc. 45-1 ¶ 11 with Tabs 121-122 (showing no attempt to claim a trademark in either of the foregoing phrases but showing a claimed trademark in "Peppershot" being added in late 2013.) Seventh, ATO's counsel did not fly to California to serve either Defendant with the TRO in the Indiana action. (*Compare* Doc. 45, at 9 & Doc. 45-1 ¶ 12 with Tab 123 and Piell Decl. ¶ 5 (process was served by a third party process server, counsel was in California on another case, and Defendants refused counsel entry into the premises thus preventing counsel from taking the ordered inventory and instead Defendants provided an inventory they generated outside of any inventory tracking system.)

Eighth, even if APON manufactured projectiles, APON manufactured the projectiles in Mexico, so Perfect Circle was the only domestic manufacturer of spherical irritant powder filled projectiles. (*Compare* Doc. 45, at 4 with Doc. 45, at 6 (showing inconsistency in Defendants' Response brief).) Ninth, Defendants did not add a "slogan" to their projectiles to comply with a TRO and that "slogan" has not appeared on "all irritant projectiles sold by Real Action [Paintball] since early 2013. (*Compare* Defs.' Opp. [Doc. 45], at 10 & 26; Tran Decl. [Doc. 45-1] ¶ 14 with Tab 124.) Putting aside the fact that a slogan is "a distinctive cry, phrase, or motto of any party, group, manufacturer, or person; catchword or catch phrase;" the text Defendants' printed on some of their projectile's shells merely identifies the active ingredient (PAVA) and class of product (less lethal). (*See* Tab 106, ¶ 21.) Further, Defendants removal of the Sun/APON projectiles from

-7-

quarantine in an attempt to create a new trade dress was explicitly prohibited by the TRO and rejected by the Court. (*See* Tabs 47, at 2 and Tab 48, at 3-4.) Still further, Defendants' current website most prominently features projectiles with no slogan printed on them. (*See* Tab 124.)

Tenth, Defendants attempt to create the impression that Conrad Sun created a new projectile and/or irritant powder formula and that what was what Defendants were selling. (*See* Doc. 45, at 7.) To the contrary, the new formula that Polansky developed for Sun was not delivered to Sun until after Sun had delivered the projectiles at issue to Defendants. (*Compare* Tab 125 (all of the invoices produced by Defendants for APON projectiles showing last delivery was 8/15/12) with Tab 126 (Polansky report issued 9/14/12) and Tab 127-128 (Polansky did not test the manufacturability of formula or know its efficacy).) Eleventh, the Defendants falsely assert that "[t]he Accused Announcements Were on the Internet for Less than a Month." (Defs.' Opp., at 9.) UTS not only attached several of the "accused announcements" that are on the Internet even to this day, but ATO confronted Defendants about their failure to remove the "accused announcements" from Defendants' own website well after the TRO went into effect. (*See* Tab 36.)  These demonstrable facts establish Defendants' willful disregard of the truth. (*See* Tabs 89 & 90, at 356:20-369:24 (especially 368:1-13).) Twelfth, the projectiles received from Defendants' counsel were packaged by RAP4 (as evidenced by the tape around the bubble wrap), were packaged consistent with how projectiles were shipped to customers, and leaked like every other shipment Plaintiff received directly or through a consumer transaction. (*See* Defs.' Opp., at 5 & 11; Tab 16; & Tab 106 ¶¶ 12 & 15.)

Finally, with the exception of ATO's customer list Defendants received all of the discovery they were entitled to – including all e-mails and contact information for the customers who contacted ATO expressing confusion following Defendants' announcements.[8] Although the

---

[8] Unlike in Defendants' cited case (*Nordstrom, Inc. v. NoMoreRack Retail Grp., Inc.*, Case No. C12-1853-RSM (W.D. Wash. March 25, 2013)), UTS has presented evidence of actual confusion from known individuals who were/are ATO/UTS's customers, or Defendants' customers and suppliers. (*See* Tabs 10, 29-33 & 54-55.) UTS also presented evidence of Defendants perpetuating the confusion when customers called, so Defendants' infringement is not limited to their online postings. (*See* Tab 10, at 2.) Further, Defendants misrepresent to this Court that ATO did not comply with a substantial number of discovery orders. (*See* Defs.' Opp., at 14 n. 6 & 19 n.7) ATO only refused to produce its complete customer list, but produced the identities of the customers who had contacted Plaintiff in writing to express confusion resulting from Defendants' announcement. ATO produced these customer's information in response to

-8-

1  magistrate judge ordered the customer list produced, the District Court refused Defendants'

2  request to dismiss ATO's case or deny injunctive relief on all of ATO's claims in light of

3  Defendants' counsel's history of willfully violating protective orders. (*See* Tab 129, at 43:12-

4  44:19 (discussing events that occurred in *Novelty, Inc. v. Mountain View Marketing Inc.*, No.

5  1:07-CV-1229, 2010 WL 1490416 (S.D. Ind. Apr. 12, 2010)).)

6  **ARGUMENT**

7  **I.**  **THE RULES OF EVIDENCE ARE RELAXED AND DISCOVERY IS OFTEN
        LIMITED IN THE PRELIMINARY INJUNCTION CONTEXT.**

8

9  Defendants' complaint that Plaintiff failed properly to authenticate its exhibits is without

10  merit. "[I]n the preliminary injunction context, the Court is not strictly bound by all rules of

11  evidence." *Ticketmaster L.L.C. v. RMG Technologies*, 507 F.Supp.2d 1096, 1102 n. 2 (C.D. Cal.

12  2007) (citing *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).

13  "[D]istrict courts have the discretion 'to consider otherwise inadmissible evidence in ruling on the

14  merits of an application for a preliminary injunction.'" *Rosen Entm't Sys., LP v. Icon Enters, Inc.*,

15  359 F.Supp.2d 902, 904 (C.D. Cal. 2005) (citations omitted).

16  Defendants' claim that they should be allowed additional discovery also lacks merit.

17  Defendants' own precedent provides that "expedited discovery is not automatically granted

18  merely because a party seeks a preliminary injunction." *American LegalNet, Inc. v. Davis*, 673

19  F.Supp.2d 1063, 1066 (C.D. Cal. 2009). Further, the expedited discovery needs to be "narrowly

20  tailored to obtain information relevant to a preliminary injunction determination." *Id.* (quoting

21  *Dimension Data N. Am. v. NetStar–1, Inc.*, 226 F.R.D. 528, 532 (E.D.N.C.2005)).

22  Finally, as the Court has recognized, there is an urgency to issuance of a preliminary

23  injunction that should not be delayed by further discovery. (*See* Doc. 43 (denying Defendants'

24  time to conduct discovery prior to a hearing on this motion).) Defendants have not provided this

25  Court with any reason to change its original decision. Defendants can always later move to

26  dissolve any injunction issued should they claim to discover facts that support such a motion

27
28  Defendants' baseless allegation that ATO had fabricated evidence of actual confusion. Despite being provided with the complete contact information for this subset of customers, Defendants were unable to find any evidence that ATO manufactured evidence of confusion.

