UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED TACTICAL SYSTEMS, LLC,

Plaintiff,

v.

REAL ACTION PAINTBALL, INC., et al.,

Defendants.

Case No.  14-cv-04050-MEJ

**ORDER RE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 27

## I.    INTRODUCTION

On September 5, 2014, Plaintiff United Tactical Systems, LLC ("UTS") brought the instant against Defendants Real Action Paintball, Inc. ("RAP4") and K.T. Tran (collectively, "Defendants"), related to the trademark, PepperBall.  UTS now seeks a preliminary injunction enjoining Defendants from using the PepperBall name and mark during the pendency of this action.  Dkt. No. 27 ("Mot.").  Defendants oppose UTS's motion.  Dkt. No. 45.  Having considered the parties' positions, relevant legal authority, and the record in this case, the Court GRANTS IN PART and DENIES IN PART UTS's motion.

## II.    BACKGROUND

**A.    PepperBall Technologies and ATO**

Since at least the late 1990s, non-party PepperBall Technologies, Inc. sold irritant projectiles called PepperBalls.  Irritant projectiles are generally small plastic spheres that contain an irritant powder that functions similar to pepper spray, and are primarily sold to law enforcement and military.  Unlike pepper spray, an irritant projectile can be shot from a distance.  When an irritant projectile is shot at a person, it disintegrates upon impact creating an irritating but typically non-lethal plume of powder intended to disable the person.  PepperBall Technologies sold its

"live" PepperBall rounds in a red colored shell, indicating that the projectile contained the irritant powder, as well as other projectiles in different colors, such as green marking rounds, clear training rounds, etc. Defs.' Ex. 14.[1]

PepperBall Technologies was a dominant player in the irritant projectile market, and there is no dispute that its PepperBall mark became incontestable. PepperBall Technologies developed an irritant powder for its PepperBalls, which an outside manufacturer then assembled into plastic shells. One manufacturer was Perfect Circle, Inc., and according to its managing member, Gary Gibson, Perfect Circle made the majority of PepperBall Technologies' projectiles for nearly 14 years. More recently, PepperBall Technologies worked with a company called APON, located in Mexico, to assemble some of its PepperBall projectiles. The extent of APON and PepperBall Technologies' relationship is uncertain; it appears that PepperBall Technologies hired APON to assemble some PepperBall projectiles, but whether PepperBall Technologies ever sold those APON-manufactured projectiles is unclear.

Around 2010, PepperBall Technologies experienced monetary troubles, defaulting on loans. Perfect Circle and another company, Tiberius Arms, joined together to purchase PepperBall Technologies' loans, in the process forming a new company named Advanced Tactical Ordnance Systems, LLC ("ATO"). ATO did business as Phoenix International, Inc. On January 9, 2012, Phoenix International purchased "all the tangible and nontangible assets" of PepperBall Technologies at a Uniform Commercial Code sale in San Diego, California (the "UCC Sale" or "foreclosure sale"). Through this foreclosure, ATO allegedly acquired all of PepperBall Technologies' tangible and intangible property—including the incontestable PepperBall trademarks, goodwill, business name, and trade secrets.

In the two month period before the sale, UTS alleges that ATO's owners ensured a seamless transition with PepperBall Technologies, including retaining most employees, trainers, and suppliers. ATO operated PepperBall Technologies under the same trade name and was reachable by phone, e-mail, and via its website as PepperBall Technologies. Thus ATO, as

---

[1] The Court will refer to Defendants' exhibits attached to Dkt. No. 45 as "Defs.' Ex." with the corresponding number. For instance, Defs.' Ex. 14 refers to Dkt. No. 45-14.

United States District Court
Northern District of California

PepperBall Technologies, became the supplier of PepperBall irritant projectiles, with parent company Perfect Circle continuing to manufacture PepperBall projectiles.  ATO sold standard live rounds, which were all red, and maximum strength rounds, which were half-red and half-black.

**B.     RAP4**

Defendant RAP4 is a competitor in the irritant projectile market.  RAP4 alleges that it has sold irritant projectiles since 2005, simultaneous with PepperBall Technologies.  RAP4 sells its irritant projectiles under the trademark LESS LETHAL LIVE AGENT ROUNDS and MAX PAYLOAD LESS LETHAL ROUNDS.  RAP4 has obtained its irritant projectiles from various suppliers over the years, including companies in China, South Africa, and the United States. RAP4 generally used orange shells to indicate live rounds.  UTS Tab 94.[2]  For a period of time, RAP4 purchased irritant projectiles from a United States company named SWAT.  Defendants allege that SWAT merged with PepperBall Technologies in the late 2000s, and RAP4 then sold the projectiles from SWAT/PepperBall Technologies as PepperBall branded products.  Aside from that time, RAP4 asserts that it has never sold PepperBall-branded irritant projectiles.

Following the foreclosure sale, Defendants began communicating with PepperBall Technologies' former Chief Operations Officer, Conrad Sun.  Sun brokered an "Exclusive Dealing Agreement" for RAP4 to acquire irritant filled projectiles from APON.  The agreement was made effective on April 5, 2012.

**C.     August 2012**

Most of the events giving rise to this action occurred in August 2012.  Around August 9, 2012, RAP4 posted on its website and sent an email broadcast stating the following:

> RAP4 is proud to announce the acquisition of machinery, recipes, and materials once used by PepperBall Technologies Inc., the manufacturer of Less Lethal Live Rounds that are trusted by law enforcement and military units far and wide.  Now we manufacture our Less Lethal Live Rounds directly, on that original machinery, and conforming with the original specifications, to provide our customers with improved quality control uninterrupted supplies. With the inspiring success and service-proven track record of our

---

[2] The Court refers to UTS's exhibits found as "UTS Tab" with the corresponding number.  UTS Tabs 1-105 refer exhibits attached to Dkt. No. 28; UTS Tabs 106 to 147 refer exhibits attached to Dkt. No. 55.

United States District Court
Northern District of California

> Less Lethal Launchers, comes the need for high-quality, highly effective less lethal ammunition like that originally manufactured by PepperBall Technologies Inc.
>
> Earlier this year, PepperBall Technologies Inc was liquidated and foreclosed by their creditors. RAP4 acted immediately through acquisition and resume [sic] the machinery, recipes, and materials required to continue production of our Less Lethal Live Rounds. That means we have direct oversight of quality control, and the ability to keep producing those less lethal rounds that have proven themselves as invaluable tools time and again. [. . . .]
>
> With PepperBall Technologies Inc.'s equipment, recipes, and standards integrated into our manufacturing, we will be able to offer even more innovations . . . and an uninterrupted supply of the less lethal rounds that our police and military customers need!

UTS Tab 26 ("original broadcast announcement"). The posting, titled "RAP4 Resumes PepperBall Technologies Inc. Production[,]" contains pictures of RAP4's new projectiles, which use red and red-black to indicate standard and maximum strength live rounds. *Id.*

On August 10, RAP4 issued "clarifications" on its Facebook page and elsewhere, stating among other things, that "[i]t has come to our Attention that there has been some misinformation and confusion in relation to our acquisition of PepperBall Technology." UTS Tabs 27, 28, 144 (titled "Clarification About RAP4's Acquisition of PepperBall Technology"). These clarifications state that "The Original Recipe and machinery to produce pepperballs was acquisitioned by RAP4 and RAP4 is now able to manufacture the original pepperball under the name of RAP4 Less Lethal." The clarification also acknowledges that "Pepperball Technology is Forclosed [sic]" and "[a]ll rights to the name Pepperball belong to the new owners, which is Phoenix International, LLC LIMITED LIABILITY COMPANY INDIANA 2713 Ferguson Road Fort Wayne INDIANA 46809." A screen shot from August 14, 2012 shows RAP4's website continued to display the original broadcast announcement even after posting these clarifications.

On August 14, 2012, ATO through its counsel sent a cease and desist letter to Tran. At some point not long after, RAP4 evidently sent a second email broadcast[3] and issued another statement on its website:

> RAP4 Less Lethal Live Rounds are produced by the original OEM manufacturer that once produced for PepperBall Technologies Inc. In 2012 PepperBall Technologies Inc. was liquidated and foreclosed

---

[3] Both parties referred to this second email but neither produced the email for the Court's review.

and now PepperBall Technologies Inc. and brands belong to Phoenix International LLC.  Because of this reason, RAP4 and original OEM manufacturer have been able to team up and have improved the formula and process for making Less Lethal Live Rounds.  Now RAP4 is able to guarantee the highest-quality product and provide continuous availability!

**Disclaimer:**
- RAP4 is not associated nor affiliated with PepperBall Technologies Inc. and brands.  All rights to the PepperBall Technologies Inc. and brands belong to its new owner.
- RAP4 live rounds are NOT made by the current PepperBall Technologies Inc.

UTS Tab 36.  Following RAP4's announcements, ATO's and RAP4's management and owners had a meeting, where RAP4 informed ATO of its agreement with APON.  Evidently the parties discussed potential solutions, but they ultimately did not resolve their dispute.

In the meantime, both ATO and RAP4 received communications from customers and others indicating that they believed that (1) RAP4 had purchased PepperBall Technologies, and (2) RAP4 made and sold PepperBalls.  UTS alleges that RAP4 told customers over the phone that it was PepperBall Technologies and that it sold official PepperBalls.  UTS also alleges that RAP4 did not correct customers' misunderstandings when they contacted RAP4.

**D.      The Indiana Litigation**

In September 2012, ATO filed suit in the District Court for the Northern District of Indiana and sought a temporary restraining order ("TRO") against Defendants.  ATO's suit was primarily based on RAP4's August announcements above.  ATO also sued Conrad Sun and APON, but they were dismissed after settling with ATO.  The Northern District of Indiana issued a TRO in ATO's favor enjoining RAP4 from selling certain projectiles that ATO claimed infringed on its trademark.  The TRO went into effect on September 5, 2012.  A preliminary injunction was issued on August 16, 2013.  UTS Tab 1 ("Indiana Injunction").

Defendants appealed the preliminary injunction and the court's jurisdiction over them, as both RAP4 and Tran are California residents.  The Court of Appeals for the Seventh Circuit found that the district court lacked personal jurisdiction over Defendants and ordered the preliminary injunction vacated and the case dismissed.  The injunction was dissolved on August 28, 2014.[4]

---

[4] RAP4 sued ATO in this District on May 27, 2014.  *See Real Action Paintball, Inc. v. Advanced*

United States District Court
Northern District of California

**E.      Other Events Since August 2012**

       1.      RAP4 sells PAVA Less Lethal projectiles; ATO stops selling all-red projectiles

      After the TRO was issued, sometime in late 2012 or early 2013, RAP4 began to sell all-red and red/black projectiles with slogan "PAVA Less Lethal" imprinted on the shell.  UTS Tab 121. ATO moved for sanctions against RAP4, alleging that RAP4 had used the same stock of projectiles the Indiana Injunction ordered to be segregated.  The Indiana Court found that ATO had not submitted sufficient proof that the projectiles came from the same segregated stock, noting that the fact that Defendants had used the same colors for the projectile shells as those in the segregated stock did not necessarily mean they were the same projectiles.  UTS Tab 68. Defendants have sold these PAVA Less Lethal imprinted projectiles since the issuance of that Order.  In the meantime, ATO stopped selling all red PepperBall projectiles in late 2012, when inventory ran out.

