1
2
3
4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7   UNITED TACTICAL SYSTEMS, LLC,              Case No.  14-cv-04050-MEJ

                  Plaintiff,
8                                              **ORDER RE: CROSS MOTIONS FOR**
           v.                                  **SUMMARY JUDGMENT**
9
                                               Re: Dkt. Nos. 307, 316
10  REAL ACTION PAINTBALL, INC., et al.,
                  Defendants.
11  ───────────────────────────────

12  AND  RELATED  ACTION  AND  CROSS
    ACTION
13

14

15                              **INTRODUCTION**

16         Pending before the Court is the Motion for Summary Judgment filed by Plaintiff and

17  Counter-Defendant United Tactical Systems, LLC ("UTS") and related Counter-Defendants[1]

18  (together with UTS, "Counter-Defendants").  UTS Mot., Dkt. No. 307.  Defendants and Counter-

19  Claimants Real Action Paintball, Inc. and K.T. Tran (collectively, "Real Action") filed an

20  Opposition and Cross-Motion for Summary Judgment.  RAP Mot., Dkt. No. 316.  UTS and Real

21  Action each filed Replies.  UTS Reply, Dkt. No. 320; RAP Reply, Dkt. No. 322.  Having

22  considered the parties' positions, the relevant legal authority, and the record in this case, the Court

23  **GRANTS IN PART** and **DENIES IN PART** Counter-Defendants' Motion and **DENIES** Real

24  Action's Motion for the following reasons.

25  //

26

27  ───────────────────────────
    [1] Counter-Defendants are UTS, Advanced Tactical Ordnance Systems, LLC ("ATO"); Perfect
28  Circle Projectiles LLC; Gary Gibson; Tactical Air Games, Inc.; Tyler Tiberius; United Tactical
    Systems Holdings, LLC; and United Tactical Systems Intermediate Holdings, LLC.

United States District Court
Northern District of California

**BACKGROUND**

**A.    Factual Background**

       1.    <u>The PepperBall Trademark</u>

      PepperBall projectiles are small plastic spheres that contain a proprietary irritant powder that functions similarly to pepper spray.  RAP Resp. to Counter-Defs.' Statement of Undisputed Fact ("RAP SUF Reply") ¶ 2, Dkt. No. 316-17.[2]  UTS and its predecessors have sold PepperBall projectiles to police and governmental agencies, militaries, and private security firms as a non-lethal force compliance tool.  *Id.* ¶ 3; Decl. of Gary Gibson ("Gibson Decl.") ¶ 5, Dkt. No. 308.

      On September 14, 1999, Jaycor, Inc. ("Jaycor") filed an application with the United States Patent and Trademark Office ("USPTO") to trademark the name "PepperBall."  RAP SUF Resp. ¶ 5; *see* Gibson Decl., Ex. 1.  On October 27, 2000, Jaycor assigned the PepperBall trademark application to Jaycor Tactical Systems, Inc. ("Jaycor Tactical").  RAP SUF Resp. ¶ 6; Gibson Decl., Ex. 2.  On December 31, 2001, Jaycor filed a confirmation of assignment of six trademark applications, including the PepperBall trademark, to Jaycor Tactical.  RAP SUF Resp. ¶ 7; *see* Gibson Decl., Ex. 3.

      On May 13, 2003, the PepperBall trademark was registered under the number 2,716,025 (the "PepperBall mark") to Jaycor Tactical for use generally in connection with "NON-LETHAL WEAPONRY, NAMELY, NON-LETHAL PROJECTILES; LAUNCH DEVICES FOR NON-LETHAL PROJECTILES; NON-LETHAL SUBSTANCES FOR USE IN NON-LETHAL PROJECTILES, NAMELY, LIQUID AND NON-LIQUID MATERIALS, NAMELY, WATER, INERT OR IRRITANT POWDERS, OLEORESIN CAPSICUM, MARKER DYES, IRRITANTS AND POWDERED OR GRANULATED MATERIALS, NAMELY BISMUTH, IN CLASS 13

---

[2] Real Action included in a single document (1) its Statement of Disputes of Fact in response to Counter-Defendants' original Statement of Uncontroverted Facts and (2) its Statement of Uncontroverted Facts.  *See* Dkt. No. 308-12.

For citation purposes, this Order separately cites Real Action's Responses to Counter-Defendants' SUF ("RAP SUF Resp.") and Real Action's Statement of Facts ("RAP SUF").  Real Action's Responses contain both Counter-Defendants' SUF (Dkt. No. 307-1) and Real Action's responses thereto.

United States District Court
Northern District of California

1    (U.S. CLS. 2 AND 9)."[3]  RAP SUF Resp. ¶ 8; Gibson Decl., Ex. 4; Decl. of Padraic Glaspy

2    ("Glaspy Decl."), Ex. 63, Dkt. No. 309.

3         Jaycor Tactical twice filed a change of name to PepperBall Technologies, Inc.

4    ("PepperBall Technologies" or "PTI"), once on December 26, 2002 and again on July 23, 2003.

5    RAP SUF Resp. ¶¶ 10-11; *see* Gibson Decl., Exs. 6-7.  PepperBall Technologies was registered as

6    a Delaware corporation.  Gibson Decl., Ex. 7.  The July 23, 2003 filing included an assignment of

7    the PepperBall mark to PepperBall Technologies.  *Id.*; RAP SUF Resp. ¶ 11.

8         2.    The Simpson Loans

9         On January 15, 2010, PepperBall Technologies took out a loan from the James Simpson

10   Foundation (the "Simpson Foundation Loan"), which provided a security interest in PepperBall

11   Technologies' intellectual property, including its trademarks and associated goodwill.  RAP SUF

12   Resp. ¶ 15; Gibson Decl., Ex. 9.  Under the terms of the Simpson Foundation Loan, "Borrower

13   grants Lender a security interest in all of Borrower's personal property . . . , including without

14   limitation all of the following: all accounts, cash, patents, copyrights, trademarks, goodwill,

15   general intangibles . . . ."  Gibson Decl., Ex. 9 § 2.  PepperBall Technologies also took out a loan

16   from the J.A. & G.L. Simpson Trust (the "Simpson Trust Loan") (together with the Simpson

17   Foundation Loan, the "Simpson Loans"), a related Simpson entity.  RAP SUF Resp. ¶ 16.  The

18   Simpson Trust Loan "contained substantially the same terms" as the Simpson Foundation Loan.

19   RAP SUF Resp. ¶ 16.

20        On October 25, 2011, the J.A. & G.L. Simpson Trust and the James Simpson Foundation

21   (together, the "Lenders") and PepperBall Technologies amended the Simpson Loans to include

22   PepperBall Technologies-CA, Inc. ("PepperBall Technologies-CA" or "PTI-CA") as a co-

23   borrower.  Counter-Defs.' Statement of Uncontroverted Facts ("Counter-Defs.' SUF") ¶ 17, Dkt.

24   No. 307-1; Gibson Decl., Ex. 10 (Second Amendment to the Simpson Foundation Loan); *id.*, Ex.

25   12 (Second Amendment to the Simpson Trust Loan); Declaration of Jim Simpson ("Simpson

26

27   ───────────────────
     [3] Another PepperBall trademark was registered under the number 2,651,502 (the "1502 mark") to
28   Jaycor Tactical on November 19, 2002.  RAP SUF ¶ 9; Gibson Decl., Ex. 5.  The 1502 mark is not
     at issue in this litigation.

United States District Court
Northern District of California

United States District Court
Northern District of California

Decl."), Ex. 2 (Second Amendment to the Simpson Foundation Loan), Dkt. No. 320-4; *id.*, Ex. 3 (Second Amendment to the Simpson Trust Loan).  PepperBall Technologies-CA is a wholly owned subsidiary of PepperBall Technologies and is incorporated in Delaware.  Gibson Decl., Ex. 13.  Both amendments provided that "the grant of security interest set forth in Section 2 of the Original Agreement shall be deemed for all purposes to include a grant of security interest by PepperBall Technologies-CA in its personal property[.]"  Gibson Decl., Exs. 10 ¶ 2 & 12 ¶ 2; Simpson Decl., Exs. 2 ¶ 2 & 3 ¶ 2.  PepperBall Technologies' and PepperBall Technologies-CA's chairman, as well the James Simpson Foundation's president, signed the amendments.  *See* Gibson Decl., Exs. 10, 12; Simpson Decl., Exs. 2-3.  The James Simpson Foundation filed two Uniform Commercial Code ("UCC") Financing Statements with the Delaware Secretary of State indicating it and the J.A. & G.L. Simpson Trust had a secured interest in "[a]ll of Borrower [PepperBall Technologies-CA]'s personal property . . . including without limitation all of the following: . . . patents, copyrights, trademarks, [and] goodwill[.]"  RAP SUF Resp. ¶ 18; Gibson Decl. Exs. 16-17.

Phoenix International LLC ("Phoenix") acquired the Simpson Loans through an Assignment Agreement.  RAP SUF Resp. ¶ 21; Gibson Decl., Exs. 20-22.  In addition to the Simpson Loans, PepperBall Technologies and PepperBall Technologies-CA took out "second-tier debt" in the form of small loans from individuals and entities.  RAP SUF Resp. ¶ 22; Gibson Decl., Exs. 18, 40.  PepperBall Technologies also gave a security interest to Agility Capital, LLC ("Agility Capital").  RAP SUF Resp. ¶ 19; Gibson Decl., Ex. 18.

3.    The UCC Foreclosure Sale

PepperBall Technologies and PepperBall Technologies-CA materially defaulted on the Simpson Loans.  Counter-Defs.' SUF ¶ 24; *see* Gibson Decl., Exs. 20-22.  On January 9, 2012, Phoenix held a UCC foreclosure sale pursuant to the security interests in PepperBall Technologies and PepperBall Technologies-CA's secured assets, including the PepperBall trademark and goodwill.  Counter-Defs.' SUF ¶ 25.  Notices of the UCC foreclosure sale were placed in the San Diego Daily Transcript on December 30, 2011 and January 6, 2012.  RAP SUF Resp. ¶ 26; Gibson Decl., Exs. 23-24.  Notice of the sale was made by multiple means and sent to each of PepperBall

4

1   Technologies' secured creditors.  Counter-Defs.' SUF ¶ 27; *see, e.g.*, Gibson Decl., Ex. 26.

2   PepperBall Technologies-CA received notice of the foreclosure sale indicating its assets were

3   being foreclosed upon; it did not object to or challenge the sale.  Counter-Defs.' SUF ¶ 29.