-9-

## II.   UTS APPROPRIATELY PRESENTED EVIDENCE BY ITS REQUEST FOR JUDICIAL NOTICE.

The facts upon which the Indiana Court based its issuance of a temporary restraining order and preliminary injunction, including declarations and testimony from six days of evidentiary hearings, are presented to the Court here. The only documents UTS sought to have this Court take judicial notice of were filed with the Courts and/or the USPTO, for facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." (Fed. R. Evid. 201(b)(2).) All three cases cited by Defendants support UTS's use of judicial notice of facts, including that the Indiana Court made certain findings of fact. In Defendants' first case, the District Court was reversed for failing to give proper notice regarding the use of findings of fact from another case, but reaffirmed that findings of fact could be judicial noticed if the underlying facts were introduced in the second action. *See Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir. 2003) Defendants' other cases only provide "a court may not take judicial notice of a fact that is 'subject to reasonable dispute.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *Taylor v. Charter Medical Corp.*, 162 F.3d 827, 830 (5th Cir. 1998). Finally, not only do Defendants fail to explain what fact Plaintiff has asked this Court to take judicial notice of that is "subject to reasonable dispute," but it should be apparent from the over 100 exhibits to UTS's motion that UTS is not relying on judicial notice as a substitute to presenting evidence.

While the Seventh Circuit ultimately found that the Indiana Court lacked personal jurisdiction over the Defendants and ordered the preliminary injunction to be vacated (which occurred on August 28, 2014), the Indiana Court's findings of fact and reasoning are still persuasive authority on which this Court can rely. *See Rosenbloom v. Pyott*, 765 F.3d 1137, 1154 n. 14 (9th Cir. 2014) ("decisions vacated for reasons unrelated to the merits may be considered for the persuasive of their reasoning.").

Contrary to Defendants' assertion, UTS is in no way claiming that this Court must rely on the Indiana Court's findings, but would note that Defendants fail to provide a reason for this Court to reinvent the wheel and witness for itself testimony from individuals the Indiana Court found to "lack credibility almost entirely." (Tab 1, at 3.) Even if the Court were disinclined to accept the

-10-

1  Indiana Court's findings of fact, UTS has properly presented to this Court the underlying evidence

2  presented to the Indiana Court, a fact not capable of dispute. This Court can always weigh such

3  evidence anew in ruling upon the instant motion.

4  **III.  DEFENDANTS FAIL TO REFUTE UTS' SHOWING OF A LIKELIHOOD OF SUCCESS ON THE MERITS.**

5

6  **A.  Defendants Have Failed To Refute UTS's Evidence Showing Not Only A Likelihood Of Success On Its Trademark Infringement Claim, But That Defendants Willfully Infringed.**

7

8  Plaintiff has demonstrated with competent evidence both elements of trademark

9  infringement (*i.e.*, "(1) that [plaintiff] has a protectible ownership interest in the mark; and (2) that

10  the defendant's use of the mark is likely to cause consumer confusion."). *SunEarth, Inc. v. Sun*

11  *Earth Solar Power Co., Ltd.*, 846 F.Supp.2d 1063, 1073 (2012)(citations omitted). The first

12  element has been demonstrated by the Gibson Declaration and written assignments recorded with

13  the USPTO. (*See* Tabs 2 ¶ 4, 106 ¶ 3, 108-109.) All Defendants offer in response to this evidence

14  is their conjecture and baseless assertions that the sale was suspicious. With respect to the second

15  element of trademark infringement, Defendants' Opposition fails to address that: (1) the

16  *Sleekcraft* factors, including the factor that an incontestable trademark is evidence of the mark's

17  strength; and (2) likelihood of confusion will be presumed when there is an intent to mislead.[9]

18  Instead, the Defendants ignore the fact that UTS's trademark was used in a manner calculated to

19  confuse the public, and instead focus on defenses that are without merit.

20  **B.  Defendants Defenses Are "Without Merit."**

21  **1.  Defendants' Used The PEPPERBALL Mark To Describe The Nature Of Their Products, Not Merely To Refer To The Corporate Name Of A Competitor.**

22

23  Defendants' argument against the application of the *Sleekcraft* factors relies upon a

24  distinction between PEPPERBALL as a mark and Pepperball Technologies, Inc. as a corporate

25  name. Under this reasoning, a competitor could essentially advertise that it is selling the same

26  Coca-Cola using the same formula made on the same equipment as Coca-Cola (despite the fact

27
28  [9] UTS would also note that the statements from ATO/UTS's customers, and Defendants' customers and suppliers, are permissible hearsay because they are being introduced for their effect on the declarant. (*See* Fed. R. Evid. 803(1)-(3).)

-11-

that this was not true) without committing trademark infringement. This argument by the Defendants is frivolous to the point of not needing to be further expounded upon.

> 2.    Defendants' Argument That PEPPERBALL Was Not Used On Defendants' Projectiles Is Irrelevant

The placing of the "PEPPERBALL" mark on Defendants' packaging or the projectiles themselves is irrelevant to a trademark infringement claim. All that is required is that the Defendants used the mark in a way likely to cause consumer confusion. Defendants' argument also ignores a case previously cited by UTS that explicitly discusses metatag infringement and the fact that use of another's trademark to attract a customer to one's store is actionable. *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1063-65 (9th Cir. 1999)). UTS has presented evidence that individuals searching for "PepperBall" will be directed to Defendants' website. (*See* Tab 130.) Further, the mere act of using another's trademark to draw the customer into the store is actionable, even if the customer realizes that the product being advertised is not the product being sold. *See Dwyer Instruments, Inc. v. Sensocon, Inc.*, 873 F.Supp.2d 1015, at 1032-33 (N.D. Ind. 2012) (citing Seventh and Ninth Circuit precedent regarding there being actionable infringement even if customers are not ultimately confused (*Brookfield Comm'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1064 (9th Cir.1999)))). Additionally, for a web based merchant such as these Defendants, their depiction of the product on their website is the packaging. Finally, trademark infringement occurs when the source – not the seller – of the product is misrepresented.

> 3.    PEPPERBALL Is Not A Generic Trademark.

Defendants merely gloss over the fact that Federal Trademark Registrations carry a presumption of validity and the registered owner's exclusive right to use in commerce. *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 846 F.Supp.2d 1063, 1074 (2012) (citations omitted). Defendants also ignore that UTS's PEPPERBALL mark is incontestable, which means that the mark is conclusively presumed to be non-descriptive (*i.e.*, the mark is at least suggestive, if not arbitrary or fanciful), or if the mark is descriptive that it has acquired secondary meaning without further proof. *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 606

-12-

(9th Cir. 2005). While an incontestable mark can be challenged as having become generic, the burden is on Defendants to prove the mark has become generic and they have failed to present any such evidence.