       2.      ATO becomes UTS and pursues this litigation

      UTS is a relatively new entity, formed on July 17, 2014.  On August 8, 2014, UTS allegedly acquired ATO's assets—including the assets previously acquired from PepperBall Technologies.  UTS filed this suit against Defendants on September 8, 2014 "to preserve the injunctive relief ATO already obtained."  Mot. at 6.  On October 3, 2014, UTS filed the present Ex Parte Motion for a Temporary Restraining Order against Defendants.  The Court denied UTS's TRO request, but construed it as a motion for a preliminary injunction.  Dkt. No. 34.  The Court permitted Defendants the opportunity to respond, which they did on October 23, 2014.  Dkt. No. 45.  UTS filed its Reply on October 31, 2014.  Dkt. No. 53 ("Reply").  The Court held a hearing on the matter on November 13, 2014.  Dkt. No. 72.

      In its motion, UTS alleges that it and its authorized distributors are the sole source for PepperBall projectiles in the United States.  UTS both manufacturers and sells PepperBall branded products, including PepperBall projectiles.  UTS claims that it and its predecessors have sold PepperBall projectiles to thousands of police and governmental agencies, militaries, and private

---

*Tactical Ordnance Systems, LLC, et al.*, 3:14-cv-02435-MEJ (N.D. Cal.).  RAP4 sued ATO for wrongful injunction, abuse of process, and malicious prosecution.

United States District Court
Northern District of California

security firms across the United States and around the world as a non-lethal force compliance tool.

Today, UTS, under the name PepperBall Technologies, sells half red/half white regular strength PepperBalls in place of the all-red PepperBalls ATO sold previously. UTS has not decided whether to permanently discontinue selling all-red PepperBall projectiles but maintains that it has the ability to resume manufacturing all-red projectiles at any time it chooses. It continues to sell half red/half black PepperBalls. UTS Tab 140. RAP4 continues to sell the PAVA LESS LETHAL Projectiles and more recently has begun selling "Peppershot" Less Lethal Projectiles. UTS Tab 124.

## III.    LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations omitted). As a result, this remedy is "never awarded as of right." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Rather "a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) and *Cottrell*, 632 F.3d at 1135). In this respect, the Ninth Circuit employs a sliding scale approach to these factors, wherein "the elements of the preliminary injunction test are balanced so that a stronger showing of one element may offset a weaker showing of another." *Cottrell*, 632 F.3d at 1131.

The burden of showing a likelihood of success on the merits is placed on the party seeking to demonstrate entitlement to the extraordinary remedy of a preliminary injunction. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1158 (9th Cir. 2007). Once Plaintiff has shown a likelihood of success on the merits, the burden shifts to the Defendants to show a likelihood that its affirmative

defenses will succeed.  *Id.*  When evaluating the merits of a preliminary injunction motion, the Court's factual findings and legal conclusions are not binding at trial on the merits.  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

## IV.   DISCUSSION

This motion comes to the Court with a protracted past rarely seen at this procedural stage. UTS naturally seeks to preserve the injunctive relief ATO obtained in Indiana, but it has not hesitated to ask for more in the process.  In the meantime, Defendants assert that this Court is free to come to its own conclusions.

### A.   Preliminary Evidentiary Issues

Before considering the merits, the Court considers the preliminary evidentiary issues raised by the parties.  First, UTS asks the Court to take judicial notice of various documents including transcripts, orders, and motions developed in the Indiana Action pursuant to Federal Rule of Evidence 201.  Dkt. Nos. 30, 56.  Rule 201 obviates the need for formal fact-finding as to certain facts that are undisputed and easily verified.  *See* Fed. R. Evid. 201; *see also Melong v. Micronesian Claims Comm.*, 643 F.2d 10, 12 n.5 (D.C. Cir. 1980) (Rule 201 judicial notice is designed for judicial recognition of scientific or historical facts without resort to cumbersome methods of proof).  Rule 201 permits judicial notice of (1) facts that are generally known in the court's territorial jurisdiction; and (2) facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, e.g., a calendar or a dictionary. Thus, "the fact must be one that only an unreasonable person would insist on disputing."  *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).  Documents in the public record may be judicially noticed to show, for example, that a judicial proceeding occurred or that a document was filed in another case, but a court may not take judicial notice of findings of facts from another case.  *See Wyatt v. Terhune*, 315 F.3d 1108, 1114 & n.5 (9th Cir. 2003); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).  Nor may a court take judicial notice of any matter that is in dispute.  *Lee*, 250 F.3d at 689-90.

The Court takes judicial notice of the orders, motions, and transcripts related to the Indiana Action for their existence and authenticity, but will not take judicial notice of its findings of fact.

1   *Id.* at 690 ("when a court takes judicial notice of another court's opinion, it may do so not for the

2   truth of the facts recited therein, but for the existence of the opinion, which is not subject to

3   reasonable dispute over its authenticity." (citation and internal quotation marks omitted)).

4        Second, Defendants raise concerns about relying only on admissible evidence.  Despite

5   this litigation's two-year history, there has only been limited discovery.  In such circumstances,

6   the Ninth Circuit has recognized that "the rules of evidence do not apply strictly to preliminary

7   injunction proceedings."  *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239,

8   1250 n.5 (9th Cir. 2013) *cert. denied*, 135 S. Ct. 57 (2014) (quoting *Republic of the Philippines v.*

9   *Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the discretion of the district court to

10  accept . . . hearsay for purposes of deciding whether to issue the preliminary injunction.")).  The

11  Court is satisfied that it may properly consider both parties' evidence as submitted and will

12  address concerns with that evidence on an individual basis.

13       The Court now considers the merits relating to UTS's motion for a preliminary injunction.

**B.**    **Likelihood of Success on the Merits**

15       UTS argues that it is likely to succeed on the merits on seven claims: trademark

16  infringement, trademark counterfeiting, deceptive comparative advertising, violations of

17  California's unfair competition and false advertising laws, willful infringement on trade dress,

18  trademark dilution, and misappropriation of trade secrets.  The Court addresses each claim below.

19       **1.**   <u>Section 32 Trademark Infringement and Counterfeiting Claims</u>

20       Two of UTS's claims—infringement and counterfeiting of a registered trademark—require

21  UTS to first establish that it is the "registrant" of the PepperBall mark.  Infringement and

22  counterfeiting of a registered trademark are prohibited under Section 32 of the Lanham Act,

23  codified at 15 U.S.C. § 1114, which states that violates Section 32(a) or (b) "shall be liable in a

24  civil action *by the registrant* for the remedies hereinafter provided."  15 U.S.C. § 1114 (emphasis

25  added).  The term "registrant" also embraces the actual registrant's "legal representatives,

26  predecessors, successors and assigns."  15 U.S.C. § 1127.  Section 32's registrant requirement

27  contrasts with Section 43(a) of the Lanham Act, which allows suits "*by any person* who believes

28  that he or she is or is likely to be damaged" by the defendant's actions.  15 U.S.C. § 1125(a)(1)

United States District Court
Northern District of California

(emphasis added).  Federal registration of the mark is prima facie evidence that the registrant is the owner of the mark.  *Dep't of Parks & Recreation v. Bazaar del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (citations omitted); *see also Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 755 (9th Cir. 2006) ("Federal registration of a trademark constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark in commerce.") (internal citation and quotations omitted).

       Here, UTS provided evidence that ATO assigned the PepperBall trademark to UTS (UTS Tab 109), indicating that UTS is now the registrant of the mark.  UTS asserts that "it is undisputed that 'pepperball' is not only a registered mark, but that Plaintiff's 'pepperball' trademarks are incontestable."  Mot. at 16 (citing UTS Tab 3).  Defendants, however, challenge UTS's purported ownership of the PepperBall mark on the grounds UTS has not shown that (1) ATO ever validly acquired the mark from PepperBall Technologies, or (2) that UTS then validly acquired the mark from ATO.  Opp'n at 15.

       UTS contends that ATO validly acquired all of PepperBall Technologies' tangible and intangible property, including the incontestable PepperBall trademarks, goodwill, business name, and trade secrets through the UCC Foreclosure Sale in January 2012.  Mot. at 3; *see also* Compl. ¶ 9.  Defendants dispute the validity of this sale and note UTS's failure to submit any written assignment executed by either PepperBall Technologies or ATO assigning the Federal Registration.  Opp'n at 15 ("An assignment of a Federal registration 'shall be by instrument in writing duly executed.' 15 U.S.C. § 1060(a)(3).").  UTS's Reply details the purchase of PepperBall Technologies' loan agreements and related assets but does not provide a written assignment between PepperBall Technologies and ATO.  Instead, UTS relies heavily on the registrations recorded with the USPTO.  Reply at 11 (citing UTS Tabs 108 & 109).  Defendants assert that reliance on these registrations is misplaced.  The Court agrees.

       While the Lanham Act provides that the fact that an assignment "is recorded in the United States Patent and Trademark Office . . . [is] prima facie evidence of execution" of that assignment, 15 U.S.C. § 1060(a)(3), "prima facie evidence of execution is not the same as conclusive evidence of the validity of an assignment."  *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 623

United States District Court
Northern District of California

F.3d 61, 68 (2d Cir. 2010).  As the USPTO explained, "[t]he mere act of recording [an assignment] document is a ministerial act," and "[t]he Assignment Branch [of the USPTO] does not examine the substance of the transaction;" rather, it records any assignment "that appears on its face to be an assignment."  *In re Ratny*, 24 U.S.P.Q.2d 1713, 1715 (Com'r Pat. & Trademarks 1992); *see also Spirits Int'l*, 623 F.3d at 68 (noting that it would be a "perverse result" if the use of "recording—a ministerial act—[was transformed] into a mechanism for conclusively defeating allegations . . . challenging the legality of the assignment.").

To prove the validity of the assignment, UTS provided the USPTO registration of the PepperBall *nunc pro tunc* from ATO to ATO, and the accompanying bill of sale from ATO to ATO.  As Defendants pointed out at the hearing, the *nunc pro tunc* assignment was recorded on December 5, 2012—after the Indiana litigation had commenced and the TRO was granted.  Although this assignment was made effective on January 9, 2012, there is no indication that any written assignment was made on January 9, 2012.  Gary Gibson, an owner of Perfect Circle, stated that the "United States Patent and Trademark Office has recorded the assignments of the PepperBall trademarks from PepperBall Technologies, Inc. to ATO, and from ATO to UTS."  UTS Tab 106 ("Second Gibson Decl.") ¶ 4.[5]  Gibson did not explain if he means the *nunc pro tunc* assignment to be the assignment from PepperBall Technologies to ATO, but if he was referring to a different document, that document was not provided to the Court.  Gibson's statement also conflicts with Conrad Sun's statement that "Pepperball never executed an assignment of [the PepperBall trademark] registration to ATO."  UTS Tab 97 ("Sun Decl.") ¶ 27.

Defendants also argue that the assignment fails because it was not made with the goodwill of the business.  Opp'n at 15 (citing 15 U.S.C. § 1060(a)(1)).  Notably, ATO's recorded assignment of the PepperBall mark to UTS purports to convey the entire interest and the goodwill in the PepperBall mark.  *See* Tab 109.  This registration also attached a formal written and executed "Trademark Assignment Agreement" of the PepperBall mark from ATO to UTS.  *Id.*

---

[5] Defendants argue that Gary Gibson's initial declaration (Tab 2, "Gibson Decl.") should not be considered because it refers to events that occurred four days after the declaration was signed.  UTS submitted a new declaration by Gary Gibson with its Reply, which clarifies that the signature date was a typographical error.  The Court is satisfied with this explanation.

United States District Court
Northern District of California

1    Gibson likewise stated that "on August 8, 2014, all of [Perfect Circle]'s and ATO's tangible and

2    intangible property was sold to the Plaintiff in this action, [UTS,] [and] [a] written assignment of

3    the PepperBall trademarks and goodwill was executed and has been submitted to the United States

4    Patent and Trademark Office for recordation."  Gibson Decl. ¶ 4.  This statement highlights the

5    absence of such an assignment from PepperBall Technologies to ATO.  The issue then is whether

6    the absence of a written assignment of the goodwill and trademark from PepperBall Technologies

7    to ATO makes UTS unlikely to succeed showing it is the "registrant" under Section 32.