4   PepperBall Technologies and PepperBall Technologies-CA worked with Phoenix to ensure

5   foreclosure proceedings included the proper entities.  *Id.* ¶ 28.

6           On May 25, 2012, Phoenix changed its name to Advanced Tactical Ordinance Systems

7   LLC; it filed a second Certificate of Amendment that same day to correct the name to Advanced

8   Tactical Ordnance Systems LLC ("ATO").  RAP SUF Resp. ¶¶ 31-32; Gibson Decl., Exs. 28-29.

9   On December 5, 2012, ATO filed with the USPTO a nunc pro tunc Bill of Sale memorializing the

10  completed foreclosure sale.  RAP SUF Resp. ¶ 34; *see id.* ¶ 33 (not disputing nunc pro tunc

11  trademark assignment); Gibson Decl., Ex. 30.  The Bill of Sale's identified property included the

12  PepperBall mark as the property.  Gibson Decl., Ex. 30.

13          4.      Renewal of the PepperBall Mark

14          On May 13, 2009, the USPTO received pursuant to Section 8 of the Lanham Act a

15  Declaration of Use regarding the PepperBall mark.  *See* Glaspy Decl., Ex. 67; Counter-Defs.'

16  Reply to RAP SUF ¶¶ 1-2, Dkt. No. 320-7.[4]  The Section 8 Declaration lists "Jaycor Tactical

17  Systems, Inc." as the current owner and "Pepperball Technologies, Inc." as the proposed owner.

18  Glaspy Decl., Ex. 67.  The Declaration is signed by Conrad Sun.  *Id.*  The USPTO accepted the

19  Declaration on June 29, 2009.  *Id.*, Ex. 66.

20          On October 30, 2013, ATO filed a Section 8 Declaration of Use and a Section 9

21  Application for Renewal for the PepperBall mark.  Counter-Defs.' SUF ¶ 49; Gibson Decl., Ex.

22  35.  On November 4, 2013, the USPTO granted the Section 9 Renewal portion, but it rejected the

23  Section 8 portion because "[o]ffice records do not show clear chain of title in the party [ATO] who

24  filed the Section 8 Affidavit."  Counter-Defs.' SUF ¶ 50; Gibson Decl., Ex. 36.  That same day,

25  ATO filed with the USPTO a statement confirming ATO had acquired the PepperBall mark in a

26  foreclosure sale.  Counter-Defs.' SUF ¶ 51; Gibson Decl., Ex. 37.  On November 13, 2013, the

27  ─────────────────

28  [4] This document contains both Real Action's asserted facts and Counter-Defendants' reply thereto.

United States District Court
Northern District of California

1    USPTO issued a Notice of Acceptance under Section 8 and Registration Renewal under Section 9.

2    Counter-Defs.' SUF ¶ 52; Gibson Decl., Ex. 38.

3             5.    UTS Acquisition of ATO and the PepperBall Mark

4             ATO's assets were transferred to UTS by written assignment.  RAP SUF Resp. ¶ 56;

5    Gibson Decl. ¶ 63.  The PepperBall mark was included in the transfer of these assets.  RAP SUF

6    Resp. ¶¶ 56-57; *see* Gibson Decl., Ex. 33.

7    **B.     Procedural Background**

8             Litigation over the PepperBall trademark has been extensive and fought in multiple courts.

9             1.    The Indiana Action

10            In September 2012, ATO filed suit in the United States District Court for the Northern

11   District of Indiana in a case styled *Advanced Tactical Ordnance Systems, LLC v. Real Action*

12   *Paintball, Inc., et al.*, Case No. 12-00296-JVB-RBC (N.D. Ind.), in which ATO sought and

13   obtained a temporary restraining order ("TRO") against Real Action (the "Indiana Action").[5]  RAP

14   SUF ¶ 42; Glaspy Decl., Exs. 49-50.  On August 16, 2013 and after approximately forty hours of

15   evidentiary hearings, the Northern District of Indiana issued a preliminary injunction against Real

16   Action which, among other things, prohibited Real Action from selling the irritant projectiles it

17   purchased from ATO.  RAP SUF ¶ 43; *see* Glaspy Decl., Exs. 51-60.

18            Real Action appealed to the United States Court of Appeals for the Seventh Circuit.  RAP

19   SUF ¶ 45; Glapsy Decl., Ex. 61.  The Seventh Circuit found the district court lacked personal

20   jurisdiction over Real Action and ordered the district court to vacate the preliminary injunction

21   and dismiss the action.  RAP SUF ¶ 46; *see* Glaspy Decl., Ex. 62.[6]

22            2.    The Instant Proceedings

23            The parties have litigated the case in this Court since 2014.  On May 27, 2014, Real Action

24   sued ATO for claims arising out of the Indiana Action in a case styled *Real Action Paintball, Inc.*

25   _____

26   [5] ATO also sought a TRO against APON Industries Corp., APON International Group, and
     Conrad Sun.  The Northern District of Indiana dismissed those parties after they settled with ATO.

27   [6] The Seventh Circuit's opinion is available at *Advanced Tactical Ordnance Sys., LLC v. Real*
28   *Action Paintball, Inc.*, 751 F.3d 796, 799 (7th Cir. 2014), *as corrected* (May 12, 2014).

*United States District Court*
*Northern District of California*

1    *v. Adv. Tactical Ordnance Sys., Inc., et al.*, 14-cv-2435-MEJ (N.D. Cal.) (the "ATO Case").  RAP

2    SUF ¶ 48.  On September 5, 2014, UTS filed the present suit against Real Action (the "UTS

3    Case").  RAP SUF ¶ 47; *see* Compl., Dkt. No. 1.  UTS asserts ten claims against Real Action: (1)

4    infringement of a registered trademark pursuant to 15 U.S.C. § 1114; (2) infringement of a

5    trademark pursuant to 15 U.S.C. § 1125(a); (3) common law trademark infringement and unfair

6    competition; (4) deceptive comparative advertising in violation of 15 U.S.C. § 1125(a); (5)

7    counterfeiting in violation of 15 U.S.C. § 1114, et seq.; (6) trade dress infringement; (7) trademark

8    dilution; (8) misappropriation of trade secrets; (9) violation of California false advertising law,

9    Cal. Bus. & Prof. Code § 17500; and (10) violation of California unfair competition law, Cal. Bus.

10   & Prof. Code § 17200.  Compl. ¶¶ 32-90.

11          UTS moved for a TRO (Dkt. No. 27), which the Court construed as a Motion for a

12   Preliminary Injunction (Dkt. No. 34 at 5).  The Court ultimately granted it in part and denied it in

13   part, and enjoined Real Action from using the PepperBall name to refer to its irritant projectiles.

14   Dkt. No. 85; *see United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 2014 WL 6788310, at *1

15   (N.D. Cal. Dec. 2, 2014).  Real Action then counter-sued UTS, asserting several counterclaims

16   that were related to its claims against ATO.  Dkt. No. 51.  The Court subsequently consolidated

17   the two actions under the UTS Case.  Dkt. No. 140.

18          Real Action's operative Third Amended Counterclaim asserts thirteen counterclaims

19   against Counter-Defendants.  *See* Third Am. Countercl. ¶¶ 71-192, Dkt. No. 281.  Real Action

20   asserts three federal claims: (1) wrongful seizure, 15 U.S.C. § 1116(d)(1); (2) false designation of

21   origin, 15 U.S.C. § 1125; and (3) monopoly and combination in restraint of trade, 15 U.S.C. §§ 1-

22   2.  *Id.* ¶¶ 71-78, 111-36.  Real Action also asserts seven claims under state law: (1) abuse of

23   process under Indiana law; (2) intentional interference with contractual relations under Indiana and

24   California laws; (3) intentional or negligent interference with prospective economic advantage

25   under Indiana and California laws; (4) combination in restraint of trade under the California

26   Cartwright Act, Cal. Bus. & Prof. Code § 16720 et seq.; (5) unfair competition and false

27   advertising, Cal. Bus. & Prof. Code §§ 17200, 17500; (6) unjust enrichment under Indiana law;

28   and (7) conspiracy under California and Indiana laws.  *Id.* ¶¶ 79-108, 137-53, 165-78.  Finally,

1    Real Action seeks declaratory judgments (1) of no Lanham Act, common law trademark, or trade

2    dress violations; (2) of no trade secret misappropriation; and (3) for the cancellation of the

3    PepperBall registration.  *Id.* ¶¶ 154-64, 180-92.

4         The Court ordered the parties to attend a settlement conference before the Honorable

5    Joseph C. Spero.  Dkt. No. 218 at 2.  At the settlement conference, the parties agreed to file cross

6    motions for summary judgment on two issues:  (1) whether the registered trademark(s) at issue in

7    this case was validly transferred, and (2) whether the registered trademark(s) at issue had lapsed

8    before it was transferred.  Settlement Minutes, Dkt. No. 270; *see* Dkt. No. 278 at 1 n.1.  These

9    Motions followed.

10                        **REQUEST FOR JUDICIAL NOTICE**

11        Counter-Defendants request the Court take judicial notice of forty-four documents filed

12   with the Northern District of Indiana and the U.S. Court of Appeals for the Seventh Circuit; the

13   U.S. Patent and Trademark Office; the Delaware and Colorado Secretaries of States; and the U.S.

14   Securities and Exchange Commission ("SEC").  Request for Judicial Notice ("RJN") at 2-7, Dkt.

15   No. 311.  Real Action does not oppose Counter-Defendants' request.

16        Pursuant to Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that

17   is not subject to reasonable dispute because it: (1) is generally known within the trial court's

18   territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

19   accuracy cannot reasonably be questioned."  Documents in the public record may be judicially

20   noticed to show, for example, that a judicial proceeding occurred or that a document was filed in

21   another case, but a court may not take judicial notice of findings of facts from another case.  *Lee v.*

22   *City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001).  Nor may a court take judicial notice of any matter

23   that is in dispute.  *Id.* at 689-90; *but see Ruiz v. City of Santa Maria*, 160 F.3d 543, 548 n.13 (9th

24   Cir. 1998) (finding judicial notice is inappropriate where the facts to be noticed were not relevant

25   to the disposition of the issues before the court).