Defendants cite no precedent for their arguments that: (1) the public's misspelling of a trademark renders it generic;[10] (2) the public's or media's use of the trademark as occurred here renders it generic;[11] (3) one foreign manufacturer's use of the word "pepper balls" to describe their irritant powder filled projectile – in a nation where UTS does not have a trademark – makes Plaintiff's mark generic;[12] or (4) the manufacturer's use of the trademarked name of its product, followed by an accurate description of its product, in the manufacturer's training materials, makes the mark generic.[13] Given that PTI was the dominant if not the sole supplier of irritant powder filled projectiles, it is likely that law enforcement was using, and together with the public, was referring to ATO/UTS's product when discussing the tool used to subdue the perpetrators. Accordingly, Defendants' genericness defense has no evidentiary basis and was determined by the Indiana Court to be "without merit." (*See* Tab 1, at 12.)

---

[10] The fact is that (with one or two exceptions) all of the government documents cited by Defendants use the word "PepperBall" or "Pepper Ball." The capitalization of this term indicates that the author referred to a specific brand and not a class of product. The magistrate judge in the Indiana action ordered ATO's training materials to be produced on the trade dress issue of functionality in response to Sun's motion to compel. The magistrate judge rejected Defendants' argument that misspelling the PEPPERBALL mark was evidence of genericness.

[11] Despite having over two years to contact the authors of the articles Defendants rely on for evidence of generic use of "PepperBall" – something the Defendants could do without discovery being allowed by a Court – Defendants fail to present any evidence from the author of any of the 78 pages of articles and/or comments comprising Defendants' Exhibit 9 (Doc. 45-9) that they believed "pepperball" or "pepper ball" was the name of an entire class of products, as opposed to the name of ATO/UTS's product. This glaring deficiency in Defendants' argument was repeatedly pointed out in the Indiana action; therefore one can reasonably conclude that Defendants have either decided to rest on their conjecture and/or were unable to find any author who was willing to declare under oath that they were referring to a class of products.

[12] There is no evidence that Foray Security advertised in the United States, and as such UTS has no right or ability to prevent Foray Security from using the words "pepper balls." Further, Foray Security no longer exists, but Foray Security's successor, Premium Group represents itself as serving as an importer into South Africa. (*See* Tab 131.)

[13] The frivolous nature of Defendants' argument is demonstrated by substituting "FN 303" for "PepperBall" in Plaintiff's training materials. The definition offered for "PepperBall" applies equally to the "FN 303," but no rational person would argue that substituting "FN 303" for PepperBall would make "FN 303" generic.

-13-

4.      The Nominative Fair Use Doctrine Is Inapplicable.

Defendants used the PEPPERBALL mark to convey properties of their own products, not to refer to the products of UTS's predecessors in interest. The fact that Defendants deny this obvious fact and include only snippets of their infringing broadcast e-mails and web site postings should tell this Court all it needs to know about the merits of Defendants' defenses. Defendants' precedent is also inapplicable because that case involved the sale/brokering of authentic product. *See Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171 (2010) (brokers specializing in the sale of *authentic* Lexus automobiles could use Lexus trademark in domain name provided use did not suggest sponsorship of site by trademark owner). That said, Defendants fail to address the requirements of a nominative fair use defense because any discussion of the elements would have revealed the frivolous nature of Defendants' argument.

In order for the nominative use defense to apply, a defendant must demonstrate: (1) that its product was not reasonably identifiable without the plaintiff's mark; (2) that it used no more of the plaintiff's mark than was reasonably necessary; and (3) that it did not use the mark in a manner likely to suggest sponsorship or endorsement of its product by the plaintiff. *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992)

Taking the elements in order, Defendants cannot even meet the first element of the nominative use defense because they were capable of identifying their product without using UTS's mark. A review of Defendants' website prior to August 2012 demonstrates that they were capable of referring to their product (and indeed did refer to their product) without using the PEPPERBALL mark. (*See* Tabs 61, 113-114 & 120.) Further, Defendants even admitted they were capable of, and in fact did, sell their irritant powder filled projectiles without making reference to UTS's trademark. (*See* Tab 21, at 389:6-391:17.)

Regarding the second element, a review of Defendants' e-mails and posts demonstrates repeated use of UTS's trademark, including in Defendants' web page metatags and hidden text (*i.e.*, demonstrating that the use of the mark was designed to elevate Defendants' search ranking and not merely to describe or identify Defendants' product). The Ninth Circuit has made clear that in order for nominative use defense to apply, the mark cannot be used more than necessary.

-14-

*Toyota Motor Sales*, 610 F.3d at 1175-76. In the instant case, Defendants used UTS's mark repeatedly in plain text, hidden text, and metatags. (*See* Tabs 10, 26-28, 36, 59-60, 88, 90.)

Finally, with respect to the third element, Defendants' false claim that their projectiles were from the same manufacturer and same equipment that had produced for PTI was for the sole purpose of claiming that PTI would approve of Defendants' projectiles. Given that the Defendants fail to meet any of the three elements of a nominative fair use defense, UTS is likely to prevail.

### C.   Defendants Cannot Deny Their Use Of A Counterfeit Mark In Connection With The Offering For Sale And Distribution Of Their Products.

Defendants used the PEPPERBALL mark, which is identical to UTS's registered PEPPERBALL mark, so they used a "counterfeit mark" per 15 U.S.C. § 1127. Defendants used this mark in their advertising, which is a use "in connection with the . . . offering for sale . . . of goods." 15 U.S.C. § 1125(a)(1)(A). Defendants only response to Plaintiff's argument is to make two frivolous claims.

The first frivolous defense (which Defendants also incorrectly assert as a defense to trademark infringement and trademark dilution) is that PEPPERBALL had to be used "on the goods," when no such requirement exists for any of UTS's claims. (*See* Defs.' Opp., at 17, 20, 27.) This fact is confirmed by a review of the statutory section cited by Defendants (15 U.S.C. § 1116(d)(1)(B)) and Defendants' citation of *State of Idaho Potato Comm'n v. G&T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005) (third element of counterfeiting is use of the counterfeit mark "in connection with the sale, offering for sale, or distribution of goods.") The specific section cited by Defendants shows that not only is there no requirement that the mark be on the goods, but that counterfeiting occurs whenever a "counterfeit mark [is used] in connection with the sale, *offering for sale*, or distribution of goods *or services*." 15 U.S.C. § 1116(d)(1)(A) (emphasis added); *see also PepsiCo, Inc. v. California Security Cans*, 238 F.Supp.2d 1172, 1175-76 (C.D. Cal. 2002) (reciting elements of counterfeiting, none of which require use of the mark on the product).