8        Some courts have held that a business trade name and its marks are presumed to pass to its

9    buyer, absent contrary evidence.  *See Dovenmuehle v. Gilldorn Mortg. Midwest Corp.*, 871 F.2d

10   697, 700 (7th Cir. 1989) (citing *U.S. Ozone Co. v. U.S. Ozone Co. of Am.*, 62 F.2d 881, 885 (7th

11   Cir. 1932) and *Okla. Beverage Co. v. Dr. Pepper Love Bottling Co.*, 565 F.2d 629, 632 (10th Cir.

12   1977)); *see also* Restatement (Third) of Unfair Competition § 34 (1995) ("Trademark rights are

13   ordinarily presumed to pass with a sale of the associated business absent evidence of a contrary

14   intent."); *Merry Hull & Co. v. Hi-Line Co.*, 243 F. Supp. 45, 52 (S.D.N.Y. 1965) (finding that

15   defendant obtained good title to the mark through purchase at the bankruptcy sale, that it began to

16   exploit it as soon as practicable).  However, other courts have stressed the importance of the

17   "writing requirement" in determining the validity of trademark assignments.  *See, e.g.*, *Fed.*

18   *Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 74 (2d Cir. 2013) *cert. denied*,

19   134 S. Ct. 1291 (2014) (analogizing Ninth Circuit Copyright Act precedent to the trademark

20   context and noting that "the Ninth Circuit has explained that the Copyright Act's assignment-

21   related writing requirement . . . serves the ends of (1) ensuring that the owner of intellectual

22   property will not assign it inadvertently; (2) forcing parties to determine the precise rights being

23   transferred; and (3) enhancing predictability and certainty of ownership. *Effects Assocs., Inc. v.*

24   *Cohen*, 908 F.2d 555, 557 (9th Cir. 1990)."); *see also Flu Shots of Tex., Ltd. v. Lopez*, 2014 WL

25   1327706, at *5 (N.D. Tex. Apr. 3, 2014) (noting "the prerequisite for a proper assignment [is] a

26   written document memorializing the transfer of ownership" and concluding that without a written

27   assignment plaintiff lacked standing to assert its federal trademark claims); *but see Trimarchi v.*

28   *Together Dev. Corp.*, 255 B.R. 606, 611 (D. Mass. 2000) (collecting cases and finding the case

United States District Court
Northern District of California

1  law "consistently supports the proposition that the Lanham Act does not pertain to security

2  interests" under Article 9 of the Uniform Commercial Code).[6]  UTS provided no case law

3  supporting the validity of transfer of the PepperBall mark.

4        In deciding a motion for a preliminary injunction, the district court "is not bound to decide

5  doubtful and difficult questions of law or disputed questions of fact." *Int'l Molders' & Allied*

6  *Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (citation omitted).

7  Perhaps UTS will ultimately be able to demonstrate that it is the rightful owner of the registered

8  PepperBall mark, but claims under Section 32 of the Lanham Act are reserved for "registrants" of

9  the mark, and at this point there are too many unresolved issues and factual disputes for the Court

10  to find that UTS has demonstrated a likelihood of success that it is the "registrant" within the

11  meaning of the Lanham Act.  *See CLT Logistics v. River W. Brands*, 777 F. Supp. 2d 1052, 1070-

12  71 (E.D. Mich. 2011) (court could not find plaintiffs had carried their burden to establish a strong

13  likelihood of success on the ownership of the marks despite registration where the validity of the

14  assignment to plaintiffs was in doubt); *see also The Planing Mill, L.L.C. v. Hays Planing Mill,*

15  *Inc.*, 2005 WL 1319144, at *5 (D. Kan. June 2, 2005) (plaintiff did not demonstrate a substantial

16  likelihood of success where the transfer of the trademark at issue was disputed).

17      2.    Section 43(a) Trademark Infringement and False Advertising Claims

18        UTS also brings claims for trademark infringement and false advertising under Section

19  43(a) of the Lanham Act.  As previously noted, unlike claims under Section 32, claims under

20  Section 43(a) do not require UTS to be the owner of a registered mark.  Instead, a party that

21  violates the provisions of Section 43(a) "shall be liable in a civil action by any person who

22  believes that he or she is or is likely to be damaged by such act."  15 U.S.C. § 1125(a)(1).

23  Commercial injury is generally presumed "when defendant and plaintiff are direct competitors and

24  defendant's misrepresentation has a tendency to mislead consumers."  *TrafficSchool.com, Inc. v.*

25  *Edriver Inc.*, 653 F.3d 820, 826 (9th Cir. 2011); *see also Lexmark Int'l, Inc. v. Static Control*

26  *Components, Inc.*, 134 S. Ct. 1377, 1393 (2014) ("diversion of sales to a direct competitor may be

27

28  _____

[6] UTS provided the transcript of a purported UCC sale selling all of PepperBall Technologies' "tangible and intangible assets" to Phoenix International, LLC.  UTS Tab 4.

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1  the paradigmatic direct injury from false advertising").  UTS and RAP4 are direct competitors in

2  the irritant projectile market.  Mot. at 17.  UTS asserted that UTS's and RAP4's products directly

3  compete, and there is "significant overlap" in their customer base, much of which includes law

4  enforcement and military.  *Id.* (citing UTS Tabs 11 and 20).  RAP4 does not dispute UTS's

5  assertions.  UTS thus properly brings claims under Section 43(a).

6          Section 43(a) of the Lanham Act provides in relevant part:

7                  Any person who, on or in connection with any goods or services . . .
                   uses in commerce any word, term, name, symbol, or device, or any
8                  combination thereof, or any false designation of origin, false or
                   misleading description of fact, or false or misleading representation
9                  of fact, which—(A) is likely to cause confusion, or to cause mistake,
                   or to deceive as to the affiliation, connection, or association of such
10                 person with another person, or as to the origin, sponsorship, or
                   approval of his or her goods, services, or commercial activities by
11                 another person, or (B) in commercial advertising or promotion,
                   misrepresents the nature, characteristics, qualities, or geographic
12                 origin of his or her or another person's goods, services, or
                   commercial activities, shall be liable in a civil action by any person
13                 who believes that he or she is or is likely to be damaged by such act.

14  15 U.S.C. § 1125(a).  The Supreme Court recently held that Section 43(a) "creates two distinct

15  bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)."

16  *Lexmark Int'l*, 134 S. Ct. at 1384 (citing *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1108 (9th Cir.

17  1992), and abrogating it on other grounds).  The *Waits* Court noted that Section 43(a) creates

18  liability for "(1) false representations concerning the origin, association, or endorsement of goods

19  or services through the wrongful use of another's distinctive mark, name, trade dress, or other

20  device ('false association'), and (2) false representations in advertising concerning the qualities of

21  goods or services ('false advertising')."  978 F.2d at 1108 (citations omitted).  The Court

22  separately considers each of these claims.

23          *a.  False Association/Trademark Infringement Claim*

24          A false association claim is often considered as a trademark infringement claim.  "Section

25  43(a)(1) provides similar protection to trademarks regardless of registration."  *Bell v. Harley*

26  *Davidson Motor Co.*, 539 F. Supp. 2d 1249, 1254 (S.D. Cal. 2008) (*citing Brookfield Commc'ns,*

27  *Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 n.6 (9th Cir. 1999)).  "To be liable for

28  trademark infringement under § 1125(a), a person must (1) use in commerce (2) any word, false

                                                    14

1   designation of origin, false or misleading description, or representation of fact, which (3) is likely

2   to cause confusion or misrepresents the characteristics of his or another person's goods or

3   services." *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007) (citing 15 U.S.C. §

4   1125(a)); *see Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir.

5   1980) (trademark infringement claims under Section 43(a) of the Lanham Act "preclude the use of

6   another's trademark in a manner likely to confuse the public about the origin of goods").

7                                  *i.      Protectable mark*

8        Before considering likelihood of confusion, Defendants challenge that the PepperBall mark

9   is generic and no longer afforded trademark protections.  They contend that "the public uses the

10  term PEPPERBALL in a generic sense to refer to pepper-filled balls" and present dozens of pages

11  of online printouts from newspaper articles, online forums, etc., where people have used the terms

12  "pepperball," "pepper ball," and "pepper-ball" amongst other things to refer to irritant filled

13  projectiles.  Defendants argue that "[e]ven though UTS claims that the PEPPERBALL trademark

14  registration is 'incontestable,' this does not preclude a finding that the term is not enforceable as a

15  trademark because it has become generic."  Opp'n at 17.

16       "To be sure, even an incontestible mark is subject to challenge as generic." *Reno Air*

17  *Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1135 (9th Cir. 2006).  "Generic marks are not

18  capable of receiving protection because they identify the product, rather than the product's

19  source." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir.

20  2005) (citing *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)).  Even "a

21  registered mark may be canceled . . . on the grounds that it has become generic." *Id.*

22  Nevertheless, "registered marks are endowed with a strong presumption of validity, and a

23  defendant has the burden of showing genericness by a preponderance of the evidence." *Reno Air*

24  *Racing Ass'n*, 452 F.3d at 1135 (citing *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove,*

25  *Inc.*, 419 F.3d 925, 928 (9th Cir. 2005)).

26       "To determine whether a term has become generic, we look to whether consumers

27  understand the word to refer only to a particular producer's goods or whether the consumer

28  understands the word to refer to the goods themselves." *KP Permanent Make-Up*, 408 F.3d at 604

United States District Court
Northern District of California

15

1   (citation omitted).  "If the buyer understands the word to refer to the source of the goods, the term

2   is not generic.  However, if the disputed term is 'identified with all such goods or services,

3   regardless of their suppliers, it is generic.'"  *Id.* (citation omitted).  "Genericide has spelled the end

4   for countless formerly trademarked terms, including 'aspirin,' 'escalator,' 'brassiere,' and

5   'cellophane.'"  *Freecycle*, 505 F.3d at 905.

6       Defendants' genericness challenge raises a perplexing issue, particularly as UTS submitted

7   evidence showing other manufacturers using the term "Pepper Balls" to identify irritant filled

8   projectiles.  *See* UTS Tabs 135 ("Duel Military Spec Pepper Balls . . . The Hottest Pepper Ball On

9   The Market"); 136 ("Green Riot Pepper Balls – Extremely Hot . . . . Pepper Balls are fantastic for

10  stopping an intruder and pet control"); 137 ("Super Hot In Fact 55% Hotter Than Standard

11  Pepperballs . . . .  A pepperball projectile, also called a pepper-spray ball, is a hard plastic ball

12  filled with a powdered chemical . . . .").  UTS also submitted evidence where the term

13  "pepperball" was inserted into Google's search engine, and the results show that "pepper-ball" is

14  used to refer to pepper-spray projectiles.  UTS Tab 130.  While all of this evidence is compelling,

15  it is still limited, and some of Defendants' evidence could be construed as referring to PepperBall

16  branded products, as opposed to a generic term.  *See e.g.*, Defs.' Ex. 9 ("I view the Pepperball as a

17  good tool . . . . "The Pepperball works relatively well in my experience").  Given that the test of

18  whether mark is generic is a question of fact (*Yellow Cab Co.*, 419 F.3d at 929), at this point there

19  is not yet enough evidence to show that consumers understand the term "PepperBall" to refer

20  generally to irritant filled projectiles as opposed to the specific irritant projectile associated with

21  PepperBall Technologies.  Defendants raise a valid concern, but at this point the evidence is not

22  enough to find the PepperBall mark generic.