26   **A.    Documents Filed in the Northern District of Indiana and the Seventh Circuit**

27        Counter-Defendants seek judicial notice of seventeen documents that were filed in the

28   Indiana Action.  RJN at 2-4; *see* Glaspy Decl., Exs. 46, 48, 50-62, 64.  Because they have been

United States District Court
Northern District of California

8

publicly filed in other litigation, the Court may judicially notice these documents. *See Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of undisputed matters of public record, . . . including documents on file in federal or state courts." (internal citation omitted)). The Court GRANTS Counter-Defendants' request as to these exhibits, but it does so solely for its existence and content, not the truth of any statements therein. *See Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 913 (N.D. Cal. 2015).

**B.     Documents Filed with the USPTO and the SEC**

Counter-Defendants also request the Court take judicial notice of twenty-four documents filed with the USPTO and one document filed with the SEC. RJN at 4-7; *see* Glaspy Decl., Ex. 39, 41-45, 63, 65; Gibson Decl., Exs. 2-7, 18-19, 30, 34-38, 66-67. As these documents are public records filed with the USPTO or the SEC, they are properly the subject of judicial notice. *See Kelly v. Primco Mgmt., Inc.*, 2015 WL 10990368, at *4 (C.D. Cal. Jan. 12, 2015). The Court thus GRANTS Counter-Defendants' Request as to these documents. However, while "the USPTO [and the SEC] records may be subject to judicial notice, they are noticeable only for the limited purpose of demonstrating that the filings and actions described therein occurred on certain dates." *Pinterest Inc. v. Pintrips Inc.*, 15 F. Supp. 3d 992, 997 (N.D. Cal. 2014).

**C.     Documents Filed with the Delaware and Colorado Secretaries of State**

Counter-Defendants also request judicial notice of documents filed with the Delaware and Colorado Secretaries of State. RJN at 7; *see* Gibson Decl., Exs. 16-17. Because these UCC financing statements are public records, the Court GRANTS Counter-Defendants' Request as to them. *See Hanover Ins. Co. v. Fremont Bank*, 68 F. Supp. 3d 1085, 1092 (N.D. Cal. 2014) (taking judicial notice of UCC Financing Statement); *Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*, 2016 WL 4524305, at *4 (N.D. Cal. Aug. 30, 2016) (finding it appropriate to take judicial notice of filings with the California Secretary of State).

**EVIDENTIARY OBJECTIONS**

Real Action and Counter-Defendants assert several evidentiary objections. Real Action objects to evidence Counter-Defendants included with their Reply, specifically, portions of the Reply Declaration of Gary Gibson (Gibson Reply Decl., Dkt. No. 320-4), the Declaration of

1   George Eurick (Eurick Decl., Dkt. No. 320-2), and Exhibits 2 and 3 of the Simpson Declaration.

2   RAP Reply at 2-3.  Counter-Defendants object to paragraph 3 of the Declaration of Paul B.

3   Overhauser submitted in support of Real Action's Reply ("Overhauser Reply Declaration"), which

4   discusses Exhibits 2 and 3 of the Simpson Declaration.  UTS Obj., Dkt. No. 323; *see* Overhauser

5   Reply Decl., Dkt. No. 322-1.

6   **A.       The Gibson Reply Declaration**

7          Real Action objects to paragraph 3 of the Gibson Declaration on the ground that it asserts

8   an inadmissible legal conclusion.  *Id.* at 2.  "[S]tatements in declarations based on speculation or

9   improper legal conclusions, or argumentative statements, are not facts and likewise will not be

10  considered on a motion for summary judgment.  Objections on any of these grounds are simply

11  superfluous in this context."  *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D.

12  Cal. 2006).  The Court thus OVERRULES Real Action's objection to paragraph 3 of the Gibson

13  Reply Declaration.

14         Real Action also objects to paragraphs 5 through 8 of the Gibson Reply Declaration for

15  lack of personal knowledge.  RAP Reply at 2.  Real Action contends that "[b]ecause Mr. Gibson

16  expressly conditions his allegations the statements 'to my knowledge' (¶¶ 5, 6, 8) and 'as far as I

17  am aware' (¶ 5), these statements are not based on personal knowledge as required by Rule 56(c)."

18  *Id.*  Accordingly, Real Action argues "Gibson's declaration does not affirmatively show that he is

19  competent to testify about these matters."  Reply at 2.  Real Action does not specifically address

20  how Gibson lacks personal knowledge of the statements made in paragraph 7.

21         Rule 56(c) requires that "[a]n affidavit or declaration used to support or oppose a motion

22  must be made on personal knowledge, set out facts that would be admissible in evidence, and

23  show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P.

24  56(c)(4).  The Court disagrees that Gibson's statements that his assertions are made "[t]o [his]

25  knowledge" or "[t]o the best of [his] knowledge" indicate that he lacks personal knowledge.  *See*

26  Gibson Reply Decl. ¶¶ 5-6, 8.  On the contrary, Gibson offers explanations as to how his

27  knowledge was formed:

28  //

United States District Court
Northern District of California

1

> I was involved in providing the required notice of the foreclosure
> sale to all known secured creditors of PTI and/or PTI-CA. I worked
> with John Stitska, who was an officer of PTI-CA (dba PTI), and
> James Drake, ATO's counsel, in sending notice to the proper
> individuals and entities and I am familiar with the process by which
> notice was sent.

2

3

4   *Id.* ¶ 4. Given that he was personally involved in the notice process, Gibson would have personal

5   knowledge regarding Conrad Sun's involvement and notice to PepperBall Technologies and

6   PepperBall Technologies-CA's known secured creditors. *See id.* ¶¶ 5-6. That he makes the

7   declaration "to [his] knowledge" does not change that.

8        Gibson also declares he "did not have any knowledge that Scott & Goldman was a secured

9   creditor of either PTI or PTI-CA" because "[t]here was no lien filed by Scott & Goldman at the

10  time that we completed our search for secured creditors." *Id.* ¶ 7. Finally, Gibson explains that he

11  knows that "[t]o date no secured creditor of PTI has ever . . . complained about the foreclosure

12  sale on the basis of lack of notice or any other basis" because "[n]either Primary Funding

13  Corporation nor Scott & Goldman, Inc. have ever complained about the foreclosure sale based on

14  lack of notice." *Id.* ¶ 8. Given that Gibson explains the bases for his personal knowledge, the

15  Court OVERRULES Real Action's objections to paragraphs 5 through 8 of the Gibson Reply

16  Declaration.[7]

17  **B.      The Eurick Declaration**

18       Real Action also requests the Court strike the Eurick Declaration for lack of personal

19  knowledge. RAP Reply at 3. Real Action notes Eurick never states when he served as an officer

20  of UTS and does not claim to have worked for ATO, Primary Funding Corporation, PepperBall

21  Technologies-CA or PepperBall Technologies. *Id.*

22       There is no evidence that Eurick ever worked for ATO. *See* Eurick Decl. The Court

23  agrees that Eurick fails to establish personal knowledge about ATO's knowledge or awareness of

24  matters and SUSTAINS Real Action's objections to the portions of the Eurick Declaration that

25  _____

26  [7] To the extent Real Action objects Gibson's statement regarding Conrad Sun's personal
    knowledge of the notice process (*see* Gibson Reply Decl. ¶ 5), the Court OVERRULES such
27  objection. *See Smith v. Cty. of Santa Clara*, 2016 WL 4076193, at *8 (N.D. Cal. Aug. 1, 2016),
    *appeal dismissed* (Sept. 30, 2016) ("'[O]bjections to evidence on the ground that it is . . .
28  speculative . . . [is] duplicative of the summary judgment standard itself' and [is] unnecessary."
    (quoting *Burch*, 433 F. Supp. 2d at 1119)).

United States District Court
Northern District of California

1    pertain to ATO.

2        Further, although Eurick declares he is the UTS' Chief Innovation Officer (Eurick Decl. ¶

3    1), he does not explain how this position gives him familiarity with certain aspects of UTS or

4    ATO.  For instance, it is unclear how Eurick, as Chief Innovation Officer, would have knowledge

5    about the use of the term "pepperball" by parties other than UTS.  The Court therefore SUSTAINS

6    Real Action's objections to paragraphs 4, 5, and 6 of the Eurick Declaration.

7        However, the Court disagrees with Real Action's assertion that "Eurick does not claim to

8    have worked for . . . Primary Funding Corporation, PepperBall Technologies -- CA, Inc. or

9    PepperBall Technologies, Inc., so he clearly lacks knowledge about matters supposedly within the

10   corporate knowledge of those companies."  RAP Reply at 3.  On the contrary, Eurick states that

11   "[i]n my position at the time of the foreclosure sale . . . I worked with Primary Funding

12   Corporation, and specifically with its CEO, Patricia Burns.  Primary Funding Corporation received

13   notice of that sale and was fully aware of the foreclosure sale prior to it taking place.  I am

14   personally aware that notice of the foreclosure sale was given to Primary Funding Corporation."

15   Eurick Decl. ¶ 7.  Eurick further states that "I had business dealings with Pepperball

16   Technologies, Inc. prior to and leading up to the time of the foreclosure sale."  *Id.* ¶ 8.  These

17   dealings with Primary Funding Corporation and PepperBall Technologies provide a basis for his

18   knowledge about Primary Funding Corporation's receipt of notice of the foreclosure sale and

19   about the names under which PepperBall Technologies and PepperBall Technologies-CA

20   conducted business.  Accordingly, the Court OVERRULES Real Action's objections to

21   paragraphs 7 and 8 of the Eurick Declaration.