The second frivolous claim is that Defendants did not use the PEPPERBALL mark, much

-15-

less use it in a way designed to confuse consumers regarding the "origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). The claim is frivolous for the reasons stated in § III.B.4 *supra*., but UTS would also note that "the inquiry into whether a mark is 'counterfeit' must be conducted 'from the standpoint of an average purchaser.'" *U.S. v. 10,510 Packaged Computer Towers, More or Less*, 152 F.Supp.2d 1189, 1198 (N.D. Cal. 2001).

### D. Defendant Cannot Disprove The Evidence That Supports Each Element Of UTS's Deceptive Comparative Advertising Claim.

Defendants' claim that Plaintiff has failed to establish four of the five elements of its deceptive comparative advertising claim are without merit. With respect to the first element, the Defendants simply pretend that their announcements are not discussing Defendants' product. (*See* Tabs 26-28 & 36.) Even the snippet Defendants included in their Opposition undermines their argument that their announcement does not discuss Defendants' product as it states "[n]ow we manufacture *our Less Lethal Live Rounds*."[14] (Defs.' Opp., at 20-21 (emphasis added).) Further, the only competent evidence regarding APON's role with PTI's projectiles has come from ATO/UTS, and that evidence shows APON merely assembled projectiles from parts supplied to it by PTI. (*See* Tabs 106 ¶ 20, 110 ¶ 7 & 111 ¶ 7.) Regarding the second and third elements, contrary to Defendants' assertion, the instant motion discussed the tendency to deceive and the materiality of the deception on pages 17-19 & 20 (respectively).[15] Defendants' refusal to acknowledge UTS's discussion of the second element is understandable as Defendants cannot refute the presumption of confusion that arises from their intent to mislead. *See Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1076 (9th Cir. 2006); *Southland Sod*

---

[14] Contrary to Defendants argument, since Defendants call all of their irritant powder filled projectiles sold by RAP4 "Less Lethal Live Rounds," and claim that all of these rounds are made by PTI's former manufacturer, all of Defendants irritant powder filled projectiles are accused of infringing.

[15] Defendant denies it claimed its projectiles were "superior." Although Defendants did not use the word "superior," they falsely claimed they had "improved the formula and process for making Less Lethal Live Rounds" (Tab 36), rounds which Defendants maintained had been made by PTI. (*See* Tab 26.) "Improved" in this context is synonymous with "superior." Defendants also claimed that RAP4 was marking its projectiles to "ensure [the customer that they] are receiving a high quality product," which implies that ATO/UTS's projectiles were not a high quality product. (*See* Tab 64.)

-16-

1   *Farms v. Stover Seed Co.*, 108 F.3d 1134, 1146 (9th Cir. 1997); *Fuddruckers, Inc. v. Doc's BR*

2   *Others, Inc.,* 826 F.2d 837, 845-46 (9th Cir. 1987). Defendants' claim that UTS was not harmed

3   ignores the fact that ATO assigned its claim to UTS, and Defendants have all but stated they plan

4   to resume their deceptive conduct by fighting the preliminary injunction. Finally, UTS discussed

5   the fifth element of this claim (damages and harm to goodwill) on pages 20-21 of its motion.

6   Therefore, UTS has presented evidence sufficient to show a likelihood of success on its false

7   advertising claim.

8          **E.      Defendants Fail To Rebut UTS's Showing Of A Likelihood Of Success On Its**
           **False Advertising Claim And Unfair Competition Claims.**
9

10         Where trademark infringement is established, a violation of California's False Advertising

11  Law and Unfair Competition Law has also been proven. See *Philip Morris USA Inc. v. Liu*, 489

12  F. Supp. 2d 1119, 1123 (C.D. Cal. 2007); *see also Cleary v. News Corp.*, 30 F.3d 1255, 1262–63

13  (9th Cir. 1994); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1037 (C.D. Cal. 1998);

14  *Mallard Creek Industries, Inc. v. Morgan*, 56 Cal.App.4th 426, 438, 65 Cal.Rptr.2d 461 (1997).

15  The overwhelming and undisputed evidence in this case demonstrates that Defendants

16  intentionally sought to deceive the consuming public regarding the source and quality of

17  Defendants' projectiles. Not only did the Defendants' use Plaintiff's trademark repeatedly in their

18  announcements and e-mails, but also in the metatags and hidden text. Tran, who was the driving

19  force behind Defendant RAP4's marketing of the infringing projectiles, admitted that he chose the

20  word "acquire" because it would cause confusion. (*See* Tab 53, at 937:14-942:7; *see also* Tabs 10,

21  29-33 & 54-55 (demonstrating confusion).) Defendants' Opposition implicitly concedes

22  Defendants' statement was false because "[t]he dictionary definition of "acquire" includes

23  "control," and Real Action [Paintball]'s Exclusive Dealing Agreement gave it the right to

24  purchase projectiles." (*See* Defs.' Opp., at 8.) The right/ability to purchase was not exclusive to

25  the Defendants but rather required Defendants to purchase from APON, and did not give

26  Defendants any control over APON.

27         Tran was also aware that his "clarification" announcement actually caused more confusion

28  but chose not to correct that confusion. (*See* Tab 56, at 999:3-1000:3.) Further, although Tran was

-17-

aware that PTI's assets had been sold to ATO, Tran chose to promote PTI's foreclosure in an effort to give legitimacy to Defendants' claims that they had gained access to the source of PepperBall® projectiles. (*See* Tab 132.) Given the presumption that an infringer who set out to confuse the public succeeded[16] and UTS's evidence from PTI's, ATO's and even Defendants' customers of such confusion,[17] UTS is likely to succeed on its trademark infringement, unfair competition, and false advertising claims.[18]

### F. Defendants Fail To Rebut UTS's Showing Of A Likelihood Of Success On Its Trade Dress Claim.

Defendants fail to: explain why red is supposedly a functional color; address their decision to copy UTS's entire color scheme for irritant powder projectiles, and refute that they consciously decided to choose PepperBall's colors. (*See* Tab 34.) In fact, immediately prior to acquiring the Sun/APON projectiles, the only irritant powder filled projectiles being sold by RAP4 were orange and white. (*See* Tab 133.) This undermines Defendants' unfounded claim that "[l]ive projectiles are generally made 'red' in color so the users can distinguish them from the other kinds." (*See* Doc. 45, at 24 & 45-1 ¶ 5.) Further, as noted in UTS's motion, Sun's only other customer had his live projectiles made in all sorts of color combinations, none of which included red. (*See* Doc. 27, at 22 & Tab 93.) Further, the most potent of the irritant powder filled projectiles Sun (the one with knowledge of the irritant powder filled projectile market) planned to make was entirely black. (*See* Tab 134.[19]) Finally, prior to ATO asserting a trade dress infringement claim, Defendants even produced another manufacturer's web page showing irritant powder filled projectiles that had clear shells. (*See* Tab 138.)