23                          *ii.     Likelihood of confusion*

24       "The 'likelihood of confusion' inquiry generally considers whether a reasonably prudent

25  consumer in the marketplace is likely to be confused as to the origin or source of the goods or

26  services bearing one of the marks or names at issue in the case."  *Rearden*, 683 F.3d at 1209

27  (citation omitted).  "[T]he classic type of source confusion [is] 'forward confusion,' where

28  customers 'want to buy the senior user's product and because of the similarity of marks,

United States District Court
Northern District of California

16

mistakenly buy the junior user's product instead' and the junior user thus trades on the goodwill of the senior user." *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 2013 WL 4528539, at *13 (N.D. Cal. Aug. 23, 2013) *amended in part*, 2013 WL 6157208 (N.D. Cal. Nov. 22, 2013) (quoting McCarthy, *supra*, § 23:10).[7]

"To succeed, a plaintiff must show more than simply a possibility of such confusion." *Rearden*, 683 F.3d at 1209 (citations omitted).  The Ninth Circuit has articulated a non-exhaustive list of factors to be used in evaluating the likelihood of confusion by consumers.  *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).  Those factors include: similarity of the marks; relatedness or proximity of the companies' products or services; marketing channels used; strength of the mark; degree of care likely to be exercised by purchasers; defendant's intent in selecting the mark; evidence of actual confusion; and likelihood of expansion in product lines.  *See Brookfield*, 174 F.3d at 1053-54.  Some factors are more important than others and the relative significance of each factor is case specific.  *Id.* at 1054.

But this is not a traditional trademark case; UTS alleges RAP4 used the actual PepperBall mark and name in its announcements and in metatags and hidden text on RAP4's website.  RAP4 claims that its identification of PepperBall and PepperBall Technologies, Inc. in its announcements is "nominative use" and thus not infringing.  Opp'n at 17-18 (citing *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010)).  While RAP4 asserted the nominative use defense in its papers, it did not consider the test for nominative use, but instead proceed to analyze UTS's claim under the *Sleekcraft* factors.  Where a defendant uses the mark to refer to the trademarked good itself, the *Sleekcraft* analysis does not apply.  *Tabari*, 610 F.3d at 1175.  Rather "where a nominative fair use defense is raised, we ask whether (1) the product was "readily identifiable" without use of the mark; (2) defendant used more of the mark than necessary; or (3) defendant falsely suggested he was sponsored or endorsed by the trademark

---

[7] UTS established that it is the senior user of the PepperBall mark as ATO used the mark and name PepperBall Technologies in commerce in January 2012 and UTS assumed the PepperBall mark and PepperBall Technologies name from ATO via the Trademark Assignment Agreement. Second Gibson Decl. ¶ 19; UTS Tab 109.  While UTS may be able to establish rights to the mark even before 2012, the Court is satisfied that it has demonstrated priority of use since at least January 2012, at which point the PepperBall mark and trade name came to identify UTS' predecessor, ATO, as the source of PepperBall products.

United States District Court
Northern District of California

1  holder.  This test evaluates the likelihood of confusion in nominative use cases." *Id.* at 1175-76

2  (citations and internal quotation marks omitted) (referring to the "*New Kids* test" from *New Kids*

3  *on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992)).

4          UTS argues that the nominative use test does not apply here because Defendants used the

5  PepperBall mark "to convey properties of their own products, not to refer to the products of UTS's

6  predecessors in interest."  Reply at 14.  But the *New Kids* test also applies where "the defendant's

7  ultimate goal is to describe his own product."  *Tabari*, 610 F.3d at 1186 n.1 (citation omitted).

8  UTS also argues that Defendants' reference to *Tabari* is misplaced because that case involved the

9  sale/brokering of authentic products.  UTS provides no support for this argument, and in any case,

10  it is better addressed in the likelihood of confusion analysis.  As Defendants asserted a nominative

11  use defense, the burden reverts to UTS to show a likelihood of confusion under the *New Kids*

12  factors.  *See id.* at 1183.

a.   The 2012 announcements

14          Considering the factors in reverse order, *New Kids* explained that "nominative use of a

15  mark . . . lies outside the strictures of trademark law: Because it does not implicate the source-

16  identification function that is the purpose of trademark, it does not constitute unfair competition;

17  such use is fair because it does not imply sponsorship or endorsement by the trademark holder."

18  971 F.2d at 308.  Here, RAP4 did not falsely suggest it was sponsored or endorsed by the

19  trademark holder; rather it implicated the source-identification function by essentially implying it

20  was the new source of PepperBalls.  The evidence shows confusion over RAP4's announcements.

21  *See* UTS Tabs 31 (email from customer stating: "I have received an e-mail from RAP 4 stating

22  they are taking over your business.  Is there any information you can give me regarding this email

23  and the training and equipment we have been purchasing from you over the years?"); 33 (email

24  from customer stating: "What do you know about Pepperball going out of business and being

25  purchased by another company called RAP4? Is this true and, if so, how would it affect us?"); *see*

26  *also* Tabs 28-30, 32, 54-55 (showing confusion over RAP4's announcements).  Even though

27  RAP4 used the name LESS LETHAL LIVE AGENT as the actual name of its irritant projectiles,

28  it "may not avoid likely confusion by appropriating another's entire mark and adding descriptive

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1    or non-distinctive matter to it." *SMC Promotions, Inc. v. SMC Promotions*, 355 F. Supp. 2d 1127,

2    1135-36 (C.D. Cal. 2005) (quoting McCarthy, *supra*, § 23:50).

3          *New Kids* referred to nominative use cases as "a class of cases where the use of the

4    trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one

5    product for a different one." 971 F.2d at 307-08.  For instance, in *Toyota Motor Sales*, the

6    defendants were auto brokers and used the trademark "Lexus" and the circular "L Symbol Design

7    mark" on their website and in their website domain name to indicate that they brokered Lexus

8    vehicles.  610 F.3d at 1171.  The Ninth Circuit noted "one way or the other, the [defendants] need

9    to let consumers know that they are brokers of Lexus cars, and that's nearly impossible to do

10   without mentioning Lexus."  *Id.* at 1180-81.  Likewise, in *New Kids*, Plaintiffs did not allege that

11   "there was anything false or misleading about the newspapers' use of their mark.  Rather, [they]

12   alleged that] the newspapers' use of the New Kids name in conducting the unauthorized polls

13   somehow implied that the New Kids were sponsoring the polls."  971 F.2d at 308.  Unlike *Toyota*

14   *Motor Sales* and *New Kids*, UTS alleges that RAP4's use of the PepperBall mark was misleading.

15         Considering the first and second *New Kids* factors, Defendants were capable of referring to

16   their irritant filled projectiles without use of the PepperBall mark, and in fact did so for many

17   years.  *See* UTS Tabs 61, 113-14, 120.  RAP4 also used the trade name PepperBall Technologies,

18   Inc. in its announcements, thus directly referring to the source of PepperBall products.  *See*

19   *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1535 (9th Cir. 1989) (confirming trade

20   names can also be protected because "[t]rade name infringement . . . is based on considerations

21   similar to trade-mark infringement," and "both preclude one from using another's distinctive mark

22   or name if it will cause a likelihood of confusion or deception as to the origin of the goods.").

23   Even if Defendants used the PepperBall mark and name to refer to the arrangements Defendants

24   had with Sun and APON to describe their purported connection to PepperBall products, there is

25   considerable dispute as to whether RAP4's statements were true, even without considering the

26   underlying implications of those statements.  While this may be more a case of false association

27   than trademark infringement under Section 43(a), the Court nevertheless finds that UTS has

28   demonstrated a likelihood of confusion from RAP4's announcements.

United States District Court
Northern District of California

b.   Metatags and hidden text

The likelihood of confusion over RAP4's use of metatags and hidden text is more complicated.  UTS presented evidence that in December 2012, after the Indiana TRO and after RAP4 apparently removed the announcements above for its website, RAP4 used the metatags "Pepperball Projectiles," "pepper ball," "pepperball," "pepperballs," and "Pepperball" on its website instead.  *See* UTS Tab 88.  It also provided evidence that RAP4 used hidden text, i.e., white text on a white background, which included the name pepperball on its website.  UTS Tabs 59-60.  UTS alleges that RAP4 used "PepperBall in hidden text and metatags on RAP4's website in order to drive consumers to their store by driving up RAP4's position with search engines." Mot. at 18; *see also* UTS Tab 130.  UTS did not provide much evidence about how the metatags and hidden text function, and RAP4 did not assert any defenses or argument related to its metatags or hidden text.  There is no evidence about whether RAP4 uses metatags and hidden text with the PepperBall mark today, but at the hearing, UTS's counsel indicated that RAP4 continues to do so. Hearing Transcript at 79:17-20.  The issue is whether such metatags and hidden text are likely to cause confusion.

In *Brookfield*, the Ninth Circuit held that a defendant's use of a trademark in website metatags is actionable if it allows a defendant to improperly benefit from the goodwill associated with the mark.  174 F.3d at 1061-65.  *Brookfield* held that it was enough that the metatags caused initial interest confusion even if consumers were not ultimately confused at the time of purchase. *Id.* at 1064-65.  Recently, however, the Ninth Circuit warned against finding confusion "when a consumer is never confused as to source or affiliation, but instead knows, or should know, from the outset that a product or web link is not related to that of the trademark holder because the list produced by the search engine so informs him."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1147 (9th Cir. 2011) (citing *Playboy Enters., Inc. v. Netscape Commc'ns Corp*., 354 F.3d 1020, 1034-35 (9th Cir. 2004) (Berzon, J., concurring)).  "Because the *sine qua non* of trademark infringement is consumer confusion, when we examine initial interest confusion, the owner of the mark must demonstrate likely confusion, not mere diversion."  *Id.* at 1149.

20

RAP4 has not alleged nominative use, and in such circumstances, courts have referred to the *Sleekcraft* factors to weigh likelihood of confusion.  *See Network*, 638 F.3d at 1152 n.5. Considering the *Sleekcraft* factors as a whole, the Court find that UTS has established at least serious questions going to the merits of its claims related to infringing use of the terms PepperBall in RAP4's metatags and hidden text.  The metatags and hidden text use terms that are very similar and in some cases identical to the PepperBall mark.  The companies' products or services are closely related as they are direct competitors.  Both companies use similar marketing channels as both companies market their products online via their websites.  These three factors—referred to as the "Internet trinity" or "Internet troika"—are often relied on by courts in resolving internet trademark infringement cases.  *But see Network*, 638 F.3d at 1148-49 (the *Sleekcraft* factors "should be applied flexibly, particularly in the context of Internet commerce" rather than relying solely on the Internet trinity factors).

There is little argument by the parties or evidence about the factors relating to (1) the degree of care likely to be exercised by purchasers, (2) the likelihood of expansion in product lines, or (3) evidence of actual confusion as a result of the metatags and hidden text.  These factors have neutral weight.  There is also little evidence about Defendants' intent in using the mark in its metatags and hidden text.  However, courts have found that the intent to deceive factor "favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark."  *Brookfield*, 174 F.3d at 1059 (citation omitted).  This factor weighs in favor of UTS, because RAP4 had this knowledge by December 2012.

The remaining factor is strength of the mark.  "The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws."  *Brookfield*, 174 F.3d at 1058.  Two relevant measurements are conceptual strength and commercial strength.  Conceptual strength involves classification of a mark "along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful."  *Id.*  Commercial strength is based on "actual marketplace recognition," and thus "advertising expenditures can transform a suggestive mark into a strong mark."  *Id.*  Determining the strength of a mark is probative of confusion

1    "because a consumer searching for a generic term is more likely to be searching for a product

2    category." *Network*, 638 F.3d at 1149 (citation omitted).  "That consumer is more likely to expect

3    to encounter links and advertisements from a variety of sources. By contrast, a user searching for a

4    distinctive term is more likely to be looking for a particular product, and therefore could be more

5    susceptible to confusion when sponsored links appear that advertise a similar product from a

6    different source." *Id.*  As to conceptual strength, federal trademark "[r]egistration alone may be

7    sufficient in an appropriate case to satisfy a determination of distinctiveness," but courts are

8    instructed to look to the mark itself in weighting conceptual strength.  *Id.* (citations omitted).