22   **C.    Exhibits 2 and 3 of the Simpson Declaration and Paragraph 3 of the Overhauser**

23   **       Reply Declaration**

24        Real Action objects to Exhibits 2 and 3 of the Simpson Declaration, which consist of the

25   Second Amendments to the Simpson Foundation and Trust Loans, respectively.  Reply at 3-4; *see*

26   Simpson Decl., Exs. 2-3.  Counter-Defendants submitted versions of these documents in support

27   of their Motion.  *See* Gibson Decl., Exs. 10, 12.  Real Action points out that the Second

28   Amendments attached to the Gibson Declaration are missing the Lenders' signatures.  RAP Mot.

United States District Court
Northern District of California

1    at 43; *see* Gibson Decl., Exs. 10, 12.  In response, Counter-Defendants submit Exhibits 2 and 3 of

2    the Simpson Declaration, which show the Second Amendments with the signatures of James

3    Simpson as President/Director of the James Simpson Foundation, and Simpson and Gretchen

4    Simpson as Trustees of the J.A. & G.L. Simpson Trust.  *See* Simpson Decl., Ex. 2 at 3; *id.*, Ex. 3

5    at 3.  Real Action contends Counter-Defendants failed to disclose the Second Amendments during

6    discovery, despite a Court order requiring "the parties [to] produce all documents relating to the

7    trademark registrations and renewals and to the transfer of the registered trademark in accordance

8    with Judge Spero's proposal **by September 1, 2016**."  Dkt No. 278 at 2 (emphasis in original); *see*

9    Settlement Minutes. In support of this argument, Real Action offers the Overhauser Reply

10   Declaration, in which counsel for Real Action declares that

> On December 1, 2016, as part of the Declaration of Jim Simpson
> (Dkt. 320-4), UTS proffered two new versions of (a) a document
> entitled Second Amendment To Loan Agreement purportedly
> between the James Simpson Foundation, Pepperball Technologies,
> Inc. and Pepperball Technologies -- CA, Inc.; and (b) a document
> entitled Second Amendment To Loan Agreement purportedly
> between the J.A. & G.L. Simpson Trust, Pepperball Technologies,
> Inc. and Pepperball Technologies -- CA, Inc.  UTS had never
> produced these documents prior to submitting them as part of the
> Simpson Declaration.

17   Overhauser Reply Decl. ¶ 3.[8]

18          Counter-Defendants object to this paragraph as inadmissible speculation and for lack of

19   foundation.  UTS Obj. at 1.  Counter-Defendants contend "Overhauser does not indicate anywhere

20   in his declaration any knowledge as to whether Plaintiff or Counter-Defendants were in possession

21   of the fully executed amendment documents prior to submitting them with their Opposition, and

22   therefore whether they were under any duty to produce the same, or had any ability to."  *Id.*  They

23   explain that "Counter-Defendants were not in possession of a copy of the fully executed

24   agreement, but rather were able to obtain the same after Real Action filed its Cross-Motion . . . in

25   which, for the first time, it challenged the validity of the Second Amendment on the basis that it

26   had not been fully executed."  *Id.* at 2 (internal citation omitted).  "Once challenged, Plaintiff and

27

28   _____
     [8] The Overhauser Reply Declaration contains two paragraphs numbered as "3."  *See* Overhauser
     Reply Decl.  This citation refers to the first paragraph "3."

13

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Counter-Defendants were able to obtain a copy of the fully executed agreement from Jim

2   Simpson, who was in possession of such a copy, and as is reflected in the declaration that he

3   submitted with [Counter-Defendants'] Opposition." *Id.*  Counter-Defendants emphasize that "no

4   one, including Real Action, had previously challenged the validity of the Second Amendment on

5   the basis of the lack of a fully executed copy of the amendment documents." *Id.*

6         The Court is perturbed that Counter-Defendants did not obtain or produce Exhibits 2 and 3

7   to the Simpson Declaration prior to filing its Motion.  "If a party fails to provide information . . .

8   as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply

9   evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is

10  harmless." Fed. R. Civ. P. 37(c)(1).  Nonetheless, Real Action offers no evidence that Counter-

11  Defendants *purposefully* withheld Exhibits 2 and 3.  The Overhauser Declaration fails to establish

12  that Counter-Defendants could and should have produced Exhibits 2 and 3 before September 1,

13  2016, or that Counter-Defendants were not otherwise substantially justified in failing to provide

14  them to Real Action.  Further, Real Action is not harmed by not receiving Exhibits 2 and 3 before

15  this point: their argument on the issue is relatively brief (only three paragraph), and they had an

16  opportunity to address these documents in their Reply.  Therefore, the Court SUSTAINS Counter-

17  Defendants' objection to paragraph 3 of the Overhauser Reply Declaration and OVERRULES

18  Real Action's objections to Exhibits 2 and 3 of the Simpson Declaration.

19                                    **LEGAL STANDARD**

20        Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

21  that there is "no genuine dispute as to any material fact and [that] the movant is entitled to

22  judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment

23  bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that

24  demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

25  317, 323 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v.

26  Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is

27  sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

28        Where the moving party will have the burden of proof on an issue at trial, it must

                                        14

affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 324-25.

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 250.  All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  However, it is not the task of the Court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.*; *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322 (internal quotations omitted).

Additionally, at the summary judgment stage, parties must set out facts they will be able to prove at trial.  At this stage, courts "do not focus on the admissibility of the evidence's form . . . . [but] instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citation omitted).  "While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citations omitted).  Accordingly, "[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001); *Celotex*, 477 U.S. at 324 (a party need not "produce

15

1  evidence in a form that would be admissible at trial in order to avoid summary judgment."); *see*

2  *also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must

3  be made on personal knowledge, set out facts that would be admissible in evidence, and show that

4  the affiant or declarant is competent to testify on the matters stated.").

**DISCUSSION**

6        The Court first addresses whether the registered trademark at issue had lapsed before it was

7  transferred then turns to the issue of whether the registered trademark at issue was validly

8  transferred.

9  **A.**      **Whether the PepperBall Trademark Lapsed Prior to the Transfer**

10        Section 9 of the Trademark Act provides that a trademark "registration may be renewed for

11  periods of 10 years at the end of each successive 10-year period following the date of

12  registration."  15 U.S.C. § 1059(a); *see In re Bose Corp.*, 580 F.3d 1240, 1242 n.1 (Fed. Cir. 2009)

13  ("Federal trademark registrations issued on or after November 16, 1989, remain in force for ten

14  years, and may be renewed for ten-year periods.").  "To renew a registration, the owner must file

15  an Application for Renewal under Section 9."  *In re Bose*, 580 F.3d at 1242 n.1.

16        In addition, Section 8 requires the trademark's owner to file, before the fifth and tenth

17  years of the registration, an affidavit or declaration stating the trademark is still in use, among

18  other things.  15 U.S.C. § 1058(a), (b)(1)(A); *see* 37 C.F.R. § 2.160 ("[T]he owner of the

19  registration must file an affidavit or declaration of continued use or excusable nonuse, or the

20  registration will be cancelled . . . on or after the fifth anniversary and no later than the sixth

21  anniversary after the date of registration"); *id.* § 2.161 ("A complete affidavit or declaration under

22  section 8 of the Act must . . . [i]nclude a verified statement attesting to the use in commerce . . .

23  within the period set forth in section 8 of the Act.").  Failure to timely file a Section 8 affidavit

24  automatically results in the trademark's cancellation.  15 U.S.C. § 1058(a) ("[T]he registration of

25  any mark shall be canceled by the Director unless the owner of the registration files in the United

26  States Patent and Trademark Office [Section 8] affidavits . . . ."); 37 C.F.R. § 2.164(b) ("If the

27  affidavit or declaration is not filed within the time periods set forth in section 8 of the Act, the

28  registration will be cancelled.").

United States District Court
Northern District of California

1    "Registration of a mark is prima facie evidence of the validity of the mark, the registrant's

2    ownership of the mark, and the registrant's exclusive right to use the mark in connection with the

3    goods specified in the registration."  *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th

4    Cir. 2014) (citing 15 U.S.C. § 1115(a)); *see Yellow Cab Co. of Sacramento v. Yellow Cab of Elk*

5    *Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005) ("Federal registration of a mark constitutes prima

6    facie evidence of the validity of the mark." (citing 15 U.S.C. § 1057(b)).  "Therefore, the registrant

7    is granted a presumption of ownership, dating to the filing date of the application for federal

8    registration, and the challenger must overcome this presumption by a preponderance of the

9    evidence."  *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir.), *as modified*, 97

10   F.3d 1460 (9th Cir. 1996).

11          1.      The 2009 Section 8 Declaration

12          Jaycor, which later became Jaycor Tactical, originally registered the PepperBall mark on

13   May 13, 2003.  RAP SUF Reply ¶¶ 6, 8; Gibson Decl., Ex. 4.  Jaycor Tactical changed its name

14   and transferred the PepperBall mark to PepperBall Technologies on July 23, 2003.  *See* RAP SUF

15   Reply ¶ 11; Glaspy Decl., Ex. 63.  The Lanham Act required the PepperBall mark's owner to file a

16   Section 8 affidavit in 2009 and both a Section 8 affidavit and a Section 9 renewal in 2013 to keep

17   the mark valid.  *See* 15 U.S.C. §§ 1058-59.  Real Action maintains the true owner of the

18   PepperBall mark did not file the 2009 Section 8 Declaration and the Declaration is therefore

19   invalid.  RAP Mot. at 18-20.

20          a.      *Owner of the PepperBall Mark*

21          On May 13, 2009, PepperBall Technologies filed a Combined Declaration of Use and

22   Incontestability under Sections 8 and 15, which listed "PepperBall Technologies, Inc." as the

23   mark's proposed owner.  *See* 2009 Declaration.  The USPTO accepted the Declaration on June 29,

24   2009, stating "[t]he registration remains in force."  *Id.*, Ex. 66.  Counter-Defendants have therefore

25   made a prima facie showing that PepperBall Technologies was the owner of the PepperBall mark

26   in 2009.