---

[16] *See Kendall-Jackson Winery v. E. & J. Gallo Winery*, 150 F.3d 1042, 1048 (9th Cir. 1998); *Fuddruckers*, 826 F.2d at 845-46.

[17] *See* Tabs 10, 29-33 & 54-55.

[18] "Proof of trademark infringement under the Lanham Act independently constitutes unfair competition under California law." *Philip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119, 1123 (C.D. Cal. 2007); *see also Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994); *Mallard Creek Industries, Inc. v. Morgan*, 56 Cal.App.4th 426, 438, 65 Cal.Rptr.2d 461 (1997).

[19] Defendants' assertion that their projectiles need to be red is undermined by the fact that their South African supplier (Duel) makes irritant powder filled projectiles that are dark purple/dark grey to the point they appear black (*See* Tab 135), and other manufacturers use green and yellow for their live rounds. (*See* Tabs 136 & 137.)

-18-

Defendants' legally unsupported and illogical argument is that PTI/ATO/UTS's color scheme is functional because PTI was first to market and/or is the dominant manufacturer. The test for functionality, which would prohibit enforcement of a trade dress claim, is "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, (4) and whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998). Defendants offer only their conjecture that red offers a utilitarian advantage as neither Sun nor Tran are in law enforcement or explain how they are familiar with law enforcement's practices In fact, in a high stress situation, law enforcement officers are likely going to look for an external indicator (*e.g.*, magazine color) to determine what kind of round is loaded. Defendants admit as much when they offer weapons with different color stocks, barrels, and magazines to differentiate their less lethal launcher from their firearm. (*See* Tab 139.) Additionally, the fact that SWAT, FN, and RAP4's Chinese supplier all used orange and yellow on their projectiles not only shows that red offers no utilitarian advantage, but that alternative designs are available. Further, there was no advertising touting UTS's color scheme and no evidence that it is cheaper to produce a red projectile than one in another color. Accordingly, Defendants have failed to prove any element of their defense that UTS's color scheme is functional. In reality, the only advantage red and red/black projectiles offer Defendants is it makes it easier for them to sell to departments already trained to use UTS's system,[20] and it makes it more believable that Defendants' projectiles are from the same source as PTI's. However, neither of these reasons are a basis for finding functionality or non-infringement.

Defendants' fallback defense is to claim abandonment; however, this defense has no more merit than the frivolous abandonment claim Defendants submitted to the USPTO. In order for there to be a presumption of abandonment, the trade dress has to have not been used for three

---

[20] Which is one of the reasons some customers specify that their live projectiles be red. Another reason is that until August 2012 red identified the brand the agency wanted as there was only irritant powder filled projectile sold in the United States that was red. Further, there are many shades of red, but Defendants chose to copy not only PepperBall's color scheme but shade as well because they were trying to pass themselves off as being from the same manufacturer, if not authentic PepperBall® projectiles. (*See* Tabs 34 & 132.)

years. 15 U.S.C. § 1127; *see also Roulo v. Russ Berrie & Co., Inc.*, 886 F. 2d 931, 938 (7th Cir. 1989) (applying § 1127 to trade dress). Defendants concede the evidence only shows that the all-red projectile has not been manufactured for "nearly two years," but completely ignore: (1) Defendants also copied PTI/ATO/UTS's half-red/half-black design which UTS actively manufacturers and sells; and (2) Gibson's testimony that it has not decided whether to discontinue making an all-red projectile permanently. (Defs.' Opp., at 26; *see also* Tab 140 and Tab 106 ¶ 22.)

**G.**   **Defendants Ignore UTS's Evidence Of The Fame Of The PEPPERBALL Mark In Its Response To The Trademark Dilution Claim.**

UTS's discussion of the fame of the PEPPERBALL mark – as defined by statute and case law – is set forth in its motion at pages 23-24 with the evidence to support those assertions set forth throughout the motion and in some cases provided by the Defendants' response.[21] Defendants' only response to this evidence was to pretend it does not exist. Therefore, UTS has nothing further to respond to on this claim.

The evidence in this case is abundant that Defendants in both of their e-mail blasts to all of the Defendants' customers, and in all of their various posting around the Internet, want the public to believe that ATO only obtained the name "PepperBall," but that Defendants had the goodwill (*i.e.*, access to the actual manufacturer of the PepperBall<sup>®</sup> projectiles prior to foreclosure on PTI). (*See* Tabs 26-28 & 36.) Although UTS has demonstrated Defendants' intent to confuse the public about *inter alia* the source, affiliation, and approval of Defendants' projectiles, and by their conduct and arguments indicated an intent to resume their unlawful conduct, UTS has demonstrated that it is entitled to a preliminary injunction on its each of its Lanham Act claims and claims brought under California's Unfair Competition and Fair Advertising laws.

---

[21] Millions of dollars and over a decade promoting PepperBall mark (Tab 99, at 251:25-252:5); the mark is used on goods sold throughout the world (Tab 15, at 533:16-18); and mark is registered and incontestable (Tab 3). Defendants even admit that the mark is well recognized as PTI's PepperBall rounds "are trusted by law enforcement and military units far and wide." (Defs.' Opp., at 7.)

**H.    UTS Presented Evidence Of Confidentiality And Ownership Of Its Trade Secrets.**

Defendants' ignore UTS's evidence of trade secret confidentiality and ownership. As previously noted, the Sun Declaration was not cited for Conrad Sun's beliefs as to what the law provides, but for Sun's admission that he felt that he was free to do as he wished with PTI's trade secrets. Given Sun's attitude, the fact that Defendants contracted for the receipt of information that was confidential provides a basis for concluding that they misappropriated trade secrets. Not only did the Defendants receive from Sun pricing that was marked confidential;[22] but Defendants also contracted for the receipt of market leads. (*See* Tabs 40 & 39 (respectively).) Given this contractual right, and Sun's interest in seeing Defendants sell as many projectiles as possible, Defendants ask this Court to believe Defendants did not ask for and/or receive a list Tran testified it would take him ten years to recreate. (*See* Tab 141 at 877:1-880:19.) Finally, if the foregoing were not enough, drafts of the RAP4-Sun agreement explicitly provided for Defendants to receive "new rounds developed by *PepperBall*, [Sun] or [RAP4]." (*See* Tab 142, at 1 (emphasis added to show intent to receive rounds and associated intellectual property that did not belong to Sun).) Given the foregoing, there is more than enough circumstantial evidence[23] to show that misappropriation likely occurred and "[a]ctual or threatened misappropriation may be enjoined." *Central Valley General Hosp. v. Smith*, 75 Cal. Rptr. 3d 771, 788 (2008).