9          Courts have found that the strength of the mark is of diminished importance in the

10   likelihood of confusion analysis where the products involved are closely related and use identical

11   terms.  *Brookfield*, 174 F.3d at 1058-59 (citing McCarthy, *supra*, 11:76 ("Whether a mark is weak

12   or not is of little importance where the conflicting mark is identical and the goods are closely

13   related.")).  Here, while there are potential issues related to genericide of the mark, the

14   combination of the registration of the PepperBall marks and the fact the products are closely

15   related and use identical and nearly identical terms establishes at least serious questions going

16   toward the merits of a trademark infringement claim relating to RAP4's metatags and hidden text.

17   *See Friends of the Wild Swan*, 767 F.3d at 942 (preliminary injunction may issue if a plaintiff can

18   show *inter alia* that there are "serious questions going to the merits").

19                    *b.  Deceptive Comparative Advertising Claims*

20         UTS also brings claims for deceptive comparative advertising under Section 43(a)(1)(B) of

21   the Lanham Act.  To prevail on a false advertising claim, a plaintiff must show (1) a false

22   statement of fact by the defendant in a commercial advertisement about its own or another's

23   product; (2) the statement actually deceived or has the tendency to deceive a substantial segment

24   of its audience; (3) the deception is material, in that it is likely to influence the purchasing

25   decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the

26   plaintiff has been or is likely to be injured as a result of the false statement, either by direct

27   diversion of sales from itself to defendant or by lessening of the goodwill associated with its

28   products.  *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir.

United States District Court
Northern District of California

2014), *as amended* (Mar. 11, 2014) (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)).

                 i.       *Elements 1 & 4: falsity of statements entering interstate commerce*

As to the first element, a plaintiff may establish the "falsity" of the advertisement in one of two ways. *Southland Sod*, 108 F.3d at 1139 (9th Cir. 1997). A "plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Id.* (citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943, 946 (3d Cir. 1993)); *see also Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) ("[A] false advertising cause of action under the [Lanham] Act is not limited to literal falsehoods; it extends to false representations made by implication or innuendo."). "When evaluating whether an advertising claim is literally false, the claim must always be analyzed in its full context." *Id.* at 1139 (citing *Castrol*, 987 F.2d at 946). Defendants must have also "caused its false statement[s] to enter interstate commerce." *Wells Fargo*, 758 F.3d at 1071.

RAP4 issued several different announcements around August 2012 in which it connects itself with PepperBall Technologies and the PepperBall projectiles. RAP4's original broadcast announcement was titled "RAP4 Resumes PepperBall Technologies Inc. Production[.]" UTS Tabs 26, 29. The announcement then goes on to explicitly state that "PepperBall Technologies Inc was liquidated and foreclosed by their creditors"—perhaps a literally true statement, but when that statement is combined with RAP4's other statements, including remarks about RAP4's "acquisition" of PepperBall's equipment and technology, it is likely to mislead or confuse consumers into thinking that RAP4 acquired PepperBall Technologies. *See* UTS Tab 26, 29. The implication of RAP4's announcement was that the source of RAP4's new projectiles was the former PepperBall Technologies, with the same qualities and key characteristics.

Defendants argue that RAP4's subsequent announcements belie the notion that they intended to "palm off" its projectiles as PepperBall branded projectiles. Opp'n at 19; *see also* McCarthy, *supra*, § 25:2 (palming off is an "attempt to make the purchaser believe that the product of the subsequent entrant is that of his better known competitor."). Specifically,

23

1    Defendants posted disclaimers saying that (1) "RAP4 is not associated nor affiliated with

2    PepperBall Technologies Inc. and brands[;]" (2) "All rights to the PepperBall Technologies Inc.

3    and brands belong to its new owner[;]" and (3) "RAP4 live rounds are NOT made by the current

4    PepperBall Technologies Inc[.]"  UTS Tab 36.  While these disclaimers are perhaps an attempt at

5    clarification, the Court cannot ignore full context.  The previous section of the announcement

6    describes how RAP4's Live Rounds "are produced by the original OEM manufacturer that once

7    produced for PepperBall Technologies Inc."  *Id*.  The implication is that RAP4's projectiles are,

8    for all intents and purposes, PepperBalls.  There is also some indication that RAP4 implied that it

9    had "improved" the PepperBall formula and quality control.  UTS Tabs 26, 36.

10            RAP4's other "clarifications" are also likely to cause confusion.  RAP4 indeed recognizes

11   this fact, stating in a Facebook post and elsewhere "[i]t has come to our Attention that there has

12   been some misinformation and confusion in relation to our acquisition of PepperBall

13   Technology."  UTS Tabs 27, 28, 144.  While RAP4 is purportedly clarifying the confusion, in the

14   very same breathe it insinuates that it has acquired PepperBall Technology.  This is not a singular

15   error; the titles of these statements are "Clarification About RAP4's Acquisition of PepperBall

16   Technology[.]"  The statements also declare that "[t]he Original Recipe and machinery to produce

17   pepperballs was acquisitioned by RAP4 and RAP4 is now able to manufacture the original

18   pepperball under the name of RAP4 Less Lethal."  While these statements acknowledge that

19   "Pepperball Technology is Forclosed[sic]" and "[a]ll rights to the name Pepperball belong to the

20   new owners, which is Phoenix International, LLC[,]" the implication and likelihood of confusion

21   remains that RAP4 is now the manufacturer of PepperBall irritant projectiles.

22            RAP4 argues that the announcements it made were not about its "own product" and

23   therefore UTS's false advertising claim should not survive.  RAP4 argues that its statements were

24   about what it does and what it acquired.  The Court disagrees with RAP4's argument.  RAP4's

25   announcements may have included statements about what it does and what it acquired, but these

26   statements could also be interpreted by consumers to mean that RAP4's projectiles are for all

27   intents and purposes PepperBalls as originally sold by PepperBall Technologies.[8]  As described

28   _____

[8] It is also worth noting that the statute itself does not require the representation to be only about

*United States District Court*
*Northern District of California*

by UTS, RAP4 publicized that it had "'PepperBall' projectiles in everything but name." Mot. at 20. Consumers could also interpret RAP4's announcements communicating that RAP4 had improved the PepperBall formula and quality control. While at some point RAP4 may have altered the formula, there is no evidence those alterations occurred by the time RAP4 made its announcements or that there were changes in quality control.

RAP4 sent its announcements by email and posted them on its website and other online forums. Courts have held that such acts are sufficient to establish that a defendant caused its false statement to enter interstate commerce. *See, e.g.*, *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 982 (N.D. Cal. 2008) (finding a likelihood of success on the merits on this element where defendant had disseminated the misleading statement via email and on its website); *Neighborhood Assistance Corp. of Am. v. First One Lending Corp.*, 2012 WL 1698368, at *18 (C.D. Cal. May 15, 2012) (likelihood of success on interstate commerce element met where misleading statements "appear[ed] on websites available to anyone in the United States."). The Court finds that UTS is likely to succeed in showing that RAP4 made misleading statements concerning its irritant projectiles in interstate commerce.

> ii.     *Elements 2 & 3: tendency to deceive & materiality*

UTS must also establish a likelihood of success in showing that RAP4's statements actually deceived or had the tendency to deceive a substantial segment of its audience, and that deception is material in that it is likely to influence the purchasing decision. *Wells Fargo*, 758 F.3d at 1071. UTS provided several communications from customers showing confusion resulting from RAP4's announcements. *See* UTS Tabs 28-33 (described above). Tran also testified that even after posting the clarifications he still received letters from customers showing that they were confused. UTS Tab 56 at 999:3-1000:3.

RAP4 argues that this evidence is insufficient to establish that a substantial section of the audience was confused, contending that UTS's failure to present survey evidence demonstrating confusion is fatal to UTS's claim. However, courts have recognized that "failure to establish that

RAP4's products—the misrepresentation can go to the nature, characteristics, or qualities of "goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).

a significant number of consumers were actually deceived is not necessarily fatal to [a plaintiff's] case.  If [the defendant] intentionally misled consumers, we would presume consumers were in fact deceived."  *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir.) *supplemented sub nom. William H. Morris Co. v. Grp. W. Inc.*, 67 F.3d 310 (9th Cir. 1995); *see also Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989) (intent to mislead justifies presumption that consumers are in fact deceived).  To show RAP4's intent to deceive, UTS highlights Tran's testimony in the Indiana Action, which indicated that Tran may have realized that use of the word "acquisition" in RAP4's announcements was confusing for customers.  *See* UTS Tab 53 at 942:3-7; 937:14-940:17; *see also* Tab 52.

UTS's evidence is compelling.  While Defendants are correct that evidence of deception is required, the cases they cite did not find any intent to deceive on the part of the defendant.  *See Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1036, 1042-43 (C.D. Cal. 1998) (recognizing that "If a defendant intentionally misled consumers, the Court may presume consumers were in fact deceived, and defendant has the burden of demonstrating otherwise[,]" but finding no persuasive evidence of such intent by defendant); *see also Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 359 (7th Cir. 1983) (affirming district court's finding that no intent was found in the record); *Ragold, Inc. v. Ferrero, U.S A., Inc.*, 506 F. Supp. 117, 128 (N.D. Ill. 1980) (plaintiff had presented no evidence of consumer responses).  The evidence UTS presents is different; it shows evidence of actual consumer confusion and Defendants' intent to deceive.  The Court is persuaded that there are at least serious questions going to the merits as to this element.

RAP4 does not raise much argument as to the materiality of the purported deception, but after reviewing the record, the Court is persuaded that deception concerning RAP4's ability to produce PepperBall quality projectiles—or better—would be material.  PepperBall Technologies and its PepperBall projectiles had a strong reputation for quality and reliability.  *See* UTS Tab 8 at 76:11-24 (testimony describing PepperBall Technologies' good reputation); *see also* Tab 91 at 552:15-19 (same).  If consumers believed that RAP4 purchased PepperBall Technologies and thus the ability to produce the original PepperBall, consumers could likewise believe that RAP4 now sells PepperBalls, inducing them to purchase from RAP4.  The Court again finds that UTS has

established a likelihood of success for this element as well.

*iii.*   *Likelihood of injury*

The final element is whether the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by lessening of the goodwill associated with its products.  *Wells Fargo*, 758 F.3d at 1071.  Proof of this element may not be strictly necessary; the Ninth Circuit held that "because of the possibility that a competitor may suffer future injury, as well as the additional rationale underlying section 43(a)— consumer protection—a competitor need not prove injury when suing to enjoin conduct that violates section 43(a)."  *Harper House*, 889 F.2d at 210 (citation omitted); *see also Southland Sod*, 108 F.3d at 1145-46 ("[E]ven if Plaintiffs had failed to raise a triable issue as to causation and injury, their Lanham Act claim would still be viable to the extent it sought an injunction.").

In any case, UTS has established a likelihood of injury as a result of these false statements. ATO and now UTS sell PepperBall projectiles and PepperBall branded products; RAP4 does not dispute this.  If consumers are misled into thinking that RAP4 sells PepperBall products, and that RAP4 is the former PepperBall Technologies, then sales that would otherwise go to UTS are likely to be diverted instead to RAP4.  UTS provided evidence of one such potentially diverted sale that occurred during the pendency of the TRO in the Indiana Action.  *See* UTS Tab 92 at 508:8-509:21.  The Court is finds UTS has demonstrated likelihood of success on this element.

In sum, on the claim of deceptive advertising under Section 43(a) of the Lanham Act, the Court finds that UTS has demonstrated a likelihood of success on the merits.