27          Real Action disputes PepperBall Technologies was the true owner and argues the

28   PepperBall mark's owner did not file timely or properly file the required affidavits or renewals

and, as a result, the mark lapsed.  RAP Mot. at 18-33.  This claim is based on Real Action's assertion that two distinct corporations used the name "PepperBall Technologies, Inc.": (1) a Delaware corporation, which became PepperBall Technologies-CA after a merger; and (2) a Colorado corporation, which resulted from Securities With Advanced Technologies, Inc.'s ("SWAT") name change to PepperBall Technologies, a Colorado corporation.

Real Action contends that on September 19, 2008, PTI Acquisition Corp. ("PTI Acquisition") merged with and into PepperBall Technologies—which owned the PepperBall mark—under the name PepperBall Technologies-CA, Inc.  RAP Mot. at 4-5, 18; *see* Decl. of Paul Overhauser ("Overhauser Decl."), Ex. 7.  Real Action argues that pursuant to Delaware law, Pepperball Technologies-CA became the owner of the PepperBall mark as a result of the merger.  RAP Mot. at 12, 18 (citing Del. Code Ann. tit. 8 § 259 ("When any merger . . . shall have become effective . . . the constituent corporations shall become a new corporation, or be merged into 1 of such corporations, . . . all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation . . . .").

Around the time PepperBall Technologies and PTI Acquisition merged into Pepperball Technologies-CA in September 2008, SWAT changed its name to PepperBall Technologies, Inc.  RAP Mot. at 4-5; *see* Overhauser Decl., Ex. 6.  Real Action does not explain the relationship between SWAT and the original PepperBall Technologies.  *See* RAP Mot.; Overhauser Decl.  The new PepperBall Technologies, Inc. was registered as a Colorado corporation.  RAP Mot. at 5, 19; *see* Overhauser Decl., Ex. 6.  Real Action argues PepperBall Technologies and PepperBall Technologies-CA are "two separate corporations."  RAP Mot. at 3.

Real Action thus contends PepperBall Technologies did not own the PepperBall mark in 2009; rather, PepperBall Technologies-CA did.  RAP Mot. at 2, 5, 18.  Further, because non-owner PepperBall Technologies filed the 2009 Declaration, and PepperBall Technologies-CA did not, Real Action argues the trademark lapsed.

Counter-Defendants dispute Real Action's "argument that Pepperball Technologies and Pepperball-CA are '[t]wo different corporations' that bear no relation to each other."  UTS Reply

18

United States District Court
Northern District of California

at 17 (quoting RAP Mot. at 2; brackets in original).  Counter-Defendants argue PepperBall Technologies-CA was the wholly owned subsidiary of the parent company, the new PepperBall Technologies.  UTS Reply at 15.  In support, Counter-Defendants point to PepperBall Technologies-CA's corporate resolution that describes PepperBall Technologies-CA as "a wholly-owned subsidiary of Pepperball Technologies, Inc., a Colorado corporation ('Parent')."  Gibson Decl., Ex. 13; *see id.*, Ex. 14 (PepperBall Technologies' corporate resolution stating "proceeds of the Loan Agreements have been applied substantially to the benefit of the [PepperBall Technologies'] wholly-owned subsidiary, Pepperball Technologies-CA, Inc., a Delaware corporation[.]"); *id.*, Ex. 9 (Exhibit A to the Simpson Foundation Loan, listing PepperBall Technologies-CA as one of the "Subsidiaries and partnerships and joint ventures").  Real Action offers no facts to contradict Counter-Defendants' evidence of a subsidiary relationship.

Counter-Defendants further characterize Real Action's argument that PepperBall Technologies-CA owned the PepperBall mark by virtue of Delaware law as "all pure speculation . . . and not evidence."  UTS Reply at 17; *see id.* at 14 ("Real Action claims that by operation of Delaware law the resulting company, Pepperball-CA would have obtained the ownership of the trademark.  However, Real Action has no evidence for this assertion.").  Indeed, Counter-Defendants object to Real Action's Statement of Uncontroverted Facts stating PepperBall Technologies-CA owned the PepperBall registration as of May 2009 and May 2013.  Counter-Defs.' Reply to RAP SUF ¶¶ 1-2.

But Counter-Defendants nonetheless implicitly concede that PepperBall Technologies-CA was in fact the owner: "the evidence is that Pepperball-CA *was* the entity that filed the Section 8 Declaration here, but that it did so under the name Pepperball Technologies, Inc., because it did all its business, both before and after the merger with SWAT, under that name, including continued to hold the ownership of the PepperBall® trademark with the USPTO in that name."  UTS Reply at 17 (emphasis in original); *see id.* at 18 ("The only actual evidence in this case is that the party that Real Action contends *should* have filed the Section 8 Declaration, did in fact do so, just under the name it exclusively did business under and which was the name on the USPTO's register." (emphasis in original)).  Counter-Defendants thus recognize that PepperBall Technologies-CA is

19

the true owner of the PepperBall mark and should have filed the 2009 Declaration.

Counter-Defendants explain PepperBall Technologies-CA "continued to do business exclusively as Pepperball Technologies, and official USPTO records and filings continued to list the owner of the mark as Pepperball Technologies." *Id.* at 14.  Real Action argues Counter-Defendants "do[] not proffer any evidence that PepperBall Technologies-CA, Inc. was . . . 'doing business as' PepperBall Technologies, Inc." and "[o]nly someone from PepperBall Technologies-CA, Inc. would be competent to testify as what 'doing business as' names it used, but [Counter-Defendants] ha[ve] not offered a single declaration from any of its current or former representatives."  RAP Reply at 10.  This overlooks the Declaration of Jeffrey McGonegal PepperBall Technologies' and PepperBall Technologies-CA's former Chief Financial Officer.  *See* McGonegal Decl. ¶ 1, Dkt. No. 320-6.  McGonegal explains that "Pepperball Technologies-CA, Inc. exclusively conducted business under the name Pepperball Technologies, Inc.  Even after the company changed its name to Pepperball Technologies-CA, Inc., after the merger with SWAT, it did not do any business except under the name Pepperball Technologies, Inc." *Id.* ¶ 5.

But the 2009 Declaration does not reflect these details: it only names "PepperBall Technologies, Inc." as the mark's owner and does not mention that it is a dba for PepperBall Technologies-CA.  *See* Glaspy Decl., Ex. 67.  Even if PepperBall Technologies-CA is PepperBall Technologies' subsidiary, the evidence shows they are separate entities.  *See* Gibson Decl., Ex. 10 (noting PepperBall Technologies is a Colorado corporation and Pepperball Technologies-CA is a Delaware corporation); *id.*, Ex. 12 (same); Overhauser Decl., Ex. 6 (Articles of Amendment for PepperBall Technologies, Inc., a Colorado corporation, effective Sept. 29, 2009); *id.*, Ex. 7 (Sept. 19, 2008 Certificate of Merger for PepperBall Technologies-CA, Inc., a Delaware corporation).

Prior to October 30, 1999, the Lanham Act required a trademark's "registrant" to file a declaration or an affidavit of continued use.  That changed with the 1999 amendment.  According to the legislative history,

> [t]hroughout the revised section 8, the term "registrant" has been replaced by the term "owner." The practice at the Patent and Trademark Office has been to require that the current owner of the registration file all the post-registration affidavits needed to maintain a registration.  The current owner of the registration must aver to

United States District Court
Northern District of California

> actual knowledge of the use of the mark in the subject registration. However, the definition of "registrant" in section 45 of the Act states that the "terms 'applicant' and 'registrant' embrace the legal representatives, predecessors, successors and assigns of each applicant and registrant." Therefore, use of the term "registrant" in section 8 of the Act would imply that any legal representative, predecessor, successor or assign of the registrant could successfully file the affidavits required by sections 8 and 9. To correct this situation, and to keep with the general principal, as set out in section 1, that the owner is the proper person to prosecute an application, section 8 has been amended to state that the owner must file the affidavits required by the section.

H.R. Rep. No. 105-194, at 18-19 (1997). "[T]he statute expressly requires that the declaration be filed by the current owner of the registration within the time periods specified in § 8 of the Act." *Re: Trademark Registration of Ace III Commc'ns, Inc.*, 62 U.S.P.Q.2d 1049 (T.T.A.B. 2001).

In *In Re Media Central IP Corp.*, the Commissioner of Trademarks upheld the refusal of a Section 8 declaration filed by the subsidiary of the owner of a trademark, rather than the owner itself. 65 U.S.P.Q.2d 1637 (Dec. Comm'r Trademarks 2002). The USPTO had issued a registration to Hanson Publishing Group, Inc., which later changed its name to Cowles Business Media, Inc. ("Cowles"). In 1999, Cowles assigned the registration to Intertec Publishing Corporation ("Interec"), which changed its name to PRIMEDIA Business Magazines & Media Inc. in 2001. *Id.* at *1. PRIMEDIA in turn assigned the registration to Media Central IP Corporation ("Media Central"). *Id.* In 2000, Cowles filed a combined declaration of use and application for renewal; however, the Affidavit/Renewal Examiner refused the Section 8 declaration because it was unclear whether Cowles was the current owner of the registration. *Id.*

The Commissioner upheld the refusal. *Id.* at *4-5. Noting that "only the current owner of the registration can file an affidavit or declaration of use or excusable nonuse under 15 U.S.C. § 1058[,]" the Commissioner characterized the fact that the Declaration was signed by a person who had authority to sign on behalf of the registration's true owner and therefore should be accepted as "irrelevant." *Id.* at *3-4. What mattered was that "Intertec was the owner of the mark when Cowles, its subsidiary, filed the Section 8 Declaration. Although Cowles [was] a subsidiary of the current owner and a predecessor in interest, the fact remain[ed] that Cowles and Intertec [were] two separate entities." *Id.* "Since the current owner did not file an affidavit or declaration of continued use or excusable nonuse before the expiration of the statutory grace period, the

1    requirements of Section 8 of the Act ha[d] not been met." *Id.*  Accordingly, the Commissioner

2    ordered the registration cancelled.