Defendants' final argument that "UTS proffers no evidence that any third party ever agreed with UTS to keep any information confidential" is frivolous as well. (Defs.' Opp., at 27.) ATO purchased all of the tangible and intangible assets of PTI. (*See* Tab 106 ¶¶ 3 & 9.) Included with those assets were contracts between PTI and all of its employees which provided that the obligation of confidentiality was transferable and survived the termination of the agreement. (*See* Tab 143 ¶ 14.) When UTS purchased all of ATO's tangible and intangible assets, it purchased the

---

[22] Pricing is one of the types of information the Sun-RAP4 agreement made confidential. (*See* Tab 39, at 4 [RAP40118].) Therefore Defendants cannot credibly argue that when they asked for and received for pricing information from Sun, that Defendants did not know they were misappropriating trade secrets.

[23] Circumstantial evidence is sufficient to establish misappropriation. *See Brocade Communications Systems, Inc. v. A10 Networks, Inc.*, 873 F.Supp.2d 1192, 1212 (N.D. Cal. 2012).

1    right to confidentiality that ATO had obtained from PTI.

2    **IV.    DEFENDANTS FAIL TO REBUT UTS'S EVIDENCE OF IRREPARABLE HARM**

3          Rather than deal with the evidence of irreparable harm presented in Plaintiff's motion,

4    Defendants misrepresent that Plaintiff is not suffering any harm because Defendants' unlawful

5    actions supposedly occurred for only one month in 2012. (Defs.' Opp., at 9, 15-16, 23 & 28-29.)

6    Defendants' assertion is demonstrably false, as Plaintiff included in its motion a copy of

7    Defendants' "clarification," posted by Defendants, that is still on the Internet as of the filing of

8    this Reply. (*See* Tabs 27 & 144.[24]) That "clarification" clearly infringed ATO/UTS's trademark by

9    stating that "The Original [sic] Recipe [sic] and machinery to produce *pepperballs* was

10   aquisitioned [sic] by RAP4 and RAP4 is now able to manufacture the original *pepperball* under

11   the name of RAP4 Less Lethal." (*See* Tabs 27 & 28 (emphasis added to show reference to a

12   product and its origin and not a corporate name).) Defendants' misrepresentations were also not

13   promptly removed from Defendants' core marketing channels as Defendants left their misleading

14   "clarification" on their official blog and Facebook pages until late September 2012 and September

15   2013 respectively. (*See* Tabs 36 & 28 (respectively).)

16         Further, the Defendants have never corrected the misrepresentation made in their first

17   announcement which they compounded in their second (*i.e.*, that their projectiles come from the

18   same manufacturer and use the same machinery and recipe as PTI's respected projectiles). Long

19   before the Indiana Court's TRO and preliminary injunction terminated, Defendants had also

20   returned to advertising for sale irritant powder filled projectiles that are identical in color to

21   Plaintiff's established color scheme. (*See* Tabs 64 & 145.) Despite the Indiana Court explicitly

22   rejecting Defendants request to modify and sell the Sun projectiles, Defendants' attempt to excuse

23   their behavior by arguing that they decided printing "PAVA[TM] Less Lethal" on the projectile

24   modified the trade dress.[25] Contrary to Defendants' claims, those projectiles have been shipped to

25   _____

26   [24] This undercuts Trans testimony in the Indiana action that he wanted to remove offending posts upon
     being notified of them. (*See* Tab 90, at 363:24-364:5.) Further, the testimony/statement under oath in Tab
     90 not only demonstrates that Defendants will lie under oath, but also that they know their infringement of

27   UTS's trademark lasted far more than one month, and that Defendants did not undertake any serious effort
     to comply with the Indiana Court's TRO as the misleading page was an official post by RAP4 on RAP4's

28   official blog. (*See* Tabs 36, 27, 144.)

     [25] Although Defendants claim to have sold their projectiles under the trademarks "LESS LETHAL LIVE

     -22-

1  customers and have leaked. (*See* Tab 16.[26]) Finally, the Defendants have admitted that the only

2  reason they took down their "clarification" was to comply with the TRO issued by the Indiana

3  Court. Therefore, all the evidence points to the conclusion that in the absence of injunctive relief,

4  Defendants will return to making their misrepresentations. Both federal and California law favor

5  the imposition of injunctive relief to prevent the Defendants from resuming their smear campaign

6  of the Plaintiff.

7  **V.    DEFENDANTS DO NOT REFUTE THAT THE BALANCING OF THE EQUITIES**
        **WEIGHS IN UTS'S FAVOR.**

8

9  Although not binding on this Court, Defendants present no evidence that the Indiana

10  Court was incorrect in finding that balancing of equities is in UTS's predecessor's favor and do

11  not now lean in UTS's favor. The injunction was vacated purely on procedural grounds by

12  Seventh Circuit. (*See* Tab 50.)

13  Moreover, UTS is under no obligation to avoid or undo the asset purchase, and

14  Defendants' argument to this effect on this point is not just strange, it has zero legal or logical

15  support. The Defendants argue without citation to precedent that UTS is not entitled to injunctive

16  relief because it could have avoided the irreparable harm caused, and being caused by the

17  Defendants, by not purchasing ATO's assets. (Defs.' Opp., at 29-30.) The only conclusion that can

18  be drawn from the Defendants' argument is that an interloper has the right to extra-judicially seize

19  and/or diminish another's assets unless the owner accedes to the interloper's demands to enter a

20  business relationship on favorable terms to the interloper. Not only does the law not support this,

21  but UTS is fairly confident that many Mafioso were incarcerated for engaging in this type of

22

23  AGENT ROUNDS and MAX PAYLOAD LESS LETHAL ROUNDS," that is not what they chose to put
    on the projectiles or claim a trademark on (on their website or with the USPTO). (*Compare* Defs.' Opp. at

24  3 and Tran Decl. [Doc. 45-1] ¶¶ 8 & 11 with Tabs 61, 64, 114, 120-122 & 124 (only trademark ever
    claimed is for "peppershot" and this only began between September and November of 2013.) The only

25  other trademark Defendants tried to claim is for the acronym of the active ingredient in irritant powder
    filled projectiles. (*See* Tabs 121 & 106 ¶ 21.) Further, prior to Defendants' April 2012 deal with Sun,

26  Defendants did not offer more than one strength of projectile so Tran again dissembles when he claims
    "[t]he only trademarks Real Action [Paintball] has used since at least 2011 for its projectiles are LESS

27  LETHAL LIVE AGENT ROUNDS and MAX PAYLOAD LIVE AGENT LESS LETHAL..." (*See* Tran
    Decl. [Doc. 45-1] ¶ 11.)

28  [26] The projectiles shown in Tab 16 were shipped by Defendants to an agent of ATO. The agent who
    ordered these projectiles ordered the projectiles without disclosing he worked for ATO.

illegal conduct. Any other rule would discourage investment in a brand if the owner of the brand could be subject to extortion if they wanted to protect the value of the brand they built.