3.   <u>California Unfair Competition and False Advertising Claims</u>

UTS raises claims under both California Business and Professions Code section 17200 (California's Unfair Competition Law, or "UCL") and section 17500 (California's False Advertising Law).  The Ninth Circuit "has consistently held that . . . actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act."  *Zeltiq Aesthetics, Inc. v. BTL Indus., Inc.*, __ F. Supp. 2d __ , 2014 WL 1245222, at *8 (N.D. Cal. Mar. 25, 2014) (quoting *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994)); *see also Philip Morris v. Shalabi*, 352 F. Supp. 2d 1067, 1072 (C.D. Cal. 2004) (noting

27

United States District Court
Northern District of California

that the essential elements of 15 U.S.C. § 1125(a)(1) "are identical and if met with adequate evidence are sufficient to establish liability under" the UCL as well).

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ."  Cal. Bus. & Prof. Code § 17200.  Because section 17200 is written in the disjunctive, "a business act or practice need only meet one of the three criteria—unlawful, unfair, or fraudulent—to be considered unfair competition under the UCL." *Daro v. Superior Court*, 151 Cal. App. 4th 1079, 1093 (2007).  "Under its 'unlawful' prong, the UCL borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL." *See Berryman v. Merit Prop. Mgmt.*, 152 Cal. App. 4th 1544, 1554 (2007) (citation and quotation marks omitted).  "Thus, a violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong." *Id.*

As the Court finds that UTS has established a likelihood of success under Section 43(a) of the Lanham Act, UTS is therefore able to establish a likelihood of success under the UCL. Likewise, a section 17500 claim requires that Plaintiff prove that Defendants engaged in "false, unfair, misleading, or deceptive advertising" that had the tendency to deceive members of the public. *Day v. AT & T Corp.*, 63 Cal. App. 4th 325, 331-32 (1998).  UTS's establishment of likelihood of success under Section 43 of the Lanham Act allows it to establish the same relief it would be entitled to under Section 17500.  *See J.K. Harris & Co., LLC v. Kassel*, 253 F. Supp. 2d 1120, 1130 n.9 (N.D. Cal. 2003).

Accordingly, the Court finds that UTS has demonstrated a likelihood of success on the merits of its claims under the UCL and California's False Advertising Law.

### 4.    Willful Infringement on Trade Dress

UTS contends that Defendants willfully infringed on its trade dress.  UTS alleges that Defendants were capable of choosing other colors and color schemes for their projectiles, but chose the PepperBall color scheme to "compete" with UTS and its predecessor ATO because red and red/black were identified as "[PepperBall's] colors." *See* UTS Tab 34.  Defendants contend that because irritant projectiles are used in high-stress crowd-control or military situations, a user needs to be able to quickly distinguish the "live" projectiles from other types, and live projectiles

are generally made "red" in color so the users can distinguish them from the other kinds.  Tran

Decl. ¶ 4, Dkt. No. 45-1.  The primary dispute is thus whether the all-red and red/black color

schemes are functional.

> To prevail on a claim for trade dress infringement, a plaintiff must prove that: (1) its trade
dress is nonfunctional; (2) the trade dress is inherently distinctive or has acquired secondary
meaning; and (3) the imitation of the trade dress creates a likelihood of consumer confusion.  *See
Fuddruckers, Inc. v. Doc's BR Others, Inc.*, 826 F. 2d 837, 842 (9th Cir. 1987).  "Under the
Lanham Act, Congress imposes a presumption of functionality, and plaintiff bears the burden of
proving non-functionality."  *Secalt S.A. v. Wuxi Shenxi Const. Mach. Co.*, 668 F.3d 677, 683 (9th
Cir. 2012) (quoting 15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement under
this Act for trade dress not registered on the principal register, the person who asserts trade dress
protection has the burden of proving that the matter sought to be protected is not functional.")).
Thus, UTS, as the "one who seeks to establish trade dress protection[,] must carry the heavy
burden of showing that the feature is not functional, for instance by showing that it is merely an
ornamental, incidental, or arbitrary aspect of the device."  *TrafFix Devices, Inc. v. Mktg. Displays,
Inc.*, 532 U.S. 23, 30 (2001).

> "A product feature is functional and cannot serve as a trademark 'if [the product feature] is
essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is,
if exclusive use of the feature would put competitors at a significant, non-reputation-related
disadvantage."  *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1048 (9th
Cir. 1998) (quoting *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995)).  The
functionality doctrine thus "prevents trademark law, which seeks to promote competition by
protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a
producer to control a useful product feature."  *Qualitex*, 514 U.S. at 164.  "Functionality is a
potent public policy, for it trumps all evidence of actual consumer identification of source and all
evidence of actual consumer confusion caused by an imitator."  McCarthy, *supra*, § 7:63.  To
analyze functionality, the Ninth Circuit has applied the "*Disc Golf* factors": (1) whether the design
yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising

United States District Court
Northern District of California

1    touts the utilitarian advantages of the design, and (4) whether the particular design results from a

2    comparatively simple or inexpensive method of manufacture.  *Secalt S.A.*, 668 F.3d at 685 (citing

3    *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002 (9th Cir. 1998)).

4        As to the first factor, Defendants present evidence that the color red provides utilitarian

5    advantages.  The training materials used by PepperBall Technologies shows that different colors

6    of projectiles indicated different things about them, e.g., a green projectile was for marking,

7    whereas purple is an inert round used for training, and red projectiles are live rounds filled with

8    the active irritant PAVA (capsaicin II).  Defs.' Ex. 14.  UTS continues to maintain those color

9    combinations as used by PepperBall Technologies.  *See* UTS Tab 124.  Conrad Sun also stated

10   that "users of projectiles use the color of the projectiles to indicate the power or strength of the

11   projectiles, not the source or the manufacturer of the projectiles.  For example red projectiles are

12   associated with 'live' rounds, i.e., rounds that have irritant powder."  Sun Decl. ¶ 17.

13       Testimony during the Indiana Action's preliminary injunction hearing likewise indicates

14   that the color red is important for customers of RAP4's projectiles.  RAP4's witness testified that

15   in "[r]ecent history, our clients do require that the colors be in red for live-fire for reason that they

16   have already successfully training their personnel to identify by the colors used."  Defs.' Ex. 15, at

17   467:20-4.  This witness also testified that at that time other manufacturers also used the color red

18   and/or reddish-orange to identify live pepper-filled rounds.  *Id.* at 467:3-14; *see also* Defs.' Ex. 6

19   (showing pepper-filled projectiles using the color red).  Conrad Sun's declaration confirms that

20   "Purchasers of 'live' irritant-filled projectiles often require the projectiles they purchase be red.

21   This is because they have adopted a color scheme for their projectiles, and trained their personnel

22   on what color of projectile is associated with what strength.  For example, the one government

23   agency specifies that its 'OC'[oleoresin capsicum] projectiles be 'red.'"  Sun Decl. ¶ 18.

24       UTS argues that the government agency only identified red for the projectiles because it

25   wanted to purchase from United States manufacturers (*see* Reply at 19, n.20; Transcript at 17:5-

26   14).  While this could be the case, UTS has presented no evidence to that effect, and even if true,

27   this fact does not undermine Defendants' evidence that their other customers require the live

28   rounds to be indicated by the color red.  Defendants also submitted a document from the

United States District Court
Northern District of California

Department of Justice that states "distinctive markings and colorings on the different shells would help to more reliably distinguish lethal from less lethal [munitions]." Defs.' Ex. 11. While this document refers to coloring and marking to distinguish between less and non-lethal munitions rather than strength of irritant projectiles, it nevertheless supports Defendants' notion that coloring plays a role for the government in distinguishing between types of projectiles. There is support for a utilitarian advantage to the color red—namely that customers use the red to identify irritant filled projectiles as opposed to other projectiles, such as inert training and marking projectiles.

However, in considering the second *Disc Golf* factor—whether alternative designs are available—UTS contends that the use of alternative color schemes by RAP4 prior to August and by other manufacturers undermines RAP4's assertion that red indicates a "live" projectile. UTS provided evidence that in June 2012, RAP4 sold irritant filled projectiles that were half orange and half white. *See* UTS Tabs 33 and 62; *see also* Tab 61 (half orange/white live projectiles used in 2009). It also presents screen shots of websites showing that other manufacturers appear to use different colors than red to identify live irritant projectile rounds. *See* UTS Tabs 135-38. Finally, UTS presents an email between Sun and Tran indicating that RAP4 indeed selected the red and red/black color scheme "to compete with Pepperball[.]" UTS Tab 34. In essence, UTS argues the red and red/black color scheme specifically identifies PepperBall branded products.

The Ninth Circuit "has suggested that 'in order to establish nonfunctionality the party with the burden must demonstrate that the product feature serves *no purpose* other than identification.'" *Disc Golf*, 158 F.3d at 1007 (quoting *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1531 (9th Cir. 1992)); *accord Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822, 826 (3d Cir. 1981) ("Proof of nonfunctionality generally requires a showing that the element of the product serves no purpose other than identification."). "Under the functionality doctrine, competitors can reasonably replicate important non-reputation-related product features." *Kendall-Jackson*, 150 F.3d at 1048 (citing *Qualitex*, 514 U.S. at 169).

While UTS's evidence shows that other manufacturers produce and offer for sale irritant-filled projectiles in colors other than red, it does not show that alternative color schemes are purchased or used by law enforcement, or other customers who may have come to rely on the red

United States District Court
Northern District of California

color scheme to indicate live rounds.  UTS states that "the only advantage red and red/black projectiles offer Defendants is that it makes it easier for them to sell to departments already trained to use UTS's system"—which UTS says is "one of the reasons some customers specify that their live projectiles be red."  Reply at 19 & n.20.  While a "wide range of available packaging and design options allows a producer to appropriate a distinctive identity without unduly hindering his competitors' ability to compete[,]" *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1261 (9th Cir. 2001) (citiation omitted), a functional feature is one the "exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." *TrafFix*, 532 U.S. at 32.

RAP4's evidence indicates that it would be at a commercial disadvantage if it was prohibited from selling red projectiles, which identify live, pepper-filled rounds.  Likewise, the two-toned, half red/half black projectiles appear to serve a functional purpose, indicating that they are extra strength rounds as compared with the all red-regular strength rounds.  UTS's counsel also indicated that there may be other functional tracking reasons for two-toned projectiles.  Hearing Transcript at 18:17-20.  Despite showing that other manufacturers produce and sell non-red irritant projectiles, UTS has not shown that the red coloring serves no purpose other than identification.

As to the third *Disc Golf* factor, PepperBall Technologies included in its training materials that "red" symbolized live rounds.  Defs.' Exs. 12-14.  UTS has maintained PepperBall Technologies' identification of rounds by color, using red to indicate when projectiles are live.  UTS Tab 140.  "If a seller advertises the utilitarian advantages of a particular feature, this constitutes strong evidence of functionality." *Disc Golf*, 158 F.3d at 1009 (citation omitted).  The implication from UTS's website and PepperBall training and advertising materials is that users can identify different rounds by their coloring.  The Court finds that this factor weighs against UTS.

The fourth *Disc Golf* factor inquires as to whether the particular design results from a comparatively simple or inexpensive method of manufacture.  A functional benefit may arise if "the design achieves economies in manufacture or use." *Disc Golf*, 158 F.3d at 1009 (citation omitted).  The parties presented little evidence to weight this factor, thus this factor is neutral.

Considering these factors in total, UTS has not established likelihood of success on the merits with its "heavy burden" to prove non-functionality of the red or half red/half black coloring.