3          Thus, PepperBall Technologies and PepperBall Technologies-CA's parent/subsidiary

4    relationship notwithstanding, the fact remains that they were separate corporations.  Although 15

5    U.S.C. § 1058 requires the current owner to file a declaration, there is evidence that PepperBall

6    Technologies-CA did not.  Courts have refused a Section 8 declaration when the declaration lists

7    an owner that does not match the name the USPTO has on record, even when declaration lists an

8    entity that is a dba for the true owner.

9          For instance, in *In re Precious Diamonds, Inc.*, the appellant filed a Section 8 declaration

10   stating "DAVID K. FINKEL, II . . . declares that he is a citizen of the United States, dba

11   PRECIOUS DIAMONDS, INC." 635 F.2d 845, 846 (C.C.P.A. 1980) (capitalization in original).

12   The declaration further stated that Finkel owned the registration.  *Id.*  The USPTO rejected "the

13   declaration because its records indicated that title was held by Precious and not Finkel dba

14   Precious." *Id.*  Although the appellant filed a declaration executed by Finkel, the examiner refused

15   it as untimely.  *Id.*  The declaration was subsequently denied, and the registration was cancelled.

16   *Id.* at 846-47.  The Commissioner held that because the "declaration was submitted by an

17   individual and not by the corporation, a separate legal entity, the declaration was not filed by 'the

18   registrant,' and amendment of the declaration after the statutory deadline would be

19   impermissible." *Id.*  The Court of Customs and Patent Appeals agreed and rejected the appellant's

20   argument that the mistake was a mere clerical error.  *Id.*; *see id.* ("Appellant has presented no

21   evidence of error in transcription or otherwise.").

22         That PepperBall Technologies was a dba for PepperBall Technologies-CA is a factual

23   distinction.  Moreover, this fact is not reflected in the 2009 Declaration: it makes no mention that

24   PepperBall Technologies is a dba, or that PepperBall Technologies-CA is the true owner.  Indeed,

25   it does not mention PepperBall Technologies-CA at all.

26         Counter-Defendants emphasize Conrad Sun signed the 2009 Declaration.  UTS Reply at

27   18-19.  Indeed he did, listing his position as "COO," or Chief Operating Officer.  *See* 2009 Section

28   8 Decl.; *see also* Glaspy Decl., Ex. 64 ¶ 2 (Dec. 6, 2012 Decl. of Conrad Sun submitted in the

1    Indiana Action, stating "I am the Chief Operating Officer of Pepperball Technologies, Inc.").

2    Counter-Defendants argue that Sun's signature supports its assertion that PepperBall

3    Technologies-CA filed the Declaration.  Specifically, Counter-Defendants contend that by signing

4    the Declaration, Sun "declare[d] that he/she is properly authorized to execute this document on

5    behalf of the Owner; and all statements made of his/her own knowledge are true and that all

6    statements made on information and belief are believed to be true."  UTS Reply at 18-19 (quoting

7    2009 Section 8 Decl. at ECF p.8).  Counter-Defendants correctly note that "Real Action submits

8    no evidence to the contrary."  *Id.*  But it is unclear how Sun's signature supports a finding that

9    PepperBall Technologies-CA submitted the Declaration: there are no facts that Sun was also the

10   COO of PepperBall Technologies-CA, or otherwise had the authority to act on PepperBall

11   Technologies-CA's behalf.  On the contrary, Sun's signature again supports Real Action's

12   position that PepperBall Technologies filed the 2009 Declaration, not PepperBall Technologies-

13   CA.

14        It is undisputed that PepperBall Technologies-CA owned the PepperBall mark at that time,

15   but there is no evidence that PepperBall Technologies-CA filed the Declaration.  In sum, nothing

16   in the record would allow a reasonable jury to find the true owner of the PepperBall mark filed the

17   2009 Declaration as required by 15 U.S.C. § 1058.  Even if PepperBall Technologies-CA was a

18   subsidiary of and solely did business as PepperBall Technologies, Inc., Real Action's evidence

19   indicates PepperBall Technologies and PepperBall Technologies-CA are separate corporations,

20   and Counter-Defendants do not offer facts to the contrary.  The 2009 Declaration lists "PepperBall

21   Technologies, Inc." as the owner and does not state it is a dba for PepperBall Technologies-CA.

22   *See* 2009 Section 8 Decl.  Conrad Sun, the undisputed COO of PepperBall Technologies, signed

23   the Declaration; however, Counter-Defendants offer no evidence that Sun was also acting on

24   behalf of PepperBall Technologies-CA.  Counter-Defendants' assertion that PepperBall

25   Technologies-CA filed the 2009 Declaration is unsupported.

26        2.    Effect of Declaration of Incontestability

27        Having found no evidence that the owner of the PepperBall mark, PepperBall

28   Technologies-CA, filed the 2009 Declaration, the fact remains that the USPTO "accepted and

United States District Court
Northern District of California

23

United States District Court
Northern District of California

1   acknowledged" the Declaration and stated "[t]he registration remains in force." Glaspy Decl., Ex.

2   66. The central question presented is thus what impact the USPTO's acceptance of the

3   Declaration has on the issue of whether the PepperBall trademark lapsed.

4           The Lanham Act provides that "the right of the owner to use such registered mark in

5   commerce for the goods or services on or in connection with which such registered mark has been

6   in continuous use for five consecutive years subsequent to the date of such registration and is still

7   in use in commerce, shall be incontestable." 15 U.S.C. § 1065. Once a registered mark is

8   determined to be incontestable, "the registration shall be conclusive evidence of the validity of the

9   registered mark and of the registration of the mark, of the registrant's ownership of the mark, and

10  of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b).

11  But "the label of 'incontestability' is rather misdescriptive. [] An incontestable registration is still

12  subject to certain defenses or defects, set forth in 15 U.S.C. § 1115, and . . . does not apply to a

13  mark that is generic." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596,

14  603 (9th Cir. 2005) (citation omitted); *see also* 15 U.S.C. § 1115.

15          Counter-Defendants argue that even if the 2009 Declaration does not list the true owner of

16  the PepperBall mark, the USPTO's acceptance of the Declaration means the mark is incontestable

17  and Real Action cannot challenge it. UTS Reply at 19-24; *see* Glaspy Decl., Ex. 66. They assert

18  "[t]he law is clear that, where the USPTO accepts a Section 8 declaration and does not issue a

19  deficiency notice, a third party cannot unwind that determination because of a technical defect,

20  including a technical defect in the listed name of the owner." UTS Reply at 19-20. Real Action

21  maintains, however, that even if the mark is incontestable, Real Action may still challenge it on

22  the ground that the PepperBall trademark is generic.[9] RAP Reply at 13. Real Action does not

23  ─────────────────────────

24  [9] In its Opposition and Cross Motion, Real Action argues "pepperball" is a generic term that
    cannot serve as a trademark and the trademark is invalid. RAP Mot. at 33-37. Genericness is a
25  ground under which a party may seek cancellation of a registered trademark. 15 U.S.C. § 1065(3).
    However, the trademark's validity falls outside the scope of the limited issues the parties agreed to
26  address in their Motions. *See* Settlement Minutes. The Court disagrees with Real Action's
    assertion that "the agreement and stipulation only addressed what was required to be addressed in
27  the motions, not what could not be addressed." RAP Reply at 14 (emphasis in original). Had Real
    Action wished to address genericness, it should have raised the issue during discussions over the
28  cross motions for summary judgment. Moreover, Counter-Defendants argue that "[a]t the time the
    parties entered into the agreement, Defendants did not provide any indication or suggestion that

United States District Court
Northern District of California

1    seek to invalidate the PepperBall mark on the grounds set forth in § 1115.

2          Counter-Defendants argue the failure to identify PepperBall Technologies-CA as the

3    owner is a mere "technical defect." *See* UTS Reply at 19-23.  The Court disagrees.  "The history

4    of Section 8 supports the view that compliance with the statutory requirements is mandatory." *In*

5    *re Mother Tucker's Food Experience (Canada) Inc.*, 925 F.2d 1402, 1405 (Fed. Cir. 1991).

6    Where the statute sets forth a specific requirement, courts have held that the failure to comply with

7    that requirement is not a technical defect that can be corrected. *See, e.g.*, *Precious Diamonds*, 635

8    F.2d at 847 ("The failure of the registrant to file a declaration within the statutory period is not a

9    'minor technical defect.'  Whereas the submission of a specimen label . . . is not a statutory

10   requirement, the timely submission by the registrant of a declaration or affidavit is.").  The

11   Lanham Act requires that "owner of the registration" to submit a declaration of use.  15 U.S.C. §

12   1058(a).  Because this is a statutory requirement, the Court cannot find that PepperBall

13   Technologies-CA's failure to file the Section 8 Declaration is a technical violation.  *See Re:*

14   *Trademark Registration of Ace III Commc'ns, Inc.*, 62 U.S.P.Q.2d 1049 (T.T.A.B. Dec. 6, 2001)

15   ("[T]he requirement that an affidavit or declaration under 15 U.S.C. §1058 be filed in the name of

16   the owner is a statutory requirement that the [USPTO] does not have the authority to waive for any

17   reason.").

18          Despite this violation, the USPTO nevertheless accepted the 2009 Declaration.[10]  "Once

19

20   ────────────────────────────────

21   genericide be included in these cross motions. Discovery on that issue has not closed, and it has
     not been the subject of the exchanges for the present motion."  UTS Reply at 31.