Regarding loss or injury, there was prior testimony that RAP4's projectiles leak and ATO's do not. That leakage occurred with every set of projectiles ATO received from the Defendants (either directly, through Defendants' counsel, or through a consumer purchase). Given that Defendants have falsely represented that their projectiles: (1) come from the manufacturer of the gold standard of irritant powder filled projectiles;[27] (2) are improved version of the projectiles made for PTI;[28] and (3) Defendants placed markings on the projectile's shell in order to differentiate their product from low quality competitors;[29] a consumer is likely to believe that lesser manufacturers' projectiles will also leak. This will result in purchasers foregoing irritant powder filled projectile systems and possibly less lethal solutions entirely.

## VI.  INFRINGEMENT OF IP RIGHTS AND THE INDISCRIMINATE SALE OF POTENTIALLY LETHAL PRODUCTS ARE NEVER IN THE PUBLIC INTEREST.

Defendants base their argument regarding the public interest on lawful competition, but the facts above demonstrate the illegality of Defendants' conduct. Illegal conduct is never in the public interest. Further, Defendants even admit that the products at issue are "primarily sold to law enforcement and military personnel" and are "typically non-lethal." (*See* Defs.' Opp., at 2.) Defendants' response memorandum fails to address – because Defendants cannot – Plaintiff's concern for the physical safety of both the police/military and public should the Defendants' product fail to work (*i.e.*, the failure of the less lethal option requires resorting to lethal force assuming the police/military personnel still have time to resort to their secondary weapon). Not only is the physical safety of the public at issue if police/military personnel will not use the less lethal option because of performance issues, but the public is fiscally injured when the government purchases equipment that will not be used. Finally, Defendants' sale of counterfeit product to the public at large is likely to drag UTS into litigation when untrained civilians injure

[27] *See* Tab 10, 26-28, 36, 144.

[28] *See* Tab 27-28, 36, 144.

[29] *See* Tab 64.

-24-

1  or kill someone through the misuses of a product UTS and its predecessors refused to sell to the

2  public. Further, contrary to Defendants' assertion, the less lethal projectiles sold by UTS and the

3  Defendants *are not* gelatinous paintballs, but frangible plastic spheres. (*Compare* Defs.' Opp., at

4  34 with Tab 64.) Defendants' projectiles' inconsistent weights will lead to erratic shots even when

5  fired by a trained professional; and as one of UTS's competitor's products has demonstrated, a

6  frangible plastic shell – even when fired by a trained professional – can be lethal. (*See* Tabs 18, at

7  110:20-111:11 & 12, at 84:22-85:18; & 146 respectively.)

8  **VII.  THE REQUESTED INJUNCTION IS NOT OVERBROAD**

9     Given that UTS is likely to prevail on its claims that Defendants intentionally engaged in:

10 trademark and trade dress infringement; false advertising; and other acts of unfair competition

11 regarding a competing product, a broad injunction is appropriate. *See Century 21 Real Estate*

12 *Corp. v. Sandlin*, 846 F.2d 1175, 1180-81 (9th Cir. 1988). That said, UTS narrowly tailored its

13 proposed injunction to address Defendants' concern that it could not manufacturer or sell a

14 projectile it claims to have developed (even though the projectile was not banned under the

15 injunctive relief granted by the Indiana Court). Given Defendants' false claim that it acquired the

16 equipment and was working with the manufacturer of PTI's projectiles, and that all of the

17 Defendants' less lethal rounds were produced using PTI's manufacturing resources, an injunction

18 barring the Defendants from manufacturing irritant powder filled projectiles using Plaintiff's

19 technology or based on Plaintiff's shell or powder formula, recipe or manufacturing equipment, or

20 selling completely spherical irritant powder filled projectiles that are either all red or half red/half

21 black is not unreasonable. Arguably, the injunction is too narrow given Defendants' history of

22 violating the orders entered by the Indiana Court. *See Creative Computing v. Getloaded.com LLC*,

23 386 F. 3d 930, 937 (9th Cir. 2004) (belligerent violation of injunction *inter alia* "justified an

24 especially aggressive prophylactic injunction"); *Scandia Down Corp. v. Euroquilt, Inc*., 772 F.2d

25 1423, 1432 (7th Cir. 1985) (prior violations of injunction allow Court greater latitude in

26 restricting even constitutional rights and "Rule 65(d) does not require a torrent of words when

27 more words would not produce more enlightenment about what is forbidden.").

28    Further, it is undisputed that both federal and California law allows for – and in cases such

1   as this – favors this Court enjoining Defendants' infringement and deceptive comparative

2   advertising. The Ninth Circuit, following the Supreme Court's lead, has held "a trademark

3   plaintiff 'entitled to relief, is entitled to effective relief; and any doubt in respect of the extent

4   thereof must be resolved in its favor as the innocent producer and against the [defendant], which

5   has shown by its conduct that it is not to be trusted.' [... and while the District] court was correct

6   in noting that cessation of the unlawful conduct can moot such a dispute, [] it failed to recognize

7   that 'the reform of the defendant must be irrefutably demonstrated and total.' 2 J. McCarthy,

8   Trademarks and Unfair Competition § 30:6, at 471 (2d ed. 1984)." *Polo Fashions, Inc. v. Dick*

9   *Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986).

10      Like the defendant in *Polo Fashions*, Defendants willfully violated and continue to violate

11  Plaintiffs' trademarks and refused to cease the infringement even after being so ordered by the

12  Court. *See id*. Further, Defendants have had two years to confirm that APON did not manufacture

13  projectiles for PTI and yet insist on continuing to misrepresent the nature of APON's projectiles.

14  Further, UTS has demonstrated that Defendants' interest in comparative advertising is not to

15  maintain the status quo, but to engage in initial interest confusion and elevated search engine

16  rankings. Accordingly, this Court can and should enjoin Defendants' use of UTS's trademark.[30]

17  The Ninth Circuit in *Polo Fashions* held it an abuse of discretion not to impose an injunction

18  under these circumstances. *See id.*, at 1136.

19      A trade secret injunction (a public document) is not required to set forth the trade secret.

20  Otherwise, the injunction would immediately become unenforceable because the trade secret

21  would not be a trade secret anymore. That said, the proposed injunction is narrowly tailored so

22  that Tran's professed inability to understand that he and RAP4 are banned from selling complete

23  spherical irritant powder filled projectiles and from manufacturing any completely spherical

24  projectiles filled with irritant causing powder that are either: (1) all-red or half-red/half-black; or

25  (2) manufactured using Plaintiff's technology or based on Plaintiff's shell or powder formula,

26

27  [30] Defendants' claim that the consuming public needs to be told that a .68 caliber projectile is compatible
    with a .68 caliber launcher is unpersuasive because this fact is obvious. This is why Defendants cannot

28  point to a single one of their product pages for launchers or spherical projectiles on which Defendants
    provided such compatibility information.