UTS does not allege that the red coloring of the PepperBall "is merely an ornamental, incidental, or arbitrary aspect of the device," nor does it refute Defendants' arguments that the coloring serves a utilitarian purpose by identifying live rounds.  One of the purposes for the important of the functionality doctrine is to "[p]reserv[e] free and effective competition by ensuring that competitors can copy features that they need to compete effectively."  McCarthy, *supra*, § 7:63. UTS raises the specter that RAP4 choose the red and red/black coloring to invoke the coloring used on the PepperBall-branded projectiles and presents persuasive evidence to that effect.  UTS may ultimately be able to show that the red coloring is not functional and that RAP4 could compete effectively with PepperBall products without this red coloring, but at this point UTS has not established that the red and red/black is non-functional.

### 5.   Trademark Dilution

UTS asserts that Defendants have diluted its trademark by both tarnishment and blurring. A successful claim for federal trademark dilution under Section 43(c) of the Lanham Act requires that a plaintiff prove that: (1) it owns a famous trademark; (2) the famous mark is distinctive; (3) the defendant is using or has used in commerce an identical or nearly identical trademark; (4) the defendant began using the mark after the mark became famous; and (5) the defendant's use of the mark is likely to cause dilution by blurring or tarnishment.  *Parts.com, LLC v. Yahoo! Inc.*, 996 F. Supp. 2d 933, 940 (S.D. Cal. 2013) (citations omitted); *see also* 15 U.S.C. § 1125(c).

A viable claim for federal trademark dilution requires that the mark be famous at the time the defendant begins using it.  15 U.S.C. § 1125(c)(1).  "A mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  *Id.* § 1125(c)(2)(A).   In determining whether a mark is famous, a court may consider "all relevant factors," including: (1) "[t]he duration, extent, and geographic reach of advertising and publicity of the mark"; (2) "[t]he amount, volume, and geographic extent of sales of goods or services offered under the mark"; (3) "[t]he extent of actual recognition of the mark"; and (4) whether the mark is registered.  *Id.* § 1125(c)(2)(A)(i)-(iv).

"It is well-established that dilution fame is difficult to prove."  *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012) (citation omitted); *Everest Capital,*

33

1    *Ltd. v. Everest Funds Mgmt. LLC*, 393 F.3d 755, 763 (8th Cir. 2005) ("The judicial consensus is

2    that 'famous' is a rigorous standard."); McCarthy, *supra*, § 24:104 (fame for dilution is "a difficult

3    and demanding requirement" and that, although "all 'trademarks' are 'distinctive'—very few are

4    'famous'")). "[C]ourts agree that a mark must be truly prominent and renowned to be granted the

5    extraordinary scope of exclusive rights created by the Federal Antidilution Act." *Rosetta Stone*

6    *Ltd. v. Google, Inc.*, 676 F.3d 144, 171 (4th Cir. 2012) (quoting McCarthy, *supra*, § 24:104).

7    "Because protection from dilution comes close to being a 'right in gross,' . . . the [Act] extends

8    dilution protection only to those whose mark is a 'household name.'" *Nissan Motor Co. v. Nissan*

9    *Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004).

10          In light of this rigorous standard, the Court finds that UTS has failed to establish that the

11   PepperBall mark and trade name is famous within the meaning of Section 43(c) of the Lanham

12   Act.  UTS provided very little evidence to support its claim of fame.  It asserted that it and the

13   prior owners of the PepperBall mark "have spent millions of dollars and fifteen years publicizing

14   the mark and selling the projectiles at issue in this litigation with the PepperBall trademark."  Mot.

15   at 24.  But UTS did not provide support for exactly how much money was actually spent, how the

16   mark was publicized, or when the mark became famous.  *Compare Visa Int'l Serv. Ass'n v. JSL*

17   *Corp.*, 590 F. Supp. 2d 1306, 1315 (D. Nev. 2008) *aff'd*, 610 F.3d 1088 (9th Cir. 2010) (finding

18   plaintiff established fame of the VISA mark with abundant evidence showing how much plaintiff

19   spent on advertising the mark, where the mark was used, how consumers recognized the mark, and

20   how the mark was used in $1.3 trillion in sales during the relevant time period).  Here UTS alleges

21   that PepperBall Technologies "sold over 23 million PepperBall projectiles between the late 1990s

22   and 2011 with each projectile selling for at least one dollar" (Mot. at 24), but it does not cite to

23   any evidence for this statement.  Nor does it explain where those sales were made or that the mark

24   would be recognized by the "general consuming public."  *Cf. Coach Servs.*, 668 F.3d at 1374-75

25   (plaintiff did not provide sufficient evidence to prove that COACH for high-end handbags and

26   leather goods was a "famous" mark).  Moreover, the fact that the PepperBall mark is registered is

27   not conclusive evidence of fame.  *Id.* at 1374 (finding the Board erred to the extent it found that

28   proof of registration as conclusive evidence of fame).  Perhaps UTS may ultimately be able to

United States District Court
Northern District of California

1   demonstrate that its PepperBall mark is famous within the meaning of Section 43(c), but at this

2   time it has not shown a likelihood of success on this claim.

3          6.        <u>Misappropriated Trade Secrets</u>

4          California's Uniform Trade Secrets Act ("CUTSA"), codified at California Civil Code

5   sections 3426-3426.11, "authorizes a court to enjoin the actual or threatened misappropriation of

6   trade secrets." *Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc.*, 160 Cal. App. 4th 288, 296

7   (2008) (citing Cal. Civ. Code § 3426.2). "A plaintiff requesting injunctive relief has the burden to

8   show that the information that was misappropriated constitutes a trade secret." *Agency*

9   *Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1015 (E.D. Cal. 2011) (citation

10  omitted). "A 'trade secret' is defined as 'information, including a formula, pattern, compilation,

11  program, device, method, technique or process, that: (1) [d]erives independent economic value,

12  actual or potential, from not being known generally to the public or to other persons who can

13  obtain economic value from its disclosure or use; and (2) [i]s subject to efforts that are reasonable

14  under the circumstances to maintain its secrecy.'" *Id.* (citing Cal. Civ. Code § 3426.1(d)).

15         To state a claim for trade secret misappropriation, a plaintiff must show: "(1) the plaintiff

16  owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret

17  through improper means, and (3) the defendant's actions damaged the plaintiff." *Cytodyn*, 160

18  Cal. App. 4th at 297. Use or acquisition of "a trade secret by '"[i]mproper means' includes theft,

19  bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or

20  espionage through electronic or other means.'" *DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal.

21  4th 864, 875 (2003), *as modified* (Oct. 15, 2003) (citing Cal. Civ. Code § 3426.1, subd. (a)).

22  "Reverse engineering or independent derivation alone," is not "considered improper means." *Id.*

23  (citing Cal .Civ. Code § 3426.1, subd. (a)). "It is crucial to any CUTSA cause of action—and any

24  defense—that the information claimed to have been misappropriated be clearly identified."

25  *Agency Solutions.Com*, 819 F. Supp. 2d at 1015. The trade secret must be described "with

26  sufficient particularity to separate it from matters of general knowledge in the trade or of special

27  knowledge of those persons who are skilled in the trade and to permit the defendant to ascertain at

28  least the boundaries within which the secret lies." *Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.*,

United States District Court
Northern District of California

35

226 Cal. App. 4th 26, 43-44 (2014), *review denied* (Aug. 20, 2014) (collecting cases).

UTS claims to own trade secrets "in the formula and recipe for the irritant powder used in the projectiles in question." Mot. at 26. Later, UTS asserts that "RAP4 and Tran contracted with [Conrad] Sun for *inter alia* market leads and market research knowing that [Sun] was a former officer of PepperBall Technologies, Inc. and that the information he would be providing RAP4 would likely have originated from PepperBall Technologies, Inc. As such, RAP4 and Tran contracted to receive trade secrets that were 'acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.'" *Id.* Although much of UTS's evidence focuses on Sun, he is not a party to this litigation, and the Court's inquiry is focused on the actions of RAP4 and K.T. Tran and whether these Defendants misappropriated trade secrets owned by UTS, namely (1) "the formula and recipe used in the projectiles in question;" (2) UTS' "customer list;" and (3) "*inter alia* market leads and market research."

Starting in reverse order, UTS has failed to show likelihood of success on the merits concerning trade secrets in "*inter alia* market leads and market research." First, UTS has not shown that this information is proprietary. *See, e.g.*, *Logtale, Ltd. v. IKOR, Inc.*, 2013 WL 4427254, at *5 (N.D. Cal. Aug. 14, 2013) (company failed to show its market research was proprietary or to identify a specific ownership interest in that information). Second, even if UTS could demonstrate that the information is proprietary, UTS has not demonstrated that Defendants had or used this information. Third, perhaps as a consequence of the former, UTS has not shown that it was damaged by Defendants' alleged misappropriation of market leads and market research. Finally, the Court is not convinced that "*inter alia* market leads and market research" is described "with sufficient particularity." *See Altavion*, 226 Cal. App. 4th at 43-44. Thus, UTS has not shown likelihood of success its market research and market leads trade secret claims.

As to UTS's second claim concerning its customer lists, the California Supreme Court has recognized that a client list can qualify as a trade secret under CUTSA if it meets the requirements of California Civil Code section 3426.1(d). *See Reeves v. Hanlon*, 33 Cal. 4th 1140, 1155 (2004). UTS provides very little discussion about its customer lists, both in how they were developed and in how RAP4 misappropriated them. Instead, UTS argues "Defendants contracted for and likely

1   received UTS's trade secrets, including powder formula and customer lists." Mot. at 30. RAP4

2   denies that it received customer lists, noting that its "witnesses testified that they never received

3   any customer list or pepper powder formula that ATO had accused Real Action of

4   misappropriating." Opp'n at 28 (citing Defs.' Ex. 17). At this point, UTS has not shown that its

5   customer list qualifies as a trade secret under California Civil Code section 3426.1(d) or that

6   RAP4 ever received UTS's customer lists.

7       Finally, to show that UTS has trade secrets in "the formula and recipe used in the

8   projectiles in question," UTS submitted evidence showing that PepperBall Technologies

9   developed and used a formula in its PepperBalls that it considered both secret and proprietary.

10  UTS also submitted testimony from Gary Gibson which explained that even Perfect Circle was not

11  allowed to know the formula, beyond what was on the material safety data sheets ("MSDSs").

12  Additionally, UTS submitted testimony that the secrecy of the formula and recipe were maintained

13  through the foreclosure sale and that the proprietary nature of the formula and recipe were critical

14  considerations in the foreclosure decision. *See* UTS Tab 46 at 98:18-99:3. There is little dispute

15  then that PepperBall Technologies' irritant powder formula would qualify as information with

16  independent economic value. *See* Cal. Civ. Code § 3426.1(d)(1).

17      RAP4 contends, however, that UTS and its alleged predecessors failed to show

18  "reasonable" efforts under section 3426.1, subd. (d)(2) were taken to protect the secrecy of its

19  purported trade secrets. In support of this argument, Defendants submit Sun's declaration where

20  he notes the contents of PepperBall Technologies' powder were listed in the MSDSs posted on

21  PepperBall Technologies' website, and that the recipes are posted in PepperBall Technologies'

22  patents.[9] At the hearing, Defendants' counsel again stated the formula was available in PepperBall

23  Technologies' patents. Hearing Transcript at 39:20-24.

24      Secrecy is an essential characteristic of information that is protectable as a trade secret.

25  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984). "It is well established that the

26  disclosure of a trade secret in a patent places the information comprising the secret into the public

27  domain. Once the information is in the public domain and the element of secrecy is gone, the

28

---

[9] UTS did not bring a patent infringement claim against RAP4.