22          Real Action offers no argument as to why the Court should consider genericness in
     determining whether the trademark lapsed prior to its transfer to ATO, or why it should consider it
23   with regard to the incontestable status of the mark.  The Court therefore STRIKES Real Action's
     arguments regarding the allegedly generic nature of term "pepperball."
24   [10] It is unclear whether the USPTO would have reason to believe the 2009 Declaration did not list
     the PepperBall mark's true owner.  Counter-Defendants present evidence that Jaycor Tactical filed
25   with the USPTO a change of name to PepperBall Technologies in 2002.  *See* Gibson Decl., Ex. 7.
     But there is no evidence the USPTO would have known of PepperBall Technologies-CA's
26   formation or of the transfer of the mark's ownership to PepperBall Technologies-CA, such that it
     would have recognized a discrepancy in its records and the 2009 Declaration.  As it stands, it
27   appears the 2009 Declaration would have reflected the USPTO's records—i.e., that PepperBall
     Technologies owned the mark—and would not have caused the USPTO to question the
28   Declaration's listed owner.

                                              25

United States District Court
Northern District of California

1  the Patent Office accepts these [Section 8] affidavits [or declarations] . . . , the marks are

2  conclusively presumed valid and are subject only to the seven narrow defenses set forth in section

3  33(b) of the Lanham Act, 15 U.S.C.A. § 1115(b), and to the grounds for cancellation recited in

4  sections 14(c) and (e), 15 U.S.C.A. § 1064(c), (e)." *Miss Universe, Inc. v. Miss Teen U.S.A., Inc.*,

5  1980 WL 30268, at *3 (N.D. Ga. Mar. 25, 1980).  Real Action does not address how the USPTO's

6  determination of incontestable status is affected by the fact that such determination is based on the

7  acceptance of a Section 8 Declaration that does not list the registered trademark's true owner, nor

8  does it offer case law on that point.[11]  At this point, the Court has no reason not to accept the

9  USPTO's acceptance of the 2009 Declaration and its finding of incontestability.

10         Based on the present record and in light of the USPTO's acceptance of the 2009

11  Declaration, a reasonable jury could not find the PepperBall mark lapsed at this point.

12         3.      The 2013 Section 8 Declaration and Section 9 Application for Renewal

13         Real Action also challenges the 2013 Combined Declaration of Use and Application of

14  Renewal of Registration (the "combined filing"), which ATO filed on October 30, 2013.  RAP

15  Mot. at 28-33; *see* Gibson Decl., Ex. 35.  The USPTO initially rejected the Section 8 portion of the

16  combined filing: on November 4, 2013, it issued an office action stating "[o]ffice records do not

17  show clear chain of title to the registration in the party who filed the Section 8 Affidavit."  Gibson

18  Decl., Ex. 36 at ECF p.2.  Specifically, "[o]ffice records show clear chain of title to the

19  registration in PEPPERBALL TECHNOLOGIES, INC.  However, the party who filed the Section

20  8 Affidavit is identified as ADVANCED TACTICAL ORDINANCE SYSTEMS, LLC." *Id.*  The

21  office action required that "[t]he party who filed the Section 8 Affidavit must establish its current

22  ownership of the registration" and set a deadline of six months from the issuance action for it to do

23  so. *Id.* at ECF pp.2-3.  That same day, ATO responded with a declaration explaining that

24          the Office records do show a clear chain of title ending with
25          Advanced Tactical Ordinance Systems, LLC, the party who signed
        the Section 8 Affidavit.  Recorded at Reel/Frame Nos. 4913/0484 is
26          the Nunc Pro Tunc Assignment [the "Assignment"] from Advanced
        Tactical Ordinance Systems, LLC, as the secured creditor of

27

28  _____
[11] It would seem the USPTO, rather than the Court, is in a better position to determine what recourse a challenger has to a trademark registration under these circumstances.

1    Pepperball Technologies, Inc. authorized to sell the assets of
     Pepperball Technologies, Inc. in a foreclosure sale, to Advanced
2    Tactical Ordinance Systems, LLC, as the assignee that acquired title
     to all assets at the foreclosure sale. This document was accepted by
3    the Office as sufficient when it was filed on December 5, 2012, as is
     reflected by the fact that the Office records do show Advanced
4    Tactical Ordinance Systems, LLC as the Registrant (as is confirmed
     by the fact that the Post Registration Office Action issued to
5    Advanced Tactical Ordinance Systems, LLC, not to Pepperball
     Technologies, Inc.).

6    *Id.*, Ex. 37 at ECF p.2.   The USPTO accepted the Section 8 Declaration on November 13, 2013.

7    *Id.*, Ex. 38.

8         Real Action argues ATO's response to the office action "did not refer to Pepperball

9    Technologies-CA, Inc. by name and does not use the term 'subsidiary' at all.  Instead, the

10   Response merely mentions the Nunc Pro Tunc Assignment which was filed with the USPTO

11   Assignment Branch in 2013[.]"  RAP Mot. at 31.  As a result, Real Action contends "ATO did not

12   establish how Pepperball Technologies-CA, Inc. obtained ownership of the registration before

13   ATO claimed to have acquired it."  RAP Mot. at 31.

14        Real Action's argument suffers from the same defect as its arguments regarding the 2009

15   Declaration: it ignores the fact that the USPTO accepted ATO's explanation and the Section 8

16   Declaration.  Real Action also does not address how that acceptance affects the PepperBall mark's

17   becoming incontestable under § 1065 if such acceptance was predicated on a faulty declaration.

18   To that end, Real Action once again does not challenge the mark's incontestable status on one of

19   the grounds listed in § 1115.

20        Counter-Defendants point out that the Assignment explicitly refers to PepperBall

21   Technologies-CA:

22        Advanced Tactical Ordnance Systems, LLC . . . herby sells,
          transfer[s], assigns and conveys to Advanced Tactical Ordnance
23        Systems, LLC *nunc pro tunc* as of January 9, 2012, all right, title
          and interest in and to the following property owned by PepperBall
24        Technologies, Inc. and PepperBall Technologies-CA, Inc. . . .: (i) all
          trademarks    and    patents,    including    registrations    for    the
25        PEPPERBALL trademark (U.S. Registration Nos. 27160625 and
          2651052)[.]
26

27   Gibson Decl., Ex. 30 at EFC p.4.  Real Action does not address the Assignment's mention of

28   PepperBall Technologies-CA in its Reply.  The Court notes, however, the Assignment does not

specify whether the PepperBall trademark was the property of PepperBall Technologies or

PepperBall Technologies-CA.  The USPTO could have conceivably interpreted the Assignment to

read that PepperBall Technologies owned the PepperBall trademark, not PepperBall

Technologies-CA.

Nevertheless, it is inescapable that the USPTO accepted ATO's explanation and reference

to the Assignment as sufficient to establish ownership of title.  As a result, the PepperBall mark

became incontestable under § 1065, and Real Action provides no evidence that challenges the

mark's incontestability under one of the grounds set forth in § 1115.  A reasonable finder of fact

thus could not conclude that the PepperBall mark lapsed in 2013.

4.    Summary

Accordingly, the Court GRANTS Counter-Defendants' Motion for Summary Judgment on

the issue of whether the PepperBall trademark lapsed prior to its transfer and DENIES Real

Action's Motion for Summary Judgment on the same issue.

**B.    Whether the PepperBall Trademark Was Validly Transferred**

Also at issue is the transfer of the PepperBall mark from PepperBall Technologies to ATO.

As noted earlier, Counter-Defendants argue ATO's predecessor, Phoenix, purchased the

PepperBall mark from PepperBall Technologies through a UCC foreclosure sale.

Real Action challenges the validity of the UCC sale on two grounds: (1) the Simpson

Loans did not give their respective lenders a security interest in PepperBall Technologies-CA's

assets, including the PepperBall mark; and (2) PepperBall Technologies' secured creditors were

not notified of the sale.  RAP Mot. at 43-44.

1.    Amendment of the Simpson Loans

Real Action argues the Amendments to the Simpson Loans were not executed, and thus the

Lenders never obtained a secured interest in PepperBall Technologies-CA's assets.  RAP Mot. at

43.  The Second Amendments to the Simpson Loans state that

> The intent of the parties when entering into the Original Agreement
> and the First Amendment was that PTI-CA would be a co-borrower
> of the loan evidenced by the Agreement (the "Credit []Facility") and
> co-obligor of all obligations of PTI set forth herein, and that PTI-CA
> would grant a security interests in its assets to secure repayment of

United States District Court
Northern District of California

1

> the Credit Facility. By mutual error of all the parties hereto, PTI-
> CA was not made a party to the Original Agreement or the First
> Amendment.

2

3  Gibson Decl., Ex. 10 ¶ B; *id.*, Ex. 12 ¶ B. As such, the Second Amendments added PepperBall

4  Technologies-CA

5

> with full effect from January 15, 2010, as a co-borrower under the
> Credit Facility and a co-obligor of all obligations of [PepperBall
> Technologies] under the Agreement. [] Without in any manner
> limiting the foregoing, (a) the grant of security interest set forth in
> Section 2 of the Original Agreement shall be deemed for all
> purposes a grant of a security interest by PTI-CA in its personal
> property as described in said Section 2[.]

6

7

8

9  Gibson Decl., Ex. 10 ¶ 2; *id.*, Ex. 12 ¶ 2.

10       Real Action argues that while PepperBall Technologies and PepperBall Technologies-CA

11  signed the Second Amendments, the Lenders did not. *See id.*, Ex. 10 at 3; *id.*, Ex. 12 at 3. As

12  such, Real Action contends the parties never executed Second Amendments and the lenders did

13  not obtain an interest in the PepperBall mark. RAP Mot. at 43. Real Action also argues the

14  Second Amendments are deficient because PepperBall Technologies' and PepperBall

15  Technologies-CA's chairman signed them, not the corporations' president as required by their

16  corporate resolutions. *Id.* at 44 (citing Gibson Decl., Ex. 13).

17       In response, Counter-Defendants submit copies of the Second Amendments that bear

18  signatures on behalf of PepperBall Technologies, PepperBall Technologies-CA, and the Lenders.