-26-

recipe, or manufacturing equipment is irrelevant. As for the injunction barring Defendants from "using or disseminating any information received from Conrad Sun regarding PepperBall Technologies, Inc.'s operations that are not public knowledge," not only were examples of the information covered by this paragraph given, but Tran's declaration essentially asserts that he has no idea what information was received from Conrad Sun. As for information Defendants received directly from Sun, Tran's assertion is ludicrous; but for information received from third parties, Defendants could always ask where the third party obtained the information about PTI.

Finally, the portion of the proposed injunction dealing with false statements is not vague. Any false statements about UTS, etc. are not allowed. If the Defendants feel compelled to issue statements about UTS, they can also confirm the accuracy of the statement with UTS. Defendants are not being sued for negligent misrepresentations, but because they intentionally sought to mislead the public about ATO and by extension UTS, and the availability of authentic PepperBall® projectiles from ATO and UTS. In fact, the only reason Defendants may not have known that all of the representations in Defendants' announcements were false is because they were willfully ignorant of the facts as a phone call to PepperBall Technologies' phone number would have revealed that PepperBall Technologies was alive and well, with the same suppliers and projectiles, but with new ownership and management. Given Defendants' history, the Plaintiff has described in reasonable detail the acts restrained and this is all that is required under Fed. R. Civ. P. 65(d)(2)(C). *See Medtronic, Inc. v. Benda*, 689 F.2d 645, 649 ("All that is required under Fed.R.Civ.P. 65(d) is for the language of the injunction to be as specific as possible under the totality of the circumstances, such that a reasonable person could understand what conduct is proscribed.").

## VIII.   NO MORE THAN A $10,000 BOND IS WARRANTED.

Most of Defendants' claimed $5.284MM bond is based on estimated attorney's fees through trial of $3.75 MM. This is based on median legal fees for a trademark infringement case "of this magnitude." (Defs.' Opp., at 37.) No evidence as to why that figure applies to this case has been presented, and UTS' counsel doubts that Defendants' counsel will be able "to churn the file" that much. Further, attorney's fees are only recoverable where there has been a

1  demonstration of bad faith by the party that obtained the injunction or in "exceptional" cases

2  involving infringement. *See TrafficSchool.com v. Edriver Inc.*, 653 F.3d 820, 831-32 (9th Cir.

3  2011); Cal Civ. Code § 3426.4.

4      Defendants get to their desired bond amount of $5.284MM only by adding another 20% to

5  the sum of Defendants' supposed lost profits and attorney's fees. Defendants provide no evidence

6  supporting that figure or any explanation as to how the attorney's fees have anything to do with

7  the amount necessary to rebuild goodwill – or that Defendants have repeat customers for their

8  counterfeit irritant powder filled projectiles. Defendants also provide no evidence beyond the

9  declaration of Tran (whose credibility has been shown lacking) to establish any of Defendants'

10  damages. Not only does Tran's declaration not provide this Court with any information regarding

11  how Tran determined Defendants' supposed damages, but Tran has changed his testimony

12  regarding the amount of harm supposedly caused to Defendants by the Indiana Court's TRO.

13  (*Compare* Tran Decl. ¶ 21 [Doc. 45-1] with Tab 100.)

14      Defendants do not provide this Court with tax returns, sales reports, Quickbooks reports,

15  or any records regarding the number of employees (misleading or otherwise) to substantiate their

16  claimed harm. Defendants also presented zero evidence to support their claim that irritant powder

17  filled projectiles drive other sales and the evidence from the period between the Defendants'

18  initial announcement and the entry of the TRO shows that Defendants' assertion is meritless.

19  (*Compare* Tran Decl. ¶ 21 [Doc. 45-1] with Tab 147.)

20      Given the Defendants provide this Court with even less evidence than they provided the

21  Indiana Court, there is no reason this Court should set a higher bond. This is especially true given

22  Defendants' reinforcement of the Indiana Court's finding that if Defendants are suffering

23  substantial damages, those damages are "of a self-imposed nature." (*See* Tab 1, at 16 n. 2; and

24  *compare* proposed injunction which only bars the manufacturing of "completely spherical

25  projectiles filled with irritant causing powder that are either: (1) all-red or half-red/half-black; or

26  (2) manufactured using Plaintiff's technology or based on Plaintiff's shell or powder formula,

27  recipe, or manufacturing equipment" with Tran's Decl. ¶ 17 (claiming that the proposed

28

-28-

1   injunction would prevent Defendants from "manufacturing projectiles.").[31])

2          Finally, Defendants do not respond to the argument that the Indiana Court did not increase

3   bond and that the illegality of Defendants' actions makes a bond beyond $10k excessive. The

4   Defendants' requested bond amount is nothing more than a transparent attempt to prevent UTS

5   from getting the injunctive relief to which it is entitled.

6                                    **CONCLUSION**

7          UTS has presented this Court with facts demonstrating that Defendants have engaged in

8   willful violations of the Lanham Act and California's Unfair Competition Law, False Advertising

9   Law, and Uniform Trade Secrets Act. Each of these laws favor injunctive relief because the

10  nature of the harm is irreparable due in no small part to the inability to quantify the damage

11  resulting from lost sales and goodwill. Some of the foregoing laws favor broad injunctive relief

12  given that the products at issue are directly competitive. In order to obtain injunctive relief, UTS

13  must show that it is likely to prevail on the merits or that there is a serious question going to the

14  merits and the other factors weigh heavily in UTS's favor. UTS is entitled to an injunction under

15  either standard as not only have the first two factors been met, but also the equities and the public

16  interest tilt heavily in UTS's favor.

17         Defendants' Opposition ignores the facts and the law presented by UTS – including the

18  overwhelming evidence of intent to mislead and intentional copying of Plaintiff's projectiles;

19  misrepresents the facts (even immaterial facts); cites to inapplicable precedent (where there is any

20  citation to precedent); fails to explain why this Court should reinvent the wheel and ignore

21  everything that occurred in the Indiana action; and claims a need for additional discovery without

22  providing this Court with the proposed discovery, an explanation of why it is necessary prior to

23  deciding the instant motion, and why it was not conducted during the Indiana litigation. In reality,

24  the Defendants do not need discovery and are merely using the need for discovery to protract this

---

[31] Defendants claim that manufacturing has nothing to do with their infringement of UTS's trademark. (Defs.' Opp., at 33.) If UTS were only pursuing a trademark infringement action, Defendant might be right, but UTS is pursuing Defendants for false advertising and misappropriation of trade secrets as well. Defendants claimed to have acquired PTI's equipment and recipes. Therefore, enjoining Defendants from manufacturing or disposing of their manufacturing equipment for irritant powder filled projectiles is not overbroad.

-29-

litigation and delay the injunctive relief to which UTS is entitled.

Dated: October 30, 2014

By: /s/ Michael Blumenthal

Michael L. Blumenthal
Attorneys for Plaintiff
UNITED TACTICAL SYSTEMS, LLC

-30-