United States District Court
Northern District of California

1  trade secret is extinguished and 'the patentee's only protection is that afforded under the patent

2  law.'" *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 528 (N.D. Cal. 2000) (citing *Stutz Motor*

3  *Car of Am., Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995) *aff'd*, 113 F.3d

4  1258 (Fed. Cir. 1997)); *see also Rototron Corp. v. Lake Shore Burial Vault Co.*, 712 F.2d 1214,

5  1215 (7th Cir. 1983) ("The grant of a patent automatically constitutes full disclosure of the

6  patented process. . . . thereafter the patentee's only protection is that afforded under the patent law.

7  These provisions of federal patent law prevail over any inconsistent State remedies."); *Ultimax*

8  *Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1356 (Fed. Cir. 2009) (affirming

9  summary judgment under CUTSA; plaintiff could not prove existence of a secret given its patent).

10      UTS did not dispute that such patents exist.  In light of Defendants' allegation, and without

11  any argument by UTS to the contrary, the Court cannot find that UTS has shown likelihood of

12  success on the merits for its trade secret claim at this time.[10]

13  **C.      Likelihood of Irreparable Harm**

14      Plaintiff may not obtain a preliminary injunction unless it can show that irreparable harm is

15  likely to result in the absence of the injunction.  *See Cottrell*, 632 F.3d at 1135.  To prove

16  irreparable harm, UTS relies heavily on presumptions of harm arising from trademark and false

17  advertising violations.  Mot. 27-28.  However, the Supreme Court's rulings in *Winter* and *eBay*

18  *Inc. v. MercExchange, L.L.C*, 547 U.S. 388, 393 (2006), disapproved the use of such categorical

19  rules.  *See Herb Reed*, 736 F.3d at 1249 (discussing same).  As the Ninth Circuit has held, "the

20  *eBay* principle—that a plaintiff must establish irreparable harm—applies to a preliminary

21  injunction in a trademark case."  *Id.*  "Gone are the days when once the plaintiff in an infringement

22  action has established a likelihood of confusion, it is ordinarily presumed that the plaintiff will

23  suffer irreparable harm if injunctive relief does not issue."  *Id.* at 1250-51 (citations and internal

24  quotation marks omitted).  Even where a party has demonstrated likelihood of success on the

25

26  ───────────────────
[10] In its Reply, UTS raised for the first time allegations that Defendants received confidential

27  pricing data from Sun.  Tab 40 shows Sun transmitted pricing data to Defendants, and according to the testimony of ATO's counsel at the time, the pricing data was nonpublic.  However, UTS provides no analysis establishing (1) that this information is a trade secret within CUTSA's definition, (2) that UTS owns this information, (3) that RAP4 and K.T. Tran misappropriated this

28  information, or (4) that UTS has been injured by Defendants actions in this respect.

1    merits, the Ninth Circuit has warned against "collaps[ing] the likelihood of success and the

2    irreparable harm factors." *Id.* at 1251.  Instead, "[t]hose seeking injunctive relief must proffer

3    evidence sufficient to establish a likelihood of irreparable harm." *Id.*

4         "An irreparable harm is one that cannot be redressed by a legal or equitable remedy

5    following trial." *Optinrealbig.com. LLC v. Ironport Sys.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal.

6    2004) (citing *Public Util. Comm'n v. FERC*, 814 F.2d 560, 562 (9th Cir. 1987)).  "Evidence of

7    loss of control over business reputation and damage to goodwill could constitute irreparable

8    harm." *Herb Reed*, 736 F.3d at 1250 (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and

9    Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001)).  But "[s]peculative injury cannot be the basis for a

10   finding of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).

11        While UTS primarily focuses on RAP4's actions in 2012, it has established that it is likely

12   to suffer irreparable harm today in the absence of the injunction because without such relief

13   continued loss of control over its business reputation is likely.  Specifically, UTS asserts that

14   several of the accused announcements are still on the Internet to this day and that Defendants

15   never corrected their misrepresentations.  Reply at 8, 22.  UTS submitted a screen shot of an

16   online forum post showing that one such announcement was still online on October 31, 2014.

17   UTS Tab 144.  Additionally, UTS's counsel represented UTS still receives calls indicating that

18   there is confusion.  Hearing Transcript at 55:4-14.  Ongoing confusion over the source of

19   PepperBalls is likely to contribute to loss of control over UTS's reputation and goodwill.

20        UTS also argues that confusion over whether RAP4's projectiles are PepperBalls harms

21   UTS because RAP4's projectiles "were established to be inferior in every sense,"[11] asserting in

22   particular that RAP4's projectiles have a propensity to leak because of weight problems.  Mot. at

23   29.  There is considerable dispute over this issue.  While RAP4 argues that UTS offers no

24   evidence that *any customer* of RAP4 has ever received a defective projectile (Opp'n at 11), UTS

25   cites a picture of leaking projectiles that RAP4 evidently sent to a customer.  Reply at 23 & n.26

26   (citing UTS Tab 16, picture of irritant projectiles).  The circumstances surrounding this photo are

27

28   _____
     [11] This broad statement appears inconsistent with UTS's claims that RAP4 used PepperBall's
     irritant powder and formula.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  unclear, but if UTS's representations are accurate, this evidence supports its theory of loss of

2  control over its reputation and damage to goodwill.

3       In light of the foregoing, the Court finds that UTS has established irreparable harm in the

4  loss of control over its reputation and goodwill.

5  **D.    Balance of Hardships**

6       RAP4 argues that it would suffer hardships, noting a loss in sales that occurred in

7  September 2012 following the Indiana TRO. Opp'n at 29. This information, however, is based on

8  sales that occurred after RAP4 made the infringing announcements and lost sales after RAP4 was

9  prohibited from engaging in infringing activities. Tran Decl. ¶ 22. *See Cadence Design Sys. v.*

10 *Avant! Corp.,* 125 F.3d 824, 829 (9th Cir. 1997) ("a defendant who knowingly infringes another's

11 copyright cannot complain of the harm that will befall it when properly forced to desist from its

12 infringing activities") (internal quotations omitted). RAP4 also submitted evidence that it had to

13 reduce the number of its employees because of the reduced sales following the Indiana injunction,

14 but it has not shown how such a similar reduction is likely to occur in the face of this injunction.

15 Ultimately, RAP4 has not shown that its hardships outweigh the harm to UTS.[12]

16 **E.    Public Interest**

17      "A plaintiff seeking an injunction must establish that the injunction is in the public

18 interest." *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 (9th

19 Cir. 2009) (citing *Winter*, 555 U.S. at 7). Here, the public interest is served by an injunction to

20 prevent consumer confusion and misleading advertising. *See Stark v. Diageo Chateau & Estate*

21 *Wines Co.*, 907 F. Supp. 2d 1042, 1067 (N.D. Cal. 2012) ("Preventing consumer confusion serves

22 the public interest"); *Church & Dwight Co., Inc. v. S.C. Johnson & Son Inc.*, 873 F. Supp. 893,

23 912 (D.N.J. 1994) (granting injunction preventing defendant from deceptive advertising and

24 stating that "the public has a right not to be deceived or confused."). The Court thus finds that an

25 injunction would be in the public's interest.

26 ─────────────────────
   [12] RAP4 argues that "[i]f UTS or its 'intellectual property' are truly suffering 'irreparable harm'
27 now, UTS could have easily avoided that harm by not buying [ATO]'s assets." Opp'n at 12.
   RAP4 does not provide support for this argument, and while UTS states that the case law does not
28 support this proposition, it likewise provides no case to assist the Court. Regardless, this
   argument does not affect the Court's decision.

## F.     Injunctive Relief

Considering the four factors required to warrant a preliminary injunction applied to this case, the Court finds that injunctive relief is appropriate.  "The scope of an injunction is within the broad discretion of the district court[.]"  *TrafficSchool.com*, 653 F.3d at 829 (citing *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002)).  Under the Lanham Act, courts "have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable."  15 U.S.C. § 1116(a).  However, an injunction should be "tailored to eliminate only the specific harm alleged," *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992), and "[c]ourts should not enjoin conduct that has not been found to violate any law."  *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012) (citation omitted).  "The essence of trademark infringement is the likelihood of confusion, and an injunction should be fashioned to prevent just that."  *Internet Specialties*, 559 F.3d at 993. When the infringing use is for a similar service, a broad injunction is "especially appropriate." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000) (citation omitted).[13]

Considering the claims at issue in this case, the Court enters a preliminary injunction against RAP4 and K.T. Tran as follows:

For the duration of this case, Defendants RAP4 and K.T. Tran and their principals, officers, agents, employees, attorneys, and affiliated companies or enterprises, as all persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are barred from:

(a) advertising, displaying or distributing products, literature or any other materials bearing the word(s) PepperBall or PepperBall Technologies to refer to RAP4 or RAP4's irritant projectiles;

(b) advertising, offering for sale, manufacturing, purchasing, shipping, selling, or brokering, irritant powder filled projectiles bearing the word(s) PepperBall or PepperBall

---

[13] RAP4 argues that it is entitled to discovery before any injunction is issued because it needs additional information about "how UTS acquired the rights it seeks to assert."  The Court finds that since most of that discovery would relate to UTS' Section 32 claims (25 U.S.C. § 1114), which the Court did not find a likelihood of success on the merits, the discovery RAP4 seeks is unnecessary at this time.

United States District Court
Northern District of California

1   Technologies;

2        (c) shipping, selling or filling orders for PepperBall projectiles;

3        (d) making any false statements, directly or indirectly, concerning: United Tactical

4   Systems, LLC; Advanced Tactical Ordnance Systems, LLC; PepperBall Technologies; or Phoenix

5   International, LLC; and/or

6        (e) making any false statements, directly or indirectly, concerning the availability of

7   authentic PepperBall projectiles from United Tactical Systems, LLC or PepperBall Technologies.

8        It is further ordered that RAP4 shall preserve and segregate at least one hundred (100)

9   irritant projectiles received from APON in 2012, or however many are remaining if fewer than one

10   hundred. RAP4 is additionally prohibited from destroying, modifying, moving or disposing of

11   any molds, tools or equipment for manufacturing said projectiles, or any business or personal

12   records relating or referring to manufacture, sale, purchase, receipt, delivery or transfer of its

13   irritant powder filled projectiles.

14        Finally, as a condition to a preliminary injunction, UTS is required to post bond "in an

15   amount that the court considers proper to pay the costs and damages sustained by any party found

16   to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Despite the seemingly

17   mandatory language, Rule 65(c) invests the district court with discretion as to the amount of

18   security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation and

19   internal quotation marks omitted).

20        RAP4 requests a bond of $5,284,129, primarily based on the possibility that (1) there will

21   be a seizure of assets; (2) it will be prohibited from selling irritant projectiles entirely; and (3) it

22   will have been found to violate UTS's trade secrets. None of these concerns result from this

23   injunction. Additionally, while RAP4 provides estimates of lost days and lost profits, those

24   estimates are based on profits from 2012 in the midst of the disputed activities giving rise to this

25   case. UTS argues that no more than a $10,000 bond is warranted, as was issued in Indiana.

26        RAP4 has raised valid concerns in addressing UTS's motion for preliminary injunction.

27   The Court finds that a $20,000 bond is appropriate given its findings above. *Cf. GoTo.com*, 202

28   F.3d at 1211 (finding $25,000 bond appropriate for injunction against the Walt Disney Company,

United States District Court
Northern District of California

which had requested at least $20 million).

### V.    CONCLUSION

For the reasons set forth above, the Court GRANTS IN PART and DENIES IN PART Plaintiff's motion for a preliminary injunction (Dkt. No. 27).  Issuance of this preliminary injunction is contingent upon Plaintiff filing proof of issuance of a bond in the amount of $20,000 by no later than 3:00 p.m. on January 2, 2015.  Should Plaintiff fail to file proof of such undertaking by that time, this injunction shall be dissolved without further Order by the Court.

**IT IS SO ORDERED.**

Dated: December 2, 2014

_____

MARIA-ELENA JAMES
United States Magistrate Judge