19  Simpson Decl., Exs. 2-3. Counter-Defendants also offer the Simpson Declaration, in which James

20  Simpson, principal of the James Simpson Foundation and the J.A. & G.L. Simpson Trust states

21  "[t]he Second Amendments to the loans of both the Simpson Foundation and the Simpson Trust

22  were fully executed by all parties thereto, including the Simpson Entitites [sic]." Simpson Decl. ¶

23  6. Real Action offers no evidence to contradict Simpson's declaration or other facts that indicate

24  the Second Amendments were not executed.

25       Counter-Defendants also argue Real Action's argument concerning the ostensible

26  requirement that the president sign the Second Amendments "misrepresents the contents of the

27  Pepperball-CA corporate resolution, which does not require that the Second Amendment be

28  executed by the President." UTS Reply at 12. Instead, the resolution provides that "the execution,

delivery and performance by [PepperBall Technologies-CA] of the Second Amendments in substantially the forms reviewed by this Board of Directors are hereby authorized, approved and ratified." Gibson Decl., Ex. 13 at ECF p.3. Moreover, as Counter-Defendants note, the resolution authorizes PepperBall Technologies-CA's president "to enter into and deliver to the appropriate counterparties each of the Second Amendments on behalf of [PepperBall Technologies-CA]." *Id.* But it does not say that *only* the president has power to do so, and Real Action offers no evidence that this is in fact the case. Thus, a reasonable jury could not find that it was improper for the chairman of PepperBall Technologies and PepperBall Technologies-CA to sign the Amendments such that the Amendments were not properly executed.

> 2.   Compliance with the UCC

As there is evidence that PepperBall Technologies-CA's assets were secured against the Simpson Loans, the issue is whether there was a valid UCC foreclosure sale. If the sale did not comply with the UCC, ATO would not have validly obtained the PepperBall mark and thus could not have validly transferred it to UTS. Real Action challenges the sufficiency of the sale based on lack of notice.

The UCC provides that "[a]fter default, a secured party: (1) may take possession of the collateral; and (2) without removal, may . . . dispose of collateral on a debtor's premises under Section 9-610." UCC § 9-609(a). Section 9-610 in turn allows a secured party to "sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." UCC § 9-610(a).

Intellectual property may transfer from one owner to another in a UCC foreclosure sale. *Sky Technologies LLC v. SAP AG*, which concerned the transfer of patents at a foreclosure sale, is analogous. 576 F.3d 1374 (Fed. Cir. 2009). The plaintiff, Sky Technologies LLC ("Sky"), acquired a patent through an assignment by XACP, a corporation that purchased the patents at a foreclosure sale. *Id.* at 1378. Sky Technologies thereafter filed a patent infringement suit against SAP, which sought to dismiss the action for lack of standing. *Id.* The district court held that because XACP had complied with the state law UCC foreclosure requirements—including providing notice— title had transferred on the date of the foreclosure sale. *Id.* Thus, when XACP

1   purchased the patents and thereafter assigned them to Sky, Sky "became vested with all rights,

2   title, and interest in the patents.  Thus, the chain-of-title had not been broken . . . , and Sky was

3   declared the proper title-holder of the patents-in-suit, giving Sky standing to bring the patent

4   infringement suit."  *Id.*  The Federal Circuit agreed: "[t]he Federal Patent Act requires that all

5   assignments of patent interest be in writing."  *Id.* at 1379 (citing 35 U.S.C. § 261).  "However,

6   assignment is not the only method by which to transfer patent ownership. . . . [F]oreclosure under

7   state law may transfer patent ownership."  *Id.* at 1380.  Because "XACP's foreclosure on its

8   security interest was in accordance with [state] law; therefore, Sky received full title and

9   ownership of the patents from XACP providing it with standing in the underlying case."  *Id.* at

10  1380.

11          Like the Patent Act, the Lanham Act requires that "[a]ssignments shall be by instruments

12  in writing duly executed."  15 U.S.C. § 1060(a)(3).  But several courts have held that trademark

13  rights may be transferred in a foreclosure sale.  *See, e.g.*, *Great Lakes Transp. Holding, LLC v.*

14  *Yellow Cab Serv. Corp. of Fl.*, 2012 WL 4813785, at *4 (E.D. Mich. Oct. 10, 2012) (finding

15  genuine dispute of material fact regarding issue of consent to use marks where "[p]laintiff's

16  purchase of the Michigan companies at the foreclosure sale included any rights the companies had

17  to enforce the . . . marks" but also "defendant['s] . . . purchase of the Florida companies through

18  the judicial foreclosure included any rights the Florida companies had acquired in the marks");

19  *John C. Flood of Va., Inc. v. John C. Flood, Inc.*, 700 F. Supp. 2d 90, 95 (D.D.C. 2010) ("The

20  company's trademark and associated goodwill are valuable assets that become part of the

21  bankruptcy estate and can be validly sold, assigned, or transferred by the estate.").

22          Real Action does not dispute that a UCC foreclosure sale can result in the transfer of

23  assets, but instead "argues that *in this case*, no common law or Federal rights to the term

24  Pepperball were transferred, or were even available to have been transferred."  RAP Reply at 5

25  (emphasis in original).  Real Action does not contest that Phoenix had the right to foreclose on

26  PepperBall Technologies' assets; it focuses on the sufficiency of the notice and argues that not all

27  of PepperBall Technologies' and/or PepperBall Technologies-CA's secured creditors were

28  notified of the foreclosure sale.  RAP Mot. at 44-45; RAP Reply at 7.

1    Counter-Defendants offer evidence of the notice provided, including notices placed in the

2    San Diego Daily Transcript on December 30, 2011 and January 6, 2012.  *See* Gibson Decl. ¶ 51 &

3    Exs. 23-24 (copies of public notices dated December 30, 2011 and January 6, 2012).  It is less

4    clear whether the secured creditors received notice beyond those published in the San Diego Daily

5    Transcript.  Gary Gibson declares that "[n]otice of the public sale of the assets of PTI and its

6    subsidiary was given to every known secured creditor of PTI and/or PTI-CA."  *Id.* ¶ 55.  James

7    Drake, counsel for Phoenix, also states that "[n]otice of the foreclosure sale was sent to all known

8    secured creditors of PTI and/or PTI-CA."  Drake Decl. ¶ 6, Dkt. No. 310.  But Counter-

9    Defendants do not offer facts to support Gibson's and Drake's statements, and "conclusory

10   allegations, unsupported by facts, are insufficient to survive a motion for summary

11   judgment."  *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1116 (9th Cir. 2003) (citing

12   *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)).  Counter-Defendants do not, for instance,

13   provide proof of mailing of notice or other evidence that PepperBall Technologies' and/or

14   PepperBall Technologies-CA's secured creditors received notice.  At best, they offer "a January 9,

15   2012 email that [Gibson] received which was written by the CEO of PTI, John Stiska, explaining

16   the sale[.]"  Gibson Decl. ¶ 53 & Ex. 26.  This email does not indicate to which secured creditors

17   it was sent: this particular email was sent to Gibson and is simply addressed "To PepperBall

18   Secured Note holders."  *See id.*, Ex. 26.  Nor is the fact that "[i]n the more than five years since

19   that sale took place no secured creditor of PTI has ever come forward to challenge the sale on the

20   basis of lack of notice" (Gibson Decl. ¶ 58) dispositive, as lack of a complaint from a creditor is

21   hardly definitive proof that the creditor received notice.  Therefore, the Court DENIES Counter-

22   Defendants' Motion as to the issue of whether the PepperBall mark was validly transferred.

23   But Real Action also fails to offer facts showing PepperBall Technologies' secured

24   creditors did not receive notice of the sale.  Real Action relies on the Declaration of Conrad Sun

25   ("Sun Declaration") that was submitted in the Indiana Action.[12]  *See* RAP Mot. at 45; Glaspy

26   Decl., Ex. 24.  In his Declaration, Sun stated that

27

28   _____

[12] While the Court has judicially noticed this document, it does so only for its existence and not the truth of the matters stated therein.

United States District Court
Northern District of California

1

2

3

4

5

> Phoenix/ATO did not notify all of PTI's secured creditors of the proposed sale. The secured creditors Phoenix/ATO claims to have notified are listed in the "transcript of the foreclosure sale[.]" As just two examples, the list of notified secured creditors does not list Primary Funding Corporation or Scott & Goldman, Inc., both of whom were secured creditors of PTI who had filed notices of their security interest with the California Secretary of State before Phoenix/ATO's purported foreclosure sale."

6  Glaspy Decl., Ex. 24 ¶ 12. Counter-Defendants argue the Sun Declaration lacks foundation. UTS

7  Reply at 6. Indeed, Sun does not state how he knows Primary Funding Corporation and Scott &

8  Goldman, Inc. did not receive notice. *See* Glaspy Decl., Ex. 24. Moreover, Counter-Defendants

9  offer Sun's deposition testimony, in which Sun states that he "was really never involved in the

10  foreclosure process." Glaspy Reply Decl., Ex. 68:17-20, Dkt. No. 320. Phoenix counsel James

11  Drake confirms that "Conrad Sun was not involved in the process of the foreclosure sale in general

12  or in the process of giving notice of the foreclosure sale to the secured creditors of PTI and/or PTI-

13  CA." Drake Decl. ¶ 5. Real Action offers no other facts to establish the necessary secured

14  creditors received notice. As such, Real Action fails to meet its burden at summary judgment, and

15  the Court DENIES its Motion.

16  **CONCLUSION**

17  Based on the analysis above, the Court hereby **GRANTS** Counter-Defendants' Motion and

18  **DENIES** Real Action's Motion as to the issue of whether the PepperBall mark lapsed prior to

19  transfer. The Court also **DENIES** both Counter-Defendants' Motion and Real Action's Motion on

20  the issue of whether the PepperBall mark was validly transferred.

21  The parties are scheduled to attend a settlement conference before Judge Spero. The

22  parties shall contact his chambers regarding any scheduling concerns.

23  **IT IS SO ORDERED.**

24

25  Dated: February 23, 2017

26  _____

27  MARIA-ELENA JAMES
United States Magistrate Judge

28

United States District Court
Northern District